[No. S040653. Apr. 9, 1996.]

EVELYN SMITH, Petitioner, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Respondent;
KENNETH C. PHILLIPS et al., Real Parties in Interest.

1144

**COUNSEL**

Jordan W. Lorence, Cimron Campbell, Jane E. Hadro, Wendell R. Bird, Mark N. Troobnick and Jay Alan Sekulow for Petitioner.

Loy Watkins, John G. Tulio, Alan J. Reinach, Boothby & Yingst, Lee Boothby, Oliver Thomas, Marc D. Stern, Jaffe, Trutanich, Scatena & Blum, Fred Blum, Proskauer, Rose, Getz & Mendelsohn, Jeffrey A. Berman,

Steven G. Drapkin and Lee W. Rierson as Amici Curiae on behalf of Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Carole R. Kornblum, Assistant Attorney General, Manuel M. Medeiros, Louis Verdugo, Jr., Kathleen W. Mikkelson, Deputy Attorneys General, Steven C. Owyang, Prudence Kay Poppink, Eisen & Johnston Law Corporation, Jay-Allen Eisen, Marian M. Johnston and Ann Perrin Farina for Respondent.

Arlo Smith, District Attorney (San Francisco), David C. Moon, Assistant District Attorney, Steven K. Green, Edward Tabash, John Beattie, Greenberg, Glusker, Fields, Claman & Machtinger and Roger L. Funk as Amici Curiae on behalf of Respondent.

David Link and Thomas F. Coleman for Real Parties in Interest.

James K. Hahn, City Attorney (Los Angeles), Charles I. Goldenberg, Assistant City Attorney, and Maria Perez Manning, Deputy City Attorney, as Amici Curiae on behalf of Real Parties in Interest.

Marsha Jones Moutrie, City Attorney (Santa Monica), Joseph Lawrence, Assistant City Attorney, Martin T. Tachiki, Barry A. Rosenbaum and Kimery A. Shelton, Deputy City Attorneys, Jon W. Davidson, Carol A. Sobel, Paul L. Hoffman, Mark D. Rosenbaum, Matthew A. Coles, Margaret C. Crosby, Tzivia Schwartz, Barbara H. Bergen, Margalynne Armstrong, James D. Smith, Ameila A. Craig, Wilson, Sonsini, Goodrich & Rosati and Clyde J. Wadsworth as Amici Curiae on behalf of Respondent and Real Parties in Interest.

## OPINION

**WERDEGAR, J.**—The California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA) declares it to be "unlawful [¶] . . . [f]or the owner of any housing accommodation to discriminate against any person because of the . . . marital status . . . of that person" (*id.*, § 12955, subd. (a)). The Fair Employment and Housing Commission (commission) ruled that a landlord violated the statute by refusing to rent an apartment to an unmarried couple. The Court of Appeal reversed, believing the state may not constitutionally apply FEHA to a landlord whose religious beliefs make it sinful to rent to an unmarried couple. We reverse the decision of the Court of Appeal.

## I. Facts

The relevant facts set out below are as found by the commission in its final decision.

"Respondent [Evelyn Smith] owns and leases four rental units located [in two duplexes] at 675, 677, 683 and 685 Eastwood Avenue, Chico, California. They are operated exclusively for business and commercial purposes, with income generated from the rentals reported as business income. The business is not organized or classified as a religious, charitable or other nonprofit concern. Respondent does not reside in any of the four units and visits the units occasionally to maintain them.

"When a vacancy occurs in one of the units, the unit is advertised for rent in local newspapers and is otherwise available to the general public. When prospective tenants inquire about a vacant unit, respondent tells them she prefers married couples. She prefers married couples because, for religious reasons, she opposes sex outside of marriage. However, since she has received so many calls from unmarried couples seeking to rent her units, she simply tells prospective tenants that she prefers to rent to married couples.

"Respondent is a Christian. She is a member of Bidwell Presbyterian Church in Chico and has attended there for approximately 25 years. Respondent believes that sex outside of marriage is sinful, and that it is a sin for her to rent her units to people who will engage in nonmarital sex on her property. Respondent believes that God will judge her if she permits people to engage in sex outside of marriage in her rental units and that if she does so, she will be prevented from meeting her deceased husband in the hereafter.

"Respondent has rented her units to single, divorced and widowed persons. Respondent has no religious objection to renting to people who are single, divorced, widowed or married. Respondent would not rent to anyone who engages in sex outside of marriage, whether they are single, divorced, widowed or married. Respondent rents her units to people without regard to their race, color, national origin, ancestry, or physical handicap. Respondent rents her units without regard to the religious beliefs of tenants. She does not know the religious background of most of her tenants because she never asks them and only knows if they volunteer the information. Respondent has rented her units to males and females and does not discriminate on the basis of sex.

"From on or about March 29, 1987, to April 13, 1987, respondent advertised the availability of one of her units in the Chico *Enterprise Record.*

Complainants [real parties in interest Gail Randall and Kenneth Phillips] saw the advertisement on April 1, 1987, and drove by the unit that night. Because of the particular location, attractive architecture, convenient location and well maintained premises, complainants took a special interest in the unit and the next morning called respondent and arranged to see it. During this telephone conversation respondent stated that she preferred to rent to married couples.

"On or about April 2, 1987, complainants met with respondent and were shown the premises, which they liked very much. Respondent told complainants that she would not rent to unmarried couples, and she asked complainants how long they had been married. Complainant Phillips falsely represented to respondent that he and complainant Randall were married. Complainants made no commitment to rent at that time and filled out an informal application for respondent. Complainant Randall signed her name, 'Gail Phillips' on that document.

"Later, complainants called respondent and told respondent they were interested in renting the unit. They met with respondent on or about April 7, 1987. A lease agreement was executed between the parties on that date for the unit located at 677 Eastwood Avenue. It was for a month-to-month tenancy commencing May 1, 1987 at a rent of $325 per month. Complainants also paid respondent a security deposit of $150 for which a receipt was given. Complainant Randall signed the lease agreement, 'Gail Phillips'. During this meeting respondent told complainants again that she would not rent to unmarried couples.

"Later in the day on April 7, 1987, complainant Randall called respondent and asked if respondent doubted that Randall and Phillips were married. Randall asked respondent if she wanted to see their marriage license. Respondent said, 'No.' Still later on the same day, complainant Phillips called respondent and told her that he and Randall were not married. Respondent told him that she could not rent to an unmarried cohabiting couple because that would violate her religious beliefs. Respondent said that she would return their deposit. She sent them a check for $150."

Randall and Phillips filed separate complaints against Smith with the commission. Based on the complaints, the commission issued two accusations. As subsequently amended, the accusations alleged Smith had violated Government Code section 12955, subdivisions (a), (b), (c) and (d),[1] Civil

---

[1] Government Code section 12955 provides in relevant part:
"It shall be unlawful:

Code section 51 (the Unruh Civil Rights Act),[2] and Government Code section 12948.[3]

A hearing before an administrative law judge ensued. Smith defended the accusations on two grounds that are relevant here: first, the relevant provisions of FEHA (Gov. Code, § 12955, subd. (a)) and the Unruh Civil Rights Act (Civ. Code, § 51) do not prohibit discrimination against unmarried couples; second, to require her to rent to an unmarried couple over her religious objections would violate the free exercise clauses of the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4.) The judge rejected both arguments and issued a proposed decision in favor of Randall and Phillips.

The commission subsequently exercised its power not to adopt the proposed decision and to hear the case itself on the existing record. (Gov. Code, § 11517, subd. (c).) After additional briefing, the commission issued its decision in favor of Randall and Phillips. In its decision, the commission found that Smith had violated Government Code sections 12955, subdivisions (a) and (d), Civil Code section 51, and Government Code section 12948. More particularly, the commission decided that FEHA's prohibition of discrimination based on "marital status" did encompass discrimination against unmarried couples, and that the Unruh Civil Rights Act prohibited all forms of arbitrary discrimination by business establishments, including discrimination against unmarried couples. The commission concluded it had no

"(a) For the owner of any housing accommodation to discriminate against any person because of the race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability of that person.

"(b) For the owner of any housing accommodation to make or to cause to be made any written or oral inquiry concerning the race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability of any person seeking to purchase, rent or lease any housing accommodation.

"(c) For any person to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a housing accommodation that indicates any preference, limitation, or discrimination based on race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability or an intention to make any such preference, limitation, or discrimination.

"(d) For any person subject to the provisions of Section 51 of the Civil Code, as that section applies to housing accommodations, to discriminate against any person on the basis of sex, color, race, religion, ancestry, national origin, familial status, marital status, disability, or on any other basis prohibited by that section."

[2] As relevant here, the Unruh Civil Rights Act provides: "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

[3] Government Code section 12948 provides: "It shall be an unlawful practice under this part [i.e., FEHA] to deny or to aid, incite, or conspire in the denial of the rights created by Section 51 or 51.7 of the Civil Code."

power to address Smith's constitutional arguments in view of article III, section 3.5, of the California Constitution.[4] As relief, the commission ordered Smith to cease and desist from discriminating on the basis of marital status; to post and give to prospective tenants various notices setting out the provisions of FEHA, the outcome of this case, and the statement that Smith practices equal housing opportunity; and to pay Randall and Phillips a total of $454 in compensatory damages and $500 in damages for emotional distress.[5] The commission dismissed the remaining claims as untimely.

Smith sought review of the commission's decision by petition for writ of mandate. (See Code Civ. Proc., § 1094.5.) The Court of Appeal reversed. The court held the state could not prevent Smith from discriminating against unmarried couples, in view of the free exercise clauses of the federal and state Constitutions (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4) and the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb et seq.). The court also concluded that Smith's inquiry into her tenants' marital status did not violate their right to privacy under the state Constitution. (Cal. Const., art. I, § 1.)[6] The court did not address Smith's argument that FEHA (Gov. Code, § 12955, subd. (a)) and the Unruh Civil Rights Act (Civ. Code, § 51; see also Gov. Code, § 12948) do not prohibit discrimination against unmarried couples.

We granted review.

## II. Discussion

### A. *Does FEHA Prohibit Housing Discrimination Against Unmarried Couples?*

In FEHA, the Legislature declared it "unlawful [¶] . . . [f]or the owner of any housing accommodation to discriminate against any person because of

---

[4]California Constitution, article III, section 3.5, provides in relevant part: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power: [¶] (a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional . . . ."

[5]We subsequently held the commission had no power to award damages for emotional distress. (*Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 265 [284 Cal.Rptr. 718, 814 P.2d 704].) Accordingly, this portion of the commission's award must be vacated.

[6]In this court, rather than asserting distinct claims under the state Constitution's privacy clause (Cal. Const., art. I, § 1), Randall, Phillips, and the commission argue that the right to privacy is one of several compelling interests, embodied in FEHA, that justify the law's application to Smith over her religious objections. (See *post*, fn. 21.) Our conclusion makes it unnecessary to address the argument.

the . . . marital status . . . of that person" (Gov. Code, § 12955, subd. (a)) or "to cause to be made any written or oral inquiry concerning the . . . marital status . . . of any person seeking to . . . rent or lease any housing accommodation" (*id.*, subd. (b)). The commission found Smith violated FEHA by refusing to rent to Randall and Phillips upon learning they were not married.

Smith argues "the statutory ban on marital status discrimination does not include [unmarried] cohabiting couples."

The argument lacks merit. To determine what a statute means, "we first consult the words themselves, giving them their usual and ordinary meaning." (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) The usual and ordinary meaning of the words "marital status," as applied to two prospective tenants,[7] is that a landlord may not ask them whether they are married or refuse to rent to them because they are, or are not. Smith asked whether Randall and Phillips were married and refused to rent to them because they were not. The conclusion that she thereby violated FEHA seems unavoidable.[8]

Various amici curiae argue that Smith's refusal to rent to Randall and Phillips does not violate FEHA because it was based on Smith's assumptions about their sexual conduct rather than their marital status. The high courts of Alaska and Massachusetts recently rejected similar arguments. (*Swanner* v. *Anchorage Equal Rights Com'n* (Alaska 1994) 874 P.2d 274, 278, fn. 4 [874 P.2d 274] [interpreting Alaska Stat. § 18.80.240]; *Attorney General* v. *Desilets* (1994) 418 Mass. 316, 320 [636 N.E.2d 233, 235] [interpreting Mass. Gen. Laws Ann. ch. 151B, § 4(6)].) Interpreting a statute analogous to FEHA, the court in *Swanner, supra,* explained its conclusion in this way: a landlord "cannot reasonably claim that he does not rent or show property to cohabiting couples based on their conduct (living together outside of marriage) and not their marital status when their marital status (unmarried) is what makes their conduct immoral in his opinion." (*Swanner* v. *Anchorage Equal Rights Com'n, supra,* 874 P.2d at p. 278, fn. 4.) The opinion of the

---

[7]As used in FEHA, the term " '[p]erson' includes one or more individuals . . . ." (Gov. Code, § 12925, subd. (d).)

[8]There are two exceptions to Government Code section 12955 that might conceivably relate to a case such as this. FEHA does not forbid a property owner to refuse "to rent or lease a portion of an owner-occupied single-family house to a person as a roomer or boarder living within the household . . . ." (Gov. Code, § 12927, subd. (c)(2)(A).) Nor does FEHA prohibit "a religious organization . . . from limiting the sale, rental, or occupancy of dwellings that it owns or operates for other than a commercial purpose to persons of the same religion or from giving preference to those persons . . . ." (Gov. Code, § 12955.4.) Smith does not contend that either exception applies to her rental properties.

Supreme Judicial Court of Massachusetts in *Attorney General* v. *Desilets*, *supra*, is to the same effect.[9]

Smith argued before the commission, and various amici curiae argue here, that Government Code section 12955 can be read as protecting single, married, widowed, and divorced *individuals* rather than unmarried *couples*. However, to acknowledge the statute protects the former, as it undoubtedly does, in no way tends to show it does not also protect the latter. The statutory language banning discrimination based on "marital status" naturally carries both meanings.

Our own Legislature's use of the words "marital status" in other statutes confirms this. Where the Legislature has, in some particular context, wished to treat married and unmarried couples identically, it has chosen to convey that idea by requiring equal treatment regardless of "marital status." In Family Code section 7602, for example, the Legislature declared that "[t]he parent and child relationship extends equally to every child and to every parent, *regardless of the marital status of the parents*." (Italics added.) In Family Code section 1830, the Legislature gave jurisdiction to the family conciliation court over child custody controversies "between parents *regardless of their marital status* . . . ." (Italics added.) In Probate Code section 6450, subdivision (a), the Legislature declared, for purposes of determining intestate succession, that "[t]he relationship of parent and child exists between a person and the person's natural parents, *regardless of the marital status* of the natural parents." (Italics added.)

The commission has interpreted Government Code section 12955 to protect unmarried couples since 1980, when FEHA was enacted. (See *Dept. of Fair Empl. & Hous.* v. *Smith* (1989) FEHC Dec. No. 89-11, at pp. 5-6, revd. on other grounds *Smith* v. *Fair Employment & Housing Com.*■ (Cal.App.); *Dept. of Fair Empl. & Hous.* v. *Donahue* (1989) FEHC Dec. No. 89-10, at pp. 4-5, revd. on other grounds *Donahue* v. *Fair Employment and Housing Com.*■ (Cal.App.); *Dept. of Fair Empl. & Hous.* v. *Andrews* (1984) FEHC

---

[9]"[A]nalysis of the [defendant landlords'] concerns shows that it is marital status and not sexual intercourse that lies at the heart of the defendants' objection. If married couple A wanted to cohabit in an apartment owned by the defendants, they would have no objection. If unmarried couple B wanted to cohabit in an apartment owned by the defendants, they would have great objection. *The controlling and discriminating difference between the two situations is the difference in the marital status of the two couples*." (*Attorney General* v. *Desilets, supra,* 418 Mass. at p. 320 [636 N.E.2d at p. 235], italics added.)

Dec. No. 84-14, pp. 4-5; *Dept. of Fair Empl. & Hous.* v. *Helfrich* (1981) FEHC Dec. No. 81-08, at pp. 5-6; *Dept. of Fair Empl. & Hous.* v. *Bequette* (1980) FEHC Dec. No. 80-29, pp. 3-5; *Dept. of Fair Empl. & Hous.* v. *Hess* (1980) No. 80-10, FEHC Precedential Decs. 1980-1981, CEB 3, p. 2.)

■ Final responsibility for interpreting the law rests with the courts rather than with administrative agencies. *(Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405].) Still, the commission's interpretation of FEHA is entitled to consideration because the commission is the agency charged with the statute's administration. (Gov. Code, § 12930.) It has been said the responsible agency's interpretation is entitled to "great weight" when, as here, it is substantially contemporaneous with the statute's enactment. This is because such interpretations " 'are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men [and women] who probably were active in the drafting of the statute.' " *(Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.*, *supra*, 24 Cal.2d at pp. 756-757, quoting *White* v. *Winchester Club* (1942) 315 U.S. 32, 41 [86 L.Ed. 619, 626, 62 S.Ct. 425]; see *also Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388 [241 Cal.Rptr. 67, 743 P.2d 1323].) ■ The commission first interpreted Government Code section 12955 to bar discrimination against unmarried persons less than two months after the Governor signed it into law. (See *Dept. of Fair Empl. & Hous.* v. *Bequette*, *supra*, FEHC Dec. No. 80-29, pp. 3-5 [dated Nov. 6, 1980]; Stats. 1980, ch. 992, § 2, p. 3154 [reflecting Governor's approval on Sept. 19, 1980].) ■ The weight due the responsible agency's interpretation of a statute increases when, as here, the agency's interpretation is uniform and of long standing. *(Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.*, *supra*, 24 Cal.2d at p. 757; see also *Hoyt* v. *Board of Civil Service Commrs.* (1942) 21 Cal.2d 399, 402 [132 P.2d 804]; *Los Angeles* v. *Superior Court* (1941) 17 Cal.2d 707, 712 [112 P.2d 10].)

■ Nothing in the legislative history of Government Code section 12955 contradicts the established interpretation. If the history sheds any light on the matter, it tends to support that interpretation.

The language prohibiting discrimination in housing accommodations "because of . . . marital status" derives from the Rumford Fair Housing Act of 1963 (Rumford Act) (former Health & Saf. Code, § 35720), which FEHA superseded. As originally enacted, the Rumford Act did not refer to "marital status." (Stats. 1963, ch. 1853, § 2, p. 3824.) The Legislature added those words in 1975. (Stats. 1975, ch. 1189, § 3, pp. 2943-2944.)

While the 1975 amendment was under consideration, representatives of the Attorney General's Office advised the Legislature in hearings that one of

its effects would be to override prior law (Bus. & Prof. Code, § 125.6), which the Attorney General had interpreted as permitting licensed realtors acting as property managers to select tenants "on the basis of a blood or marital relationship between the prospective occupants or a lack of such relationship . . . ." (Letter from Attorney General to Assemblyman Dixon (Aug. 26, 1974) quoted in 9 Assem. J. (1973-1974 Reg. Sess.) p. 17400.)

That the Legislature understood the 1975 amendment would protect unmarried cohabitants can also be inferred from the text of the amendment. An exception to the amendment, which continues in FEHA (Gov. Code, § 12995, subd. (a)(2)), expressly permitted "any postsecondary educational institution" to provide "housing accommodations reserved for either male or female students . . . or . . . married students . . . ." (Former Health & Saf. Code, § 35741.5, added by Stats. 1975, ch. 1189, § 6, p. 2947.) The exception had no apparent purpose unless the amendment, without the exception, would have required educational institutions to permit unmarried male and female students to live together, or prevented discrimination in favor of married students.

Soon after the Governor signed the 1975 amendment into law, the court in *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89, 99-100 [130 Cal.Rptr. 375] interpreted the amendment as "a general policy statement" making "unlawful" a public housing authority's policy of forbidding a tenant to live with persons of the opposite sex not related to the tenant by blood, marriage, or adoption. *Atkisson* was the only judicial interpretation of the statutory language barring housing discrimination because of "marital status" in 1980, when the Legislature decided to reuse the language in the new FEHA. ■ It is frequently said that "[w]hen a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute." (*People* v. *Bouzas* (1991) 53 Cal.3d 467, 475 [279 Cal.Rptr. 847, 807 P.2d 1076]; see also *Wilkoff* v. *Superior Court* (1985) 38 Cal.3d 345, 353 [211 Cal.Rptr. 742, 696 P.2d 134]; *People* v. *Hallner* (1954) 43 Cal.2d 715, 719 [277 P.2d 393]; *People* v. *Fox* (1977) 73 Cal.App.3d 178, 181 [140 Cal.Rptr. 615].)

■ The new FEHA received the same interpretation as did the old Rumford Act. In 1982, the court in *Hess* v. *Fair Employment & Housing Com.* (1982) 138 Cal.App.3d 232 [187 Cal.Rptr. 712] upheld the commission's finding that the owners of a duplex had violated Government Code section 12955 by rescinding a rental agreement with a man and a woman upon learning they were not married. The court relied on *Atkisson* v. *Kern*

*County Housing Authority, supra,* 59 Cal.App.3d 89, in holding that the language of FEHA "prohibits discrimination based on marital status, including that against unmarried couples." (*Hess* v. *Fair Employment & Housing Com., supra,* 138 Cal.App.3d at p. 235.) In the ensuing 13 years, no court has suggested the statute should be interpreted differently.

Smith gives the question of FEHA's interpretation cursory treatment in her brief. As mentioned, she takes the position Government Code section 12955 does not protect unmarried cohabitants. Her argument consists of acknowledging that the decisions in *Hess* v. *Fair Employment & Housing Com., supra,* 138 Cal.App.3d 232, and *Atkisson* v. *Kern County Housing Authority, supra,* 59 Cal.App.3d 89, are to the contrary, and citing without discussion opinions from other states interpreting differently statutes similar to FEHA. Smith does not cite other, more recent decisions contrary to her position. (*Attorney General* v. *Desilets, supra,* 418 Mass. at p. 320 [636 N.E.2d at p. 235]; *Worcester Hous. Auth.* v. *Massachusetts Comm'n Against Discrimination* (1989) 406 Mass. 244 [547 N.E.2d 43]; *Swanner* v. *Anchorage Equal Rights Com'n, supra,* 874 P.2d at p. 278; *Foreman* v. *Anchorage Equal Rights Com'n* (Alaska 1989) 779 P.2d 1199, 1201-1203.)

Some of the cases Smith cites are of little value for our purposes. The courts in Illinois, Minnesota, and Washington had the burden of reconciling statutes barring discrimination because of "marital status" with other statutes criminalizing private sexual conduct between consenting adults. (*Mister* v. *A.R.K. Partnership* (1990) 197 Ill.App.3d 105, 113-114 [143 Ill.Dec. 166, 553 N.E.2d 1152, 1157]; *State by Cooper* v. *French* (Minn. 1990) 460 N.W.2d 2, 5-6; *McFadden* v. *Elma Country Club* (1980) 26 Wn.App. 195, 201-202 [613 P.2d 146, 150].) We do not labor under the same burden.[10] In 1975, a few months before the Legislature amended the Rumford Act to prohibit housing discrimination because of "marital status," the Legislature repealed the laws criminalizing private, sexual conduct between consenting adults. (See Stats. 1975, ch. 71, § 7, p. 133; see generally Note, *California "Consenting Adults" Law: The Sex Act in Perspective* (1976) 13 San Diego L.Rev. 439.)

Smith also cites an opinion by the high court of Wisconsin, in which the court declared a county ordinance similar to FEHA "invalid to the extent that it [sought] to protect 'cohabitants' . . . ." (*County of Dane* v. *Norman*

---

[10]Were we to adopt Smith's interpretation of Government Code section 12955, however, we would need to reconcile it, if possible, with the holding that persons in this state have a constitutional right to live with others who are not related by blood, marriage, or adoption, as an aspect of the right to privacy. (*City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130-137 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219].)

(1993) 174 Wis.2d 683, 688 [497 N.W.2d 714, 716].) The court reasoned the county had no power to enact statutes "inconsistent with the public policy of [Wisconsin,] which seeks to promote the stability of marriage and family." (*Ibid.*) We have no analogous power to invalidate a state statute, such as Government Code section 12955, on nonconstitutional grounds. The argument is illogical in any event: one can recognize marriage as laudable, or even as favored, while still extending protection against housing discrimination to persons who do not enjoy that status.

An opinion by the high court of New York (*Hudson View Properties* v. *Weiss* (1983) 59 N.Y.2d 733 [463 N.Y.S.2d 48, 450 N.E.2d 234]) is not on point. Without expressly deciding whether or not a statute barring discrimination because of "marital status" applied to unmarried couples, the court held that "the issue arises not because the tenant is unmarried, but because the lease restricts occupancy of her apartment . . . to the tenant and the tenant's immediate family." (*Id.*, at p. 735 [463 N.Y.S.2d at p. 429, 450 N.E.2d at p. 235] [interpreting N.Y. Exec. Law, § 296, subd. 5(a).].) One can argue from the result that New York courts would not interpret their statute as applying to unmarried couples. But the cursory opinion offers no real assistance on the issue.

A lower court in Maryland (*Prince George's County* v. *Greenbelt Homes, Inc.* (1981) 49 Md.App. 314 [431 A.2d 745]) did interpret a statutory ban on "marital status" discrimination as not protecting unmarried couples. The court permitted a housing association to refuse to approve the sale of a house to an unmarried couple. The court reasoned that "neither complainant (each of whom was 'single,' 'unmarried') was denied membership individually because of his or her individual marital status. While each separately had a marital status, collectively they did not." (*Id.*, at p. 319 [431 A.2d at pp. 747-748], italics omitted.) The Maryland court's reasoning cannot easily be applied to California law. Our Legislature, as mentioned, has used the words "marital status" to refer to the presence or absence of the marital relationship between two individuals. (E.g., Fam. Code, §§ 1830, 7602; Prob. Code, § 6450.)

Ultimately, the question must be answered as a matter of California law. In view of Government Code section 12955's language, its uniform and long-standing interpretation by the commission and the courts, and its legislative history, we conclude that FEHA does protect unmarried cohabitants against housing discrimination.[11]

---

[11]In view of the conclusion that FEHA does prohibit discrimination against unmarried couples, there is a proper basis for the commission's decision. It is, therefore, unnecessary to

## B. *Does Federal or State Law Require the State to Exempt Smith From FEHA to Avoid Burdening Her Religious Exercise?*

Having concluded that Smith violated FEHA, we must now determine whether the state is required to exempt her from that law to avoid burdening her exercise of religious freedom. Although the question has arisen in three other states, only the Supreme Court of Alaska has decided it. That court rejected the landlord's claim to an exemption. (*Swanner* v. *Anchorage Equal Rights Com'n, supra,* 874 P.2d at pp. 279-280, cert. den. (1994) __ U.S. __ [130 L.Ed.2d 368, 115 S.Ct. 460].) The Supreme Judicial Court of Massachusetts found the question inappropriate for resolution by summary judgment and remanded for further evidentiary proceedings. (*Attorney General* v. *Desilets, supra,* 418 Mass. at pp. 320-334 [636 N.E.2d at pp. 235-243].) The Supreme Court of Minnesota, which interpreted Minnesota law as permitting discrimination against unmarried couples, for that reason did not address the landlord's claim to an exemption. (*State by Cooper* v. *French, supra,* 460 N.W.2d at p. 11.)

Smith's claim to an exemption implicates three areas of law: the First Amendment to the United States Constitution, the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb et seq.), and article I, section 4, of the California Constitution. We consider each in turn.

### 1. *The First Amendment.*

The First Amendment does not support Smith's claim. Her religion may not permit her to rent to unmarried cohabitants, but "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " (*Employment Div., Ore. Dept. of Human Res.* v. *Smith* (1990) 494 U.S. 872, 879 [108 L.Ed.2d 876, 886, 110 S.Ct. 1595], quoting *United States* v. *Lee* (1982) 455 U.S. 252, 263, fn. 3 [71 L.Ed.2d 127, 136, 102 S.Ct. 1051].) The statutory prohibition against discrimination because of marital status (Gov. Code, § 12955) is a law both generally applicable and neutral towards religion. The law is generally applicable in that it prohibits all discrimination without reference to motivation. The law is neutral in that its object is to prohibit discrimination irrespective of reason—not because it is

decide whether the Unruh Civil Rights Act (Civ. Code, § 51; see also Gov. Code, § 12948) has the same effect. (Compare *Beaty* v. *Truck Ins. Exchange* (1992) 6 Cal.App.4th 1455, 1462 [8 Cal.Rptr.2d 593] [declining to be the "first court" to hold that the Unruh Civil Rights Act bars discrimination based on marital status] with *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 736 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161] [dictum to the contrary], and *Frantz* v. *Blackwell* (1987) 189 Cal.App.3d 91, 95 [234 Cal.Rptr. 178] [same].)

undertaken for religious reasons. (See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah* (1993) 508 U.S. 520, 566 [124 L.Ed.2d 472, 512, 113 S.Ct. 2217].) Consequently, section 12955 does not violate the free exercise clause as interpreted in *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra.*

The foregoing principles reflect the latest evolution in the United States Supreme Court's understanding of the free exercise clause. While they bar Smith's claim *under the federal Constitution* to an exemption from FEHA, to assist in understanding her claims under the Religious Freedom Restoration Act and the California Constitution we review how the free exercise clause was interpreted in the past and how the high court arrived at the current understanding articulated in *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872.

In the earliest cases arising under the free exercise clause, the high court held that, while freedom of religious *belief* was absolutely protected, the government might regulate *conduct.* That a generally applicable law incidentally burdened a person's right to freely exercise his or her religion was not considered a valid objection to the law's enforcement. (E.g., *Reynolds* v. *United States* (1878) 98 U.S. (8 Otto) 145, 167 [25 L.Ed. 244, 250-251] [upholding application of polygamy statute to person whose religious beliefs required polygamous marriages].)

The court later came to view the distinction between belief and conduct as an insufficient basis for resolving conflicts between religious exercise and generally applicable laws. (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 220 [32 L.Ed.2d 15, 28, 92 S.Ct. 1526] ["in this context belief and action cannot be neatly confined in logic-tight compartments"].) Thereafter, instead of simply distinguishing between belief and conduct, the court weighed the burden on religious exercise against the government's interest in applying the law. If the burden was substantial and outweighed the government's interest, the government was required to accommodate the religiously motivated conduct by exempting it from the law.[12] If, on the other hand, the government's interest was of sufficient importance to outweigh the burden on religious

---

[12]E.g., *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 716-719 [67 L.Ed.2d 624, 632-635, 101 S.Ct. 1425] (state's interest in minimizing claims for unemployment compensation and avoiding inquiries into religious beliefs did not justify denying benefits to a person who, for religious reasons, quit his job manufacturing war materials) (*Thomas* v. *Review Board*); *Sherbert* v. *Verner* (1963) 374 U.S. 398, 406-409 [10 L.Ed.2d 965, 971-974, 83 S.Ct. 1790] (state's interest in avoiding fraudulent claims for unemployment compensation did not justify denying benefits to a person who quit his job because his religion prohibited working on Saturday); *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 213-236 [32 L.Ed.2d 15, 23-37] (state's interest in compulsory education did not justify requiring Amish parents to send their children to public school beyond the eighth grade over the parents' religious objections).

exercise and could not be achieved by less restrictive means, no accommodation was required.[13] Governmental interests thought to be sufficient for these purposes were variously described as "compelling" (*Sherbert* v. *Verner, supra,* 374 U.S. at p. 403 [10 L.Ed.2d at p. 970]), "strong" (*id.* at p. 408 [10 L.Ed.2d at p. 973]), "of the highest order" (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 215 [32 L.Ed.2d at p. 25]), and "very high" (*United States* v. *Lee, supra,* 455 U.S. at p. 259 [71 L.Ed.2d at p. 133]). An accommodation was not required if the burden on religious exercise was not considered substantial.[14] This approach to cases involving generally applicable laws that incidentally burdened religious exercise—balancing the state's interest against the burden on free exercise—came to be known as the "compelling interest" test after the language used in *Sherbert* v. *Verner, supra,* 374 U.S. at page 404 [10 L.Ed.2d at pages 970-971].

In 1990, in the case of *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872, the high court abandoned balancing as a way of adjudicating religiously motivated challenges to generally applicable laws. The case was brought by employees of a private drug rehabilitation program, who were fired from their jobs and denied state unemployment benefits because they had used the drug peyote for sacramental purposes at a ceremony of the Native American Church. The employees challenged the denial of benefits as a violation of the free exercise clause. The Oregon Supreme Court ordered the benefits reinstated. The court reasoned the state's interest in preserving the financial integrity of the unemployment compensation fund did not outweigh the burden on the plaintiffs' religious exercise. (*Smith* v. *Employment Div.* (1986) 301 Or. 209, 217-219 [721 P.2d 445, 449-450].)

---

[13]E.g., *Hernandez* v. *Commissioner* (1989) 490 U.S. 680, 698-700 [104 L.Ed.2d 766, 785-787, 109 S.Ct. 2136] (government's interest in maintaining a sound tax system justified denying tax deductions for payments made to Church of Scientology in exchange for religious services); *Bob Jones University* v. *United States* (1983) 461 U.S. 574, 602-604 [76 L.Ed.2d 157, 180-181, 103 S.Ct. 2017] (government's interest in eradicating racial discrimination outweighed any burden that denial of tax exempt status imposed on a private university practicing racial discrimination); *United States* v. *Lee, supra,* 455 U.S. 252, 256-261 [71 L.Ed.2d 127, 131-135] (interest in maintaining sound tax system justifies requiring Amish employer to pay Social Security tax for employees, despite employer's religious objection).

[14]E.g., *Swaggart Ministries* v. *Cal. Bd. of Equalization* (1990) 493 U.S. 378, 384-392 [107 L.Ed.2d 796, 805-811, 110 S.Ct. 688] (state tax on sales of religious materials, although reducing amount of money available for religious activities, is not a constitutionally significant burden on religion); *Tony & Susan Alamo Foundation* v. *Sec'y of Labor* (1985) 471 U.S. 290, 303-305 [85 L.Ed.2d 278, 289-291, 105 S.Ct. 1953] (payment of minimum wage under Fair Labor Standards Act [29 U.S.C. § 201 et seq.] to religious association's employees, who object to payment on religious grounds, does not burden their religious exercise because they may simply return the money); *Braunfeld* v. *Brown* (1961) 366 U.S. 599, 606 [6 L.Ed.2d 563, 568, 81 S.Ct. 1144] (upholding Sunday closing law's application to religious objectors because they need not forsake their religious practice, but may instead "retain[] their present occupations and incur[] economic disadvantage or engag[e] in some other economic activity which does not call for either Saturday or Sunday labor").

The United States Supreme Court reversed. Repudiating the balancing test set out in such cases as *Sherbert* v. *Verner, supra,* 374 U.S. 398, and *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, the court explained: "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." (*Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. at pp. 878-879 [108 L.Ed.2d at p. 885].) The court distinguished earlier cases granting exemptions for religiously motivated conduct as involving "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press [citations]." (*Id.* at p. 881 [108 L.Ed.2d at p. 887].) To the argument that, "when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation" (*id.* at p. 882 [108 L.Ed.2d at p. 888]), the court replied: "We have never held that, and decline to do so now" (*ibid.*).

In 1993, Congress restored the "compelling interest" test as a matter of statutory law by enacting the Religious Freedom Restoration Act. (42 U.S.C. § 2000bb et seq.) We shall address the act, as well as its application to this case, in the next section of this opinion.

*Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 472, disposes of Smith's claim under the free exercise clause of the federal Constitution. The *Smith* opinion, however, might be read as still requiring a court to apply the "compelling interest" test when a generally applicable law burdens a so-called "hybrid right," i.e., the right of free exercise in combination with another constitutional right. (Cf. *id.* at pp. 881-882 [108 L.Ed.2d at pp. 887-888].) The argument is based on the high court's statement that past decisions creating exceptions to generally applicable laws involved "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections . . . ." (*Id.* at p. 881 [108 L.Ed.2d at p. 887].) The remedial order issued against Smith requires her to post a sign informing prospective tenants of their rights under FEHA, among other things. This, she asserts, violates her right to freedom of speech.[15] The parties opposed to Smith's position argue the high court's discussion of hybrid rights was not intended to preserve the balancing test for any class of cases, but was, instead, merely a part of the court's explanation of why it

---

[15]In its return to Smith's petition for writ of mandate, the commission offered to modify its order by eliminating the notice requirements to which Smith objected.

Regardless of the notice requirements, Smith argues "hybrid rights" are involved because the state's interference with the management of her property violates rights protected by the just compensation clause of the Fifth Amendment and the due process clause of the Fourteenth Amendment.

was rejecting the assertion the First Amendment requires accommodation of religiously motivated conduct. (See *ante*, p. 1164.)

We need not, and do not, consider the "hybrid rights" issue. Assuming for the sake of argument the opinion in *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra*, 494 U.S. 472, does preserve the "compelling interest" test in cases involving "hybrid rights," the effect is simply to require us to apply the same test we must apply in any event under the Religious Freedom Restoration Act (42 U.S.C. § 2000bb et seq.). We turn now to the act.

### 2. *The Religious Freedom Restoration Act.*

The Religious Freedom Restoration Act (42 U.S.C. § 2000bb et seq.) (hereafter RFRA, or the act) provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subdivision (b)." (42 U.S.C. § 2000bb-1(a).) Under subdivision (b), "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person— [¶] (1) is in furtherance of a compelling governmental interest; and [¶] (2) is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000bb-1(b).)

 RFRA applies to this case. Broadly and expressly retroactive, the act "applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993 [the date on which RFRA became effective]." (42 U.S.C. § 2000bb-3(a).) Smith has standing to invoke RFRA because she claims FEHA burdens her religious exercise. Under RFRA, "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." (42 U.S.C. § 2000bb-1(c).)[16]

 In applying RFRA to this case, we look to the entire body of case law interpreting the free exercise clause prior to *Employment Div., Ore. Dept.*

---

[16]The parties opposed to Smith argue that RFRA cannot constitutionally be applied to enforce rights under the free exercise clause at the expense of the constitutional rights of third parties. (Cf. *Katzenbach* v. *Morgan* (1966) 384 U.S. 641, 651, fn. 10 [16 L.Ed.2d 828, 836, 86 S.Ct. 1717] [explaining that congressional power under section 5 of the 14th Amendment "is limited to adopting measures to enforce the guarantees of the Amendment; [section] 5 grants Congress no power to restrict, abrogate, or dilute these guarantees"].)

The conclusion set out below—that RFRA does not require the state to accommodate Smith's religiously motivated housing discrimination—makes it unnecessary to consider her opponents' specific argument about the limits of congressional power.

*of Human Res.* v. *Smith, supra,* 494 U.S. 872. That we must do so is evident from the language of the act, its legislative history, and federal judicial decisions interpreting it. In the act, Congress articulated its understanding that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." (42 U.S.C. § 2000bb(a)(5).) Congress also declared its intent "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 and Wisconsin v. Yoder, 406 U.S. 205 (1972) . . . ." (42 U.S.C. § 2000bb(b)(1).) The references to *Sherbert* and *Yoder* are illustrative only: the legislative history shows Congress did not intend to "express approval or disapproval of the result reached in any particular court decision involving the free exercise of religion, including those cited in the act itself. [Instead, the] bill is not a codification of the result reached in any prior free exercise decision but rather the restoration of the legal standard that was applied in those decisions. *Therefore, the compelling interest test generally should not be construed more stringently or more leniently than it was prior to Smith.*" (Sen.Rep. No. 103-111, 1st Sess., p. 9 (1993), reprinted in 1993 U.S. Code Cong. & Admin. News, at p. 1898 [Senate Judiciary Committee Report], italics added.) Federal courts have followed this advice in applying RFRA by looking to the entire body of case law decided before *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra.* (E.g., *American Life League, Inc.* v. *Reno* (4th Cir. 1995) 47 F.3d 642, 655, fn. 6 [quoting the Sen. Judiciary Com. Rep.]; *Thiry* v. *Carlson* (D.Kan. 1995) 887 F.Supp. 1407, 1412.)

 Read together, RFRA, the decisions interpreting RFRA, and the decisions interpreting the free exercise clause prior to *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872, prescribe the following analysis for cases in which a neutral, generally applicable law is claimed to burden the exercise of religion: (1) The burden must fall on a religious belief rather than on a philosophy or a way of life.[17] (2) The burdened religious belief must be sincerely held.[18] (3) The plaintiff must prove the burden is substantial or, in other words, legally significant.[19] (4) If all of the foregoing are true, the government must "demonstrate[] that application of the burden

---

[17]*Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 215-219 [32 L.Ed.2d 15, 24-27]; see also *Thomas* v. *Review Board, supra,* 450 U.S. 707, 713-718 [67 L.Ed.2d 624, 630-634]; *Werner* v. *McCotter* (10th Cir. 1995) 49 F.3d 1476, 1479, footnote 1; *Thiry* v. *Carlson, supra,* 887 F.Supp. at page 1412.

[18]*Thomas* v. *Review Board, supra,* 450 U.S. at page 716 [67 L.Ed.2d at page 632]; *Werner* v. *McCotter, supra,* 49 F.3d at page 1479, footnote 1; *Thiry* v. *Carlson, supra,* 887 F.Supp. at page 1412; cf. *Wisconsin* v. *Yoder, supra,* 406 U.S. at pages 215-219, 235 [32 L.Ed.2d at pages 24-27, 36].

[19]42 United States Code section 2000bb-1(a) and (b); *Swaggart Ministries* v. *Cal. Bd. of Equalization, supra,* 493 U.S. at pages 384-385 [107 L.Ed.2d at pages 805-806]; *Hernandez* v. *Commissioner, supra,* 490 U.S. at page 699 [104 L.Ed.2d at page 786]; *Tony & Susan Alamo*

to the person [¶] . . . is in furtherance of a compelling governmental interest; and [¶] . . . is the least restrictive means of furthering that compelling interest." (42 U.S.C. § 2000bb-1(b).)[20]

Randall, Phillips, and various amici curiae urge us to add a preliminary step to this analysis by asking, first, whether the activity subject to the challenged law constitutes the exercise of religion. The renting of apartments does not, they argue, and for that reason is not entitled to protection under RFRA.

We cannot dispose of Smith's claim so easily. The religious practice FEHA is alleged to burden is not the renting of apartments, but Smith's practice of not committing the sin she believes inheres in renting to unmarried cohabitants. That the alleged burden is indirect is irrelevant; the same is true of virtually all of the cases decided under the accommodation doctrine that RFRA codified. (Cf. *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872, 894 [108 L.Ed.2d 876, 895] (conc. opn. of O'Connor, J.) ["few States would be so naive as to enact a law directly prohibiting or burdening a religious practice as such. Our free exercise cases have all concerned generally applicable laws that had the *effect* of significantly burdening a religious practice"] (italics added).) While the renting of apartments may not constitute the exercise of religion, if Smith claims the laws regulating that activity indirectly coerce her to violate her religious beliefs, we cannot avoid testing her claim under the analysis codified in RFRA. We turn to that analysis now.

That Smith's Christian beliefs are religious and that she sincerely holds them is not seriously in question. An effort was made in the hearing before the commission to show that Smith's church, the Presbyterian Church, U.S.A., does not share her view that renting to unmarried couples is a sin. That such testimony might help to evaluate a person's sincerity is not inconceivable. "One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause . . . ." (*Thomas* v. *Review Board, supra,* 450 U.S. at p. 715 [67 L.Ed.2d at p. 632].) However, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit

*Foundation* v. *Sec'y of Labor, supra,* 471 U.S. at page 303 [85 L.Ed.2d at pages 289-290]; *Braunfeld* v. *Brown, supra,* 366 U.S. at pages 605-606 [6 L.Ed.2d at pages 567-568]; *Goodall by Goodall* v. *Stafford County School Bd.* (4th Cir. 1995) 60 F.3d 168, 171; *American Life League, Inc.* v. *Reno, supra,* 47 F.3d at page 654; *Werner* v. *McCotter, supra,* 49 F.3d at page 1480.

[20]42 United States Code section 2000bb-1(b); *Sherbert* v. *Verner, supra,* 374 U.S. at pages 403, 407-409 [10 L.Ed.2d at pages 969-970, 972-974]; cf. *Wisconsin* v. *Yoder, supra,* 406 U.S. at pages 214-215 [32 L.Ed.2d at pages 24-25].

First Amendment protection." (*Id.* at p. 714 [67 L.Ed.2d at p. 631].) Instead, all that is necessary to establish the required sincerity is "an honest conviction" that one's religion prohibits the conduct required by law. (*Id.* at p. 716 [67 L.Ed.2d at p. 632].) We therefore continue with the required analysis.

The parties disagree on the question whether Government Code section 12955, which forbids Smith to discriminate against unmarried cohabitants, substantially burdens the exercise of her religion. The answer to the question is critical. ■ Under RFRA, unless the challenged law imposes a *substantial burden,* the government need not demonstrate a compelling interest justifying the law or show that the law is the least restrictive means to further the interest. (See 42 U.S.C. § 2000bb-1(a) & (b); see also *Goodall by Goodall v. Stafford County School Bd., supra,* 60 F.3d at p. 171; *American Life League, Inc. v. Reno, supra,* 47 F.3d at p. 654; *Werner v. McCotter, supra,* 49 F.3d at p. 1480.) The same held true under the free exercise clause prior to *Employment Div., Ore. Dept. of Human Res. v. Smith, supra,* 494 U.S. 872. (See, e.g., *Swaggart Ministries v. Cal. Bd. of Equalization, supra,* 493 U.S. at pp. 384-392 [107 L.Ed.2d at pp. 805-811]; *Hernandez v. Commissioner, supra,* 490 U.S. at p. 699 [104 L.Ed.2d at p. 786]; *Tony & Susan Alamo Foundation v. Sec'y of Labor, supra,* 471 U.S. at pp. 303-305 [85 L.Ed.2d at pp. 289-291]; *Braunfeld v. Brown, supra,* 366 U.S. at pp. 605-606 [6 L.Ed.2d at pp. 567-568].)

One can imagine an accommodation doctrine, such as that which RFRA embodies, without the threshold requirement of a substantial burden. The resulting law would look something like this: when a person understood his or her religious beliefs as demanding that an activity be conducted in a particular way, and when the state required the activity to be conducted in a different way, the state would in every such instance be obliged to justify its law with a compelling interest and a showing that the law represented the least restrictive means to further the interest. Because religious beliefs can affect all aspects of life, and because each person may define his or her own religious beliefs, even if those beliefs are not "acceptable, logical, consistent, or comprehensible to others" (*Thomas v. Review Board, supra,* 450 U.S. at p. 714 [67 L.Ed.2d at p. 631]), to abandon the threshold requirement of a substantial burden would considerably alter the nature and efficacy of legal duties in our constitutional system: each person would unilaterally decide, in each of the multitude of situations affected by state regulation, which laws to obey and which to ignore. This would turn on its head the ordinary assumption that legislation on economic and social matters need only have a rational basis; instead, any declaration of sincerely held religious belief, however "[in]comprehensible" (*ibid.*), would require the state to justify any conflicting law under the compelling interest standard or forego its uniform enforcement.

The threshold requirement of a "substantial burden" helped, before *Employment Div., Ore. Dept. of Human Res. v. Smith, supra,* 494 U.S. 872, to avoid this potential for unlimited conflict between the multitude of laws and the multitude of religious beliefs. Congress pointedly retained the threshold requirement in RFRA. While recognizing that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise" (42 U.S.C. § 2000bb(a)(2)), Congress undertook to afford protection only against those laws that "*substantially burden* religious exercise" (*id.,* § 2000bb(a)(3), italics added; see also, *id.,* §§ 2000bb(b)(1), (b)(2), 2000bb-1(a), (b).)

In enacting RFRA, Congress did not attempt to define a "substantial burden." Instead, the legislative history of the act shows Congress "expect-[ed] that the courts [would] look to free exercise cases decided prior to *Smith* for guidance in determining whether the exercise of religion has been substantially burdened." (Sen.Rep. No. 103-111, 1st Sess., p. 8, *supra,* reprinted in 1993 U.S. Code Cong. & Admin. News, at p. 1898; see *Thiry v. Carlson, supra,* 887 F.Supp. at p. 1412 [quoting Sen. Judiciary Com. Rep.].) This general reference to the law before *Employment Div., Ore. Dept. of Human Res. v. Smith, supra,* 494 U.S. 872, does not make our task easy. While the cases decided before *Smith* do provide *guidance* on the question of what constitutes a substantial burden, they do not offer a generally applicable *definition* of substantial burden or a generally applicable *test* for determining when a substantial burden exists. Instead, the pre-*Smith* cases disclose a case-by-case approach to the problem of deciding whether the government should be obliged to justify a challenged law under the compelling interest test. Under these circumstances our task is not to invent a definition, or distill a test, that has never received the endorsement of Congress. Instead, to remain faithful to the language and intent of RFRA, we must compare the facts of the case before us with the facts of the cases decided before *Smith* and attempt to reach a consistent result.

The obvious starting points in this inquiry are the cases to which Congress specifically referred in the text of RFRA, namely *Sherbert v. Verner, supra,* 374 U.S. 398, and *Wisconsin v. Yoder, supra,* 406 U.S. 205. While examining these cases we must, however, bear in mind the admonition that Congress did not intend to "express approval or disapproval of the result reached in any particular court decision involving the free exercise of religion, *including those cited in the act itself.*" (Sen.Rep. No. 103-111, 1st Sess., p. 9, *supra,* reprinted in 1993 U.S. Code Cong. & Admin. News, at p. 1898, italics added.)

The decision in *Sherbert v. Verner, supra,* 374 U.S. 398, is the first of a line of cases holding that a state may not refuse to pay unemployment

compensation to a claimant who quit a job for religious reasons. (See also *Frazee* v. *Illinois Employment Security Dept.* (1989) 489 U.S. 829 [103 L.Ed.2d 914, 109 S.Ct. 1514]; *Hobbie* v. *Unemployment Appeals Comm'n of Fla.* (1987) 480 U.S. 136 [94 L.Ed.2d 190, 107 S.Ct. 1046]; *Thomas* v. *Review Board, supra,* 450 U.S. 707.) In *Sherbert, Frazee,* and *Hobbie,* the claimant refused to work on a religiously defined Sabbath. In *Thomas,* the claimant refused to help manufacture armaments. The Supreme Court has articulated the rule of these cases as follows: " 'Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.' " (*Hobbie* v. *Unemployment Appeals Comm'n of Fla., supra,* 480 U.S. at p. 141 [94 L.Ed.2d at pp. 197-198], quoting *Thomas* v. *Review Board, supra,* 450 U.S. at p. 717 [67 L.Ed.2d at p. 634], italics omitted.)

Turning to the case before us, one observes the obvious conflict between FEHA and the landlord's religious beliefs. This case, however, differs from the unemployment compensation cases in two significant respects. First, the degree of compulsion involved is markedly greater in the unemployment compensation cases than in the case before us. In the former instance, one can avoid the conflict between the law and one's beliefs about the Sabbath only by quitting work and foregoing compensation. To do so, however, is not a realistic solution for someone who lives on the wages earned through personal labor. In contrast, one who earns a living through the return on capital invested in rental properties can, if she does not wish to comply with an antidiscrimination law that conflicts with her religious beliefs, avoid the conflict, without threatening her livelihood, by selling her units and redeploying the capital in other investments.

Second, the landlord's request for an accommodation in the case before us has a serious impact on the rights and interests of third parties. This factor was not present in the unemployment-compensation cases. Because Smith is involved in a commercial enterprise, the state cannot exempt her from the antidiscrimination provisions of FEHA without affecting the members of the public she encounters in the course of her business. More specifically, to permit Smith to discriminate would sacrifice the rights of her prospective tenants to have equal access to public accommodations and their legal and dignity interests in freedom from discrimination based on personal characteristics. (Cf. *Atlanta Motel* v. *United States* (1964) 379 U.S. 241, 250 [13 L.Ed.2d 258, 264, 85 S.Ct. 348] ["the fundamental object of [federal civil rights legislation] was to vindicate 'the deprivation of personal dignity that

surely accompanies denials of equal access to public establishments.' "].) No comparable impairment of the rights of third parties is entailed in requiring the state to pay unemployment compensation to a worker who quits a job that conflicts with his or her religious beliefs. Even if one were to postulate that the rulings in *Sherbert* v. *Verner, supra,* 374 U.S. 398, and its progeny marginally increased the costs to employers of unemployment insurance, the resulting impact on third parties is still far more attenuated than the impact on the prospective tenants in the case before us.

The other case to which Congress specifically referred in RFRA, namely *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, is also distinguishable. In *Yoder,* a law requiring all children to attend public high school burdened the religious exercise of Amish parents; the parent's beliefs required them to educate their children at home after the eighth grade, a formative period of life, in order to protect their children from worldly influences and teach them the values and skills necessary for integration into the Amish religious community. To find the burden substantial was reasonable since the law was wholly incompatible with the Amish beliefs: adolescence comes only once; if spent in the public schools, the harm to the Amish way of life is permanent. In contrast, the landlord in this case does not claim that her religious beliefs require her to rent apartments; the religious injunction is simply that she not rent to unmarried couples. No religious exercise is burdened if she follows the alternative course of placing her capital in another investment.

The proposition that a burden on religion is not substantial if one can avoid it without violating one's religious beliefs is not of itself, we emphasize, a generally applicable test for identifying substantial burdens. As a factor to consider, however, the proposition finds support in cases decided before *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872. Such was the reasoning, for example, in *Tony & Susan Alamo Foundation* v. *Sec'y of Labor, supra,* 471 U.S. 290. In that case, the employees of a religious foundation, who worked for room and board, objected on religious grounds to receiving the monetary wages required by the Fair Labor Standards Act (29 U.S.C. § 201 et seq.). The court rejected the claim with this reasoning: "It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights. . . . Even if the Foundation were to pay wages in cash, or if the associates' beliefs precluded them from accepting the statutory amount, there is nothing in the Act to prevent the associates from returning the amounts to the Foundation, provided that they do so voluntarily. We therefore fail to perceive how application of the Act would interfere with the associates' right to freely exercise their religious beliefs." (471 U.S. at pp. 303-304 [85 L.Ed.2d at p. 290], fns. omitted.)

The decision in *Braunfeld* v. *Brown, supra,* 366 U.S. 599, is to the same effect. In that case, Orthodox Jewish shopkeepers, who observed Saturday as the Sabbath, challenged a law requiring shops to close on Sunday. The shopkeepers, who thus could open for business only five days a week, argued the law placed them at a serious economic disadvantage as compared to other merchants whose religious beliefs permitted them to conduct business six days a week. In this way, they argued, the law coerced them to violate their beliefs. (*Id.* at pp. 601-602 [6 L.Ed.2d at pp. 565-566].)

The United States Supreme Court rejected the shopkeepers' claim. (*Braunfeld* v. *Brown, supra,* 366 U.S. 599.) The court reasoned that the law "d[id] not make unlawful any religious practices of [the shopkeepers]; the Sunday law simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive." (*Id.* at p. 605 [6 L.Ed.2d at p. 567].) The shopkeepers, the court observed, "[were] not faced with as serious a choice as forsaking their religious practices or subjecting themselves to criminal prosecution. Fully recognizing that the alternatives open to [the shopkeepers] and others similarly situated—retaining their present occupations and incurring economic disadvantage or engaging in some other commercial activity which does not call for either Saturday or Sunday labor—may well result in some financial sacrifice in order to observe their religious beliefs, still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful." (*Id.* at pp. 605-606 [6 L.Ed.2d at p. 568].) "[I]t cannot be expected, much less required that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions." (*Id.* at p. 606 [6 L.Ed.2d at p. 568].)

As the high court recognized, for the shopkeepers in *Braunfeld* v. *Brown, supra,* 366 U.S. 599, to have avoided the conflict between their religious beliefs and the Sunday-closing law by "engaging in some other commercial activity" (*id.* at p. 606 [6 L.Ed.2d at p. 568]) might well have entailed an economic cost. Likewise, we may assume that for the landlord in this case to avoid the conflict between FEHA and her religious beliefs by shifting her capital from rental units to another investment would also entail a cost. An economic cost, however, does not equate to a substantial burden for purposes of the free exercise clause. To the contrary, "[i]t is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy [regulating secular conduct] merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive.'" (*Goodall by Goodall* v. *Stafford County School Bd., supra,* 60 F.3d at p. 171, quoting *Braunfeld* v. *Brown, supra,* 366 U.S. at p. 605 [6 L.Ed.2d at p. 567], first bracketed phrase added.)

The proposition that an incidental burden on religious exercise is not substantial if it can be described as simply making religious exercise more expensive finds support in several cases in addition to those already cited. This factor, like the ability of a person to avoid a conflict between law and beliefs without violating those beliefs (e.g., *Tony & Susan Alamo Foundation v. Sec'y of Labor, supra,* 471 U.S. 290; *Braunfeld v. Brown, supra,* 366 U.S. 599), may not constitute a generally applicable test for identifying substantial burdens. Nevertheless, the factor is one that courts under the relevant case law may properly consider.

In *Swaggart Ministries v. Cal. Bd of Equalization., supra,* 493 U.S. 378, for example, the high court held a state could impose its sales and use taxes on an evangelist's sale of Bibles and other religious materials. The evangelist argued the taxes burdened the exercise of his religion by reducing his income and, thus, "decreas[ing] the amount of money [he had] to spend on [his] religious activities . . . ." (*Id.* at p. 391 [107 L.Ed.2d at p. 810].) The court declared the economic burden "not constitutionally significant." (*Ibid.*) Although the court "[did] not doubt the economic cost to appellant of complying with a generally applicable sales and use tax, such a tax is no different," the court explained, "from other generally applicable laws and regulations—such as health and safety regulations—to which appellant must adhere." (*Ibid.*; see also *Hernandez v. Commissioner, supra,* 490 U.S. at pp. 698-699 [104 L.Ed.2d at pp. 785-786] [expressing doubt whether the Internal Revenue Service had imposed a substantial burden on taxpayers by disallowing deductions for payments made in exchange for religious services].)

The case of *Goodall by Goodall v. Stafford County School Bd., supra,* 60 F.3d 168, arose under RFRA. The parents of a child with a hearing impairment, who sent the child to a sectarian school pursuant to their religious beliefs, sued to compel the state to pay for the same transliteration services as provided to pupils in public school. The lower federal courts ruled such a payment would violate the establishment clause. When the high court held to the contrary (*Zobrest v. Catalina Foothills School Dist.* (1993) 509 U.S. 1 [125 L.Ed.2d 1, 113 S.Ct. 2462]; see *Goodall by Goodall v. Stafford County School Bd., supra,* 60 F.3d at p. 170), the parents claimed the state's refusal to provide transliteration services for their child burdened their religious exercise by imposing on them the $14,000 annual cost of a private transliterator.

The Fourth Circuit Court of Appeals rejected the parents' claim on the ground that the economic burden on their religious exercise occasioned by the state's refusal to provide a transliterator was not constitutionally

significant. The court reasoned: "It is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy [regulating secular conduct] merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive.' " (*Goodall by Goodall* v. *Stafford County School Bd., supra,* 60 F.3d at p. 171.) Thus, the state was not required to justify imposition of the economic burden, nor was the court required to balance the burden against the state's interest in refusing to pay. (*Ibid.*)

The court in *McCarthy* v. *Hornbeck* (D.Md. 1984) 590 F.Supp. 936 reached the same result under the free exercise clause in a case decided before *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872. Parents who sent their children to a Catholic school sued to compel the state to provide them with the same transportation services as offered to public school pupils. (*McCarthy* v. *Hornbeck, supra,* 590 F.Supp. at p. 945.) Because the state had "not prohibited plaintiffs from practicing Catholicism" or made "any effort to prevent [them] from sending their children to parochial schools," the state's policy burdened plaintiffs' exercise of their religion, the court observed, only by making it more expensive. Thus, "[t]he question presented [was] whether this increased economic burden constitute[d] an infringement of plaintiffs' free exercise rights." (*Id.* at p. 944.) The court rejected the claim.

■■■ One last factor that is relevant here, to which we have already alluded, also properly informs the inquiry into whether an asserted burden on religion is substantial. This is whether the granting of an accommodation would detrimentally affect the rights of third parties. The parties have not brought to our attention a single case in which the Supreme Court exempted a religious objector from the operation of a general law when the court also recognized that the exemption would detrimentally affect the rights of third parties. Indeed, the notion that an accommodation might affect the rights of third parties led the Supreme Court in *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, expressly to limit its holding to avoid such an implication. As limited, the decision cannot be read as authority for granting religiously based exemptions when to do so would sacrifice the rights of third parties.

In *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, Justice Douglas argued in dissent that the Amish parents' rights did conflict with those of their children. (*Id.* at p. 241 et seq. [32 L.Ed.2d at p. 40 et seq.] (dis. opn. of Douglas, J.).) In response, the majority painstakingly demonstrated that permitting Amish parents to educate their older children at home had not been shown to burden the children's rights. "This case," the court observed, "of course, is not one in which any harm to the physical or mental health of

the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred. The record is to the contrary, and any reliance on that theory would find no support in the evidence. [¶] . . . The dissent argues that a child who expresses a desire to attend public high school in conflict with the wishes of his parents should not be prevented from doing so. There is no reason for the Court to consider that point since it is not an issue in the case. The children are not parties to this litigation. . . . [¶] Our holding in no way determines the proper resolution of possible competing interests of parents, children, and the State in an appropriate state court proceeding in which the power of the State is asserted on the theory that Amish parents are preventing their minor children from attending high school despite their expressed desires to the contrary. . . . [¶] The State's argument proceeds without reliance on any actual conflict between the wishes of parents and children." (*Id.* at pp. 230-232 [32 L.Ed.2d at pp. 33-34], fns. omitted.)

The case before us is strikingly different than *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, because here the conflict between the landlord's request for an accommodation and the rights of third parties is manifest. The exemption from FEHA Smith seeks can be granted only by completely sacrificing the rights of the prospective tenants not to be discriminated against by her in housing accommodations on account of marital status. To say that the prospective tenants may rent elsewhere is to deny them the full choice of available housing accommodations enjoyed by others in the rental market. To say they may rent elsewhere is also to deny them the right to be treated equally by commercial enterprises; this dignity interest is impaired by even one landlord's refusal to rent, whether or not the prospective tenants eventually find housing elsewhere. In short, were we to grant the requested accommodation, Smith would have more freedom and greater protection for her own rights and interests, while Phillips and Randall would have less freedom and less protection.

In summary, these are the facts on which we must decide whether Smith should be exempt from the antidiscrimination provisions of FEHA: Smith's religion does not require her to rent apartments, nor is investment in rental units the only available income-producing use of her capital. Thus, she can avoid the burden on her religious exercise without violating her beliefs or threatening her livelihood. (Cf. *Tony & Susan Alamo Foundation* v. *Sec'y of Labor, supra,* 471 U.S. at pp. 303-304 [85 L.Ed.2d at pp. 289-290]; *Braunfeld* v. *Brown, supra,* 366 U.S. at pp. 605-606 [6 L.Ed.2d at pp. 567-568].) The asserted burden is the result not of a law directed against religious exercise, but of a religion-neutral law that happens to operate in a way that makes Smith's religious exercise more expensive. (Cf. *Swaggart Ministries*

v. *Cal. Bd. of Equalization, supra,* 493 U.S. at p. 391 [107 L.Ed.2d at p. 810]; *Hernandez* v. *Commissioner, supra,* 490 U.S. at pp. 698-699 [104 L.Ed.2d at pp. 785-786]; *Goodall by Goodall* v. *Stafford County School Bd., supra,* 60 F.3d at p. 171; *McCarthy* v. *Hornbeck, supra,* 590 F.Supp. at p. 944.) Finally, to grant the requested accommodation would not affect Smith alone, but would necessarily impair the rights and interests of third parties. (Cf. *Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 213 [32 L.Ed.2d at pp. 23-24].)

This set of facts does not, under the relevant case law, support Smith's argument that requiring her to comply with FEHA's antidiscrimination provisions substantially burdens her religious exercise. Accordingly, we have no occasion to determine whether application of the statute to her furthers a compelling state interest or is the least restrictive means to further such an interest. (42 U.S.C. § 2000bb-1(a) & (b).)[21] In concluding Government Code section 12955 does substantially burden Smith's religious exercise, the Court of Appeal erred.

---

[21]Only one court has reached the issue in the present context. The Alaska Supreme Court concluded the state had a compelling interest in protecting unmarried cohabitants against housing discrimination, and that application of the statute was the least restrictive means of furthering the state's interest. (*Swanner* v. *Anchorage Equal Rights Com'n, supra,* 874 P.2d at p. 280, fn. 8.)

The parties dispute whether the relevant provision of FEHA serves a compelling state interest. Smith argues the state's interest in enforcing Government Code section 12955 should be narrowly defined as the interest in requiring a particular landlord, over her religious objections, to rent to a particular unmarried couple who was able to find other housing. Having defined the state's interest in this way, Smith does not find it compelling. Smith also points out that courts, in challenges under the equal protection clause (U.S. Const., 14th Amend.), have not subjected to strict scrutiny laws discriminating against persons on the basis of marital status.

The commission, Randall, and Phillips, who maintain that Government Code section 12955 does serve compelling state interests, define the relevant interests more generally as preventing arbitrary discrimination in housing and in protecting the constitutional privacy rights of tenants. (See *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d at pp. 130-137 [holding that persons in this state have a constitutional right to live with others who are not related by blood, marriage, or adoption, as an aspect of the right to privacy (Cal. Const., art. I, § 1)]; *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 34, fn. 11 [26 Cal.Rptr.2d 834, 865 P.2d 633] [citing *Adamson, supra,* 27 Cal.3d 123, as an example of a case in which strict scrutiny was applied to a privacy claim].) These parties also point to the preamble to FEHA, which declares "the practice of discrimination because of . . . marital status . . . in housing accommodations . . . to be against public policy." (Gov. Code, § 12920.)

As explained above, we need not address these questions in this case. Nor do we need to consider the contention of Randall, Phillips, and the commission that to permit Smith to discriminate on religious grounds would violate the establishment clauses of the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4; see *Larkin* v. *Grendel's Den, Inc.* (1982) 459 U.S. 116 [74 L.Ed.2d 297, 103 S.Ct. 505] [invalidating, as an establishment of religion, a state law empowering the governing bodies of churches to veto applications for liquor licenses].)

### 3. *The California Constitution.*

 The last question we must address is whether the California Constitution exempts Smith from the requirements of FEHA. The pertinent constitutional provision that particularly concerns us is article I, section 4. As relevant here, the section provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State." (Cal. Const., art. I, § 4.)

The parties disagree on how we should apply California Constitution article I, section 4, to the case before us. Smith argues the provision, like RFRA, requires us to exempt her from FEHA unless the burden the statute imposes on her religious exercise is justified by a compelling state interest. Smith argues FEHA does not meet the test. Various amici curiae agree with Smith that article I, section 4, embodies a compelling interest test, but argue the test is satisfied by the state's interest in eradicating housing discrimination. Other amici curiae contend article I, section 4, is more analogous to the federal Constitution's free exercise clause as interpreted in *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872, and thus has nothing to say about neutral, generally applicable laws that incidentally burden religious exercise.

 We may take it for granted that the meaning of California Constitution article I, section 4, of the California Constitution is not dependent on the meaning of any provision of the federal Constitution. The state charter declares in so many words that "[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." (Cal. Const., art. I, § 24.) "Respect for our Constitution as 'a document of independent force' [citation] forbids us to abandon settled applications of its terms every time changes are announced in the interpretation of the federal charter." (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108], quoting *People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099].)

Nevertheless, a search for the independent meaning of California Constitution, article I, section 4, entails a certain amount of frustration because California courts have typically construed the provision to afford the same protection for religious exercise as the federal Constitution before *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. 872. Indeed, our more recent cases treat the state and federal free exercise clauses as interchangeable and apply, to both, the compelling state interest test articulated in *Sherbert* v. *Verner, supra,* 374 U.S. 398, and *Wisconsin* v. *Yoder,*

*supra*, 406 U.S. 205. (See *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 138-141 [253 Cal.Rptr. 1, 763 P.2d 852] [evaluating, under *Yoder*, the claim of a criminal defendant that his failure to obtain medical treatment for a child was religiously motivated]; *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1112-1120 [252 Cal.Rptr. 122, 762 P.2d 46] [rejecting, under *Yoder*, the defense of religious motivation to a cause of action for fraud]; *In re Arias* (1986) 42 Cal.3d 667, 692 [230 Cal.Rptr. 505, 725 P.2d 664] [applying *Sherbert* to prohibit electronic monitoring devices in the chapel of a Youth Authority facility]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718, fn. 1 [40 Cal.Rptr. 69, 394 P.2d 813] [reversing, under *Sherbert*, a conviction for using peyote as a sacrament of the Native American Church].)

Under the approach of these cases, the analysis that disposes of Smith's claim under RFRA also disposes of her claim under article I, section 4, of the state Constitution.

Older cases, however, suggest an approach closer to that of the United States Supreme Court in *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra*, 494 U.S. 872, which found no constitutional objection to the application to a religious objector of a neutral, generally applicable law. In *Ex parte Andrews* (1861) 18 Cal. 678, one of this court's first interpretations of California Constitution, article I, section 4, we rejected a challenge under the section to a Sunday-closing law. Chief Justice Field set out the court's understanding of the state Constitution's free exercise guarantee in terms much like those the United States Supreme Court would later use in *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra*, 494 U.S. at pages 876-880 [108 L.Ed.2d at page 885]: "[Article I, section 4,] contains a guarantee for the free exercise and enjoyment of religious profession and worship, without discrimination or preference. We understand this to be an interdict against all legislation, which invidiously discriminates in favor of or against any religious system. It does not interdict all legislation upon subjects connected with religion . . . . The operation of the [Sunday Closing law] is secular, just as much as the business on which the act bears is secular; it enjoins nothing that is not secular, and it commands nothing that is religious . . . . The mere fact that this regulation takes effect upon a day which has been appropriated as a day of rest by the sanctions of a particular church, no more destroys the power of the Legislature to command abstinence from labor on that day, than the fact that if the Legislature appointed certain public business to be done on Saturday or Sunday—this would have been 'discriminating' *against* the sects, according religious sanctity to those days." (*Ex parte Andrews, supra*, 18 Cal. at pp. 684-685; cf. *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra*, 494 U.S. at pp. 878-879 [108 L.Ed.2d at pp. 885] ["We have never held that an individual's religious

beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate"].)

Our older cases, following this approach, did not require accommodations of religiously motivated conduct. (*Gabrielli* v. *Knickerbocker* (1938) 12 Cal.2d 85, 90-92 [82 P.2d 391] [declining to reinstate a public school pupil who was expelled for refusing, on religious grounds, to salute the flag; but see *Board of Education* v. *Barnette* (1943) 319 U.S. 624 (87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674)]; *Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232, 242-250 [163 P.2d 704] [upholding, as applied to a religious organization, municipal ordinances regulating charitable contributions and solicitations]; *Rescue Army* v. *Municipal Court* (1946) 28 Cal.2d 460, 470 [171 P.2d 8] [same; "There can be no question, therefore, that a person is free to hold whatever belief his conscience dictates, but when he translates his belief into action he may be required to conform to reasonable regulations which are applicable to all persons and are designed to accomplish a permissible objective."].) Under the approach of these cases, Smith's claim to an exemption would necessarily fail.

That the state Constitution's free exercise clause is more protective of religious exercise than the federal Constitution's free exercise clause has also been suggested.[22] No court, however, has articulated a test more protective than the test set out in *Sherbert* v. *Verner*, *supra*, 374 U.S. 398, and *Wisconsin* v. *Yoder*, *supra*, 406 U.S. 205, and now codified in RFRA. ▮▮▮ Because Smith's claim fails even under that test, as explained above, we need not address the scope and proper interpretation of California Constitution, article I, section 4. These important questions should await a case in which their resolution affects the outcome.

### III. Disposition

The judgment of the Court of Appeal is affirmed to the extent it vacates the award of damages for emotional distress. (See *ante*, fn. 5.) In all other respects, the judgment is reversed.

George, J., and Arabian, J.,* concurred.

**MOSK, J.,** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I generally concur in the opinion prepared by Justice Werdegar. I largely join in its analysis. I fully join in its disposition: except as to the vacation of the

---

[22]"Although California and federal standards in this area appear to be analogous, it might be argued that Section 4 offers broader protection because it specifically refers to 'liberty of conscience.'" (Cal. Const. Revision Com., Proposed Revision of Cal. Const., arts. I, XX, XXII (1971) pt. V, p. 14.)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

award of damages for emotional distress, the judgment of the Court of Appeal must be reversed.

I write separately to consider the Religious Freedom Restoration Act of 1993 (hereafter sometimes RFRA), which is codified as section 2000bb et seq. of title 42 of the United States Code, and its applicability to this cause. I would not reach the question whether petitioner's defense under the statute is meritorious on its own terms. Rather, for the reasons stated below, I would simply hold that the statute itself is without effect as violative of the United States Constitution.

I

In pertinent part, the First Amendment declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." By their terms, these so-called "religion clauses"—individually the establishment and free exercise clauses—bind Congress and, by extension, the federal government generally—and bind them alone (see *Barron* v. *Baltimore* (1833) 32 U.S. (7 Pet.) 243, 247-250 [8 L.Ed. 672, 674-675]). They are made applicable against state legislatures and, by extension, state governments generally through incorporation in the due process clause of the Fourteenth Amendment. (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303 [84 L.Ed. 1213, 1218, 60 S.Ct. 900, 128 A.L.R 1352].) They do not so much grant the individual any rights in the religious sphere as limit government from even entering therein. In other words, they do not so much empower the individual as render government altogether "incompetent." (*Ibid.*)

In *Employment Div., Ore. Dept. of Human Res.* v. *Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595] (hereafter sometimes *Smith*), the United States Supreme Court concluded that government action prohibits the free exercise of religion in violation of the First Amendment whenever it seeks to bar an individual from holding or professing whatever religious belief he chooses. It also concluded that government action imposes the same prohibition whenever it seeks to bar an individual from engaging in religious conduct, whether consisting of performance of religiously prescribed acts or abstention from religiously proscribed acts, solely because such conduct is religious. It concluded, however, that government action does *not* impose that prohibition if it is neutral and of general applicability and merely happens to prevent an individual from engaging in religious conduct.

Thus, under *Smith*, the First Amendment's free exercise clause may be spoken of as effectively granting the individual an absolute right to hold and

profess whatever religious belief he chooses. It may also be spoken of as effectively granting the individual an absolute right to engage in religious conduct *immune from intentionally invidious government action.* But in no sense does it grant the individual any right to engage in such conduct *exempt from neutral and generally applicable government action.*

In the course of its analysis, the *Smith* court, in deed if not in word, abandoned the so-called "compelling government interest" test, which had been used in decisions such as *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790] (hereafter *Sherbert*), and *Wisconsin* v. *Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526] (hereafter *Yoder*), for determining claims and defenses relating to exemption from neutral and generally applicable government action based on the First Amendment's free exercise clause. (See *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. at pp. 882-890 [108 L.Ed.2d at pp. 887-893].) That test "requir[ed] the government to justify any substantial burden on" the exercise of religion "by a compelling [government] interest and by means narrowly tailored to achieve that interest." (*Id.* at p. 894 [108 L.Ed.2d at p. 896] (conc. opn. of O'Connor, J.); accord, *id.* at p. 883 [108 L.Ed.2d at p. 888].)

The *Smith* court all but declared the "compelling government interest" test to be "utterly unworkable" because its application would lead courts to attempt to go beyond their judicial powers in order to pass on questions that are ultimately religious. (*Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. at p. 888, fn. 4 [108 L.Ed.2d at p. 891].)

The *Smith* court made plain that the threshold inquiry under the "compelling government interest" test into whether government action "substantially burdens" an individual's exercise of religion required judges to look not only to the character of the particular action but also to the nature of the specific religious conduct. (See *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. at pp. 887-888, fn. 4 [108 L.Ed.2d at pp. 891-892].) The former they could do. The latter not. For they would be compelled to consider—explicitly or implicitly—the "centrality" of the conduct in question and/or the "centrality" of the underlying belief. (*Ibid.*) "There is" simply "no way out of the difficulty . . . ." (*Id.* at p. 888, fn. 4 [108 L.Ed.2d at p. 891].) But "[i]t is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field. What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith? Judging the centrality of different religious practices is akin to the unacceptable 'business of evaluating the relative merits of differing religious claims.'

[Citation.] . . . '[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " (*Id.* at pp. 886-887 [108 L.Ed.2d at p. 891].) " 'Constitutionally significant burden' "—a paraphrase of "substantial burden"—"would seem to be 'centrality' under another name." (*Id.* at pp. 887-888, fn. 4 [108 L.Ed.2d at p. 891].) "[I]nquiry into 'severe impact' "—another paraphrase of "substantial burden"—"is no different from inquiry into centrality. [It] . . . merely substitute[s] for the question 'How important is X to the religious adherent?' the question 'How great will be the harm to the religious adherent if X is taken away?' There is no material difference." (*Id.* at p. 888, fn. 4 [108 L.Ed.2d at pp. 891-892].) In a word, inquiry into whether government action "substantially burdens" an individual's exercise of religion *unavoidably* entails an inquiry into religion.

Forgoing both praise of *Smith* and condemnation—each is available in sufficient amount, especially the latter (compare, e.g., Marshall, *In Defense of* Smith *and Free Exercise Revisionism* (1991) 58 U. Chi. L.Rev. 308 [defending *Smith*'s result], with, e.g., McConnell, *Free Exercise Revisionism and the* Smith *Decision* (1990) 57 U. Chi. L.Rev. 1109 [attacking *Smith*])—we would do well to isolate what is at the heart of its analysis.

Put simply, *Smith* speaks about the judiciary as an institution and its lack of competence in matters of religion, whether going to an individual's religious belief or his religious conduct.

The *Smith* court did not deny the limitations the First Amendment's free exercise clause imposes on government or the rights it effectively grants to individuals. It simply construed both more narrowly than it had previously. Neither did it bar claims or defenses arising from the limitations or rights in question. It merely abandoned a tool for use as to the claims and defenses at issue—a tool it had itself fabricated—namely, the "compelling government interest" test.

To repeat: *Smith* speaks about the judiciary as an institution and its lack of competence in matters of religion.

The word the *Smith* court uttered reaches back more than a century to the landmark church property decision in *Watson* v. *Jones* (1872) 80 U.S. (13 Wall.) 679 [20 L.Ed. 666] (hereafter sometimes *Watson*)—a federal common law decision that its progeny, including *Presbyterian Church* v. *Hull Church* (1969) 393 U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601] (hereafter sometimes *Presbyterian Church*), and *Serbian Orthodox Diocese* v. *Milivojevich* (1976) 426 U.S. 696 [49 L.Ed.2d 151, 96 S.Ct. 2372] (hereafter sometimes *Serbian*

*Orthodox Diocese*), recognize as declaring the law under the First Amendment.[1]

It is simply this: " '[C]ivil courts,' " whether federal or state, " 'must be incompetent judges of matters of faith, discipline, and doctrine; and . . . , if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt which would do anything but improve either religion or good morals.' " (*Watson* v. *Jones*, *supra*, 80 U.S. (13 Wall.) at p. 732 [20 L.Ed. at pp. 677-678].) This is surely true when they consider the lone man or woman who follows a path without any companions—and who is no less worthy of solicitude for that reason (see *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 715-716 [67 L.Ed.2d 624, 632-633, 101 S.Ct. 1425]). But it is true as well when they regard hierarchical communities. For "[i]t is not to be supposed that [they] can be as competent in the . . . religious faith of all these bodies as the ablest men in each are in reference to their own." (*Watson* v. *Jones*, *supra*, 80 U.S. (13 Wall.) at p. 729 [20 L.Ed. at p. 677].)

To quote *Presbyterian Church*: "[T]he First Amendment forbids civil courts from" "determin[ing] matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion." (*Presbyterian Church* v. *Hull Church*, *supra*, 393 U.S. at p. 450 [21 L.Ed.2d at p. 666].)

To quote *Serbian Orthodox Diocese*: "[T]he general rule" under the First Amendment is that "religious controversies"—and indeed, religious questions of any sort—"are not the proper subject of civil court inquiry . . . ." (*Serbian Orthodox Diocese* v. *Milivojevich*, *supra*, 426 U.S. at p. 713 [49 L.Ed.2d at p. 165].)

This is not to deny that a court might be tempted to believe itself competent in at least some religious matters and under at least some circumstances. Yet it must not yield. The essence of religion is to go beyond the

---

[1] In his dissenting opinion in *Jones* v. *Wolf* (1979) 443 U.S. 595 [61 L.Ed.2d 775, 99 S.Ct. 3020], Justice Powell explained, without contradiction by the majority, that *Watson* had "announced" only "principles of general federal law," since it had been "decided at a time when the First Amendment was not considered to be applicable to the States through the Fourteenth Amendment, and before *Erie R. Co.* v. *Tompkins*, 304 U.S. 64 (1938) [82 L.Ed. 1188, 58 S.Ct. 817, 114 A.L.R. 1487], made state law applicable in diversity cases," including *Watson* itself. (*Jones* v. *Wolf*, *supra*, 443 U.S. at p. 617, fn. 4 [61 L.Ed.2d at p. 793] (dis. opn. of Powell, J.).) Citing *Presbyterian Church* and *Serbian Orthodox Diocese*, he went on to state, again without contradiction by the majority, that those "principles" "are now regarded as rooted in the First Amendment, and are applicable to the States through the Fourteenth Amendment." (*Jones* v. *Wolf*, *supra*, 443 U.S. at p. 617, fn. 4 [61 L.Ed.2d at p. 793] (dis. opn. of Powell, J.).)

bounds of reason. (See, e.g., *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.*, *supra*, 450 U.S. at p. 714 [67 L.Ed.2d at p. 631] [stating that "religious beliefs need not be . . . logical, consistent, or comprehensible . . . in order to merit First Amendment protection"].) Judges in our polity may not follow.

## II

Proceeding from the Constitution, we now turn to the Religious Freedom Restoration Act of 1993. A brief review of the statute is in order.

Section 1 of RFRA gives the statute's short title, which of course is the "Religious Freedom Restoration Act of 1993."

Section 2 of RFRA states Congress's findings and declares the statute's purposes. (42 U.S.C. § 2000bb.) Subsection (a) sets out the findings: "(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution"; "(2) laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise"; "(3) governments should not substantially burden religious exercise without compelling justification"; "(4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion"; and "(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." (42 U.S.C. § 2000bb(a).) Subsection (b) announces the purposes: "(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and [¶] (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government." (42 U.S.C. § 2000bb(b).)

Section 3 of RFRA contains the statute's basic rule, the exception thereto, and the form of judicial relief. (42 U.S.C. § 2000bb-1.) Subsection (a) is the rule: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability . . . ." (42 U.S.C. § 2000bb-1(a).) Subsection (b) is the exception: "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person" "(1) is in furtherance of a compelling governmental interest," and "(2) is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C.

§ 2000bb-1(b).) Subsection (c) concerns judicial relief: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. . . ." (42 U.S.C. § 2000bb-1(c).)

Section 4 of RFRA amends certain existing statutory provisions to authorize courts and administrative agencies to award attorney fees to the prevailing party, other than the United States, in any action or proceeding in enforcement.

Section 5 of RFRA provides the following definitions: "(1) the term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State"; "(2) the term 'State' includes the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States"; "(3) the term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion"; and "(4) the term 'exercise of religion' means the exercise of religion under the First Amendment to the Constitution." (42 U.S.C. § 2000bb-2.)

Section 6 of RFRA contains provisions relating to the statute's coverage and meaning. Subsection (a) declares that the statute "applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" its enactment. (42 U.S.C. § 2000bb-3(a).) Subsection (b) lays down as a rule of construction that "[f]ederal statutory law adopted after" the statute's enactment "is subject to" the act "unless such law explicitly excludes such application by reference" thereto. (42 U.S.C. § 2000bb-3(b).) Subsection (c) states that "[n]othing in" the statute "shall be construed to authorize any government to burden any religious belief." (42 U.S.C. § 2000bb-3(c).)

Lastly, section 7 of RFRA provides that "[n]othing in" the statute "shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion . . . ." (42 U.S.C. § 2000bb-4.)

When we construe RFRA, as we must, within its full context (e.g., *People v. Swain* (1996) 12 Cal.4th 593, 616-617 [49 Cal.Rptr.2d 390, 909 P.2d 994] (conc. opn. of Mosk, J.); see, e.g., *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 673 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (conc. opn. of

Mosk, J.)), which includes the First Amendment, *Sherbert*, *Yoder*, and *Smith*,[2] we arrive at the following conclusions.

First, RFRA recognizes the First Amendment's absolute limitation against government's "burden[ing]" (RFRA § 6(c), 42 U.S.C. § 2000bb-3(c)) an individual's exercise of religion to the extent that it involves religious *belief.* (Compare RFRA § 3(b), 42 U.S.C. § 2000bb-1(b) [stating that "[g]overnment may substantially burden a person's *exercise* of religion," albeit only if it satisfies the "compelling government interest" test (italics added)], with RFRA § 6(c), 42 U.S.C. § 2000bb-3(c) [stating that "[n]othing in" the statute "shall be construed to authorize any government to burden any religious *belief*" (italics added)].) It thereby recognizes the First Amendment's effective grant to the individual of an absolute right to hold and profess whatever religious belief he chooses.[3]

Second, RFRA imposes a limitation against government's "substantially burden[ing]" (RFRA § 3(a), 42 U.S.C. § 2000bb-1(a)) an individual's exercise of religion to the extent that it involves religious *conduct.* It thereby effectively grants the individual a right to engage in such conduct unencumbered with such a burden.

Third, RFRA creates an exception from the limitation it imposes on government and the right it effectively grants to the individual against any "substantial burden" on the latter's exercise of religion. The exception requires government to "demonstrate[] that application of [such a] burden to the" specific religious conduct "(1) is in furtherance of a compelling governmental interest" and "(2) is the least restrictive means of furthering that compelling governmental interest." (RFRA § 3(b), 42 U.S.C. § 2000bb-1(b).)

Fourth, the thus-qualified limitation RFRA imposes on government and the thus-qualified right it effectively grants to the individual against any

---

[2]As with all other statutes, RFRA's full context includes its legislative history. (E.g., Sen.Rep. No. 103-111, 1st Sess. (1993), reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1892-1912; H.R.Rep. No. 103-88, 1st Sess. (1993).) And as with all others, such legislative history amounts only to context, and should never be treated as though it were text: "For a statute, as it were, is a complete integration. Within its scope, it is the final and exclusive statement by the legislative body of its intent, superseding all prior and contemporaneous expressions and implications, not only those that are directly contrary but even those that are altogether consistent. Perhaps more accurately, it is the legislative body's final and exclusive *enactment*, displacing all terms and conditions of whatever sort that could, would, or might, have been passed." (*Kopp* v. *Fair Pol. Practices Com., supra,* 11 Cal.4th at pp. 672-673, original italics (conc. opn. of Mosk, J.).)

[3]RFRA does not purport to allow judicial relief from any "burden" on an individual's exercise of religion to the extent that it involves religious belief. (See RFRA § 3(c), 42 U.S.C. § 2000bb-1(c).)

"substantial burden" on the latter's exercise of religion are statutory. (Sen.Rep. No. 103-111, 1st Sess., pp. 2 & 14, fn. 43, *supra*, reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1893 & 1904, fn. 43 [speaking of a "statutory prohibition"]; H.R.Rep. No. 103-88, 1st Sess., p. ___, *supra*] [speaking of a "statutory right"].)[4]

Fifth, the terms whereby RFRA imposes a limitation on government and effectively grants a right to the individual as to the latter's exercise of religion, and creates an exception to such limitation and right, are not defined by reference to the world at large, but are rather conduits for definition through the judicial process in light of pertinent pre-*Smith* federal court decisions. (See RFRA § 2(a)(5) & (b)(1), 42 U.S.C. § 2000bb(a)(5) & (b)(1).)[5]

Sixth, RFRA applies to, and thereby displaces pro tanto, all other law and its implementation, whether federal or state, statutory or otherwise, coming before its enactment or after (RFRA § 6(a), 42 U.S.C. § 2000bb-3(a)), with the sole exception of any future federal statute explicitly excluding itself from its coverage (RFRA § 6(b), 42 U.S.C. § 2000bb-3(b)).[6]

Seventh, and most fundamental, all that RFRA is and all that it does depend on a threshold inquiry by a court into whether government action "substantially burdens" an individual's exercise of religion. (RFRA § 2(b)(1), 42 U.S.C. § 2000bb(b)(1); see RFRA § 3(a) & (b), 42 U.S.C. § 2000bb-1(a) & (b); see also RFRA § 2(a)(5), 42 U.S.C. § 2000bb(a)(5).) It simply adopts that inquiry from pertinent pre-*Smith* federal court decisions.

[4]"A statute," of course, "cannot amend the Constitution." (*Pennsylvania* v. *Union Gas Co.* (1989) 491 U.S. 1, 24 [105 L.Ed.2d 1, 22, 109 S.Ct. 2273] (conc. opn. of Stevens, J.).) RFRA does not even purport to do so. Certain language in its legislative history to the effect that Congress's purpose was "to overturn the Supreme Court's decision in *Smith*" (Sen.Rep. No. 103-111, 1st Sess., p. 12, *supra*, reprinted in 1993 U.S. Code Cong. & Admin. News, at p. 1902; accord, H.R.Rep. No. 103-88, 1st Sess., p. ___, *supra*) need not, and should not, be taken literally. (See H.R.Rep. No. 103-88, 1st Sess., p. ___, fn. 3, *supra*] ["[T]he label 'restoration' in this context is inappropriate. Congress writes laws—it does not and cannot overrule the Supreme Court's interpretation of the Constitution and thus it is unable to 'restore' a prior interpretation of the First Amendment."].)

[5]By contrast, the terms whereby the American Indian Religious Freedom Act Amendments of 1994 imposes a limitation on government and effectively grants a right to the individual as to the latter's exercise of religion are in fact defined by reference to the world at large. (American Indian Religious Freedom Act Amendments of 1994, § 2(b)(1), 42 U.S.C. § 1996a(b)(1) ["Notwithstanding any other provision of law, the use, possession, or transportation of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion is lawful, and shall not be prohibited by the United States or any State."].)

[6]As for RFRA's potential effect on federal *constitutional* law, the reader should recall that a "statute cannot amend the Constitution." (*Pennsylvania* v. *Union Gas Co., supra*, 491 U.S. at p. 24 [105 L.Ed.2d at p. 22] (conc. opn. of Stevens, J.).)

(See RFRA § 2(b)(1), 42 U.S.C. § 2000bb(b)(1); RFRA § 2(a)(5), 42 U.S.C. § 2000bb(a)(5).)

III

We may presently address the question with which we are here concerned: Is RFRA violative of the United States Constitution and therefore without effect?

Our starting point is, as it must be, the Constitution itself and its fundamental principles. Through the organic law, as Chief Justice Marshall explained in *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 176 [2 L.Ed. 60, 73] (hereafter sometimes *Marbury*), the people have ordained a government that is limited in its authority and, to that end, have delegated certain specified powers to each of its branches—legislative powers to the Congress, executive powers to the President, and judicial powers to the Supreme Court and any such inferior courts as Congress might establish.

What we call the principle of separation of powers, to quote the Supreme Court in *INS* v. *Chadha* (1983) 462 U.S. 919, 951 [77 L.Ed.2d 317, 345, 103 S.Ct. 2764] (hereafter sometimes *Chadha*), seeks "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." "[It] was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted . . . ." (*Buckley* v. *Valeo* (1976) 424 U.S. 1, 124 [46 L.Ed.2d 659, 747, 96 S.Ct. 612] (*per curiam*).)

Clearly, the principle of separation of powers is violated if any of the branches of government "exceed[s] the outer limits of its [own] power . . . ." (*INS* v. *Chadha, supra*, 462 U.S. at p. 951 [77 L.Ed.2d at p. 345].) So held the Supreme Court in *Chadha*. There, Congress had, in effect, unconstitutionally attempted to empower each of its houses *individually*, by resolution, to invalidate a decision by the Attorney General, acting pursuant to authority it had delegated, to allow a particular deportable alien to remain in the United States. It could indeed invalidate such a decision. But it had to pass a bill by majority vote in each of its houses *together*, present it to the President, and, if he disapproved, repass it by two-thirds vote in each of its houses *together*.

The principle of separation of powers is also violated if any of the branches of government causes another to exceed the outer limits of *its* power. So held the Supreme Court in *Marbury*. There, through a provision of the Judiciary Act of 1789, Congress had, in effect, unconstitutionally attempted to empower the Supreme Court to issue writs of mandamus to

federal officers. The issuance of such a writ would have amounted to the exercise of original jurisdiction. The Supreme Court's original jurisdiction, however, extends under clause 2 of section 2 of article III of the United States Constitution only to "Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party . . . ." Similar is *Lujan* v. *Defenders of Wildlife* (1992) 504 U.S. 555 [119 L.Ed.2d 351, 112 S.Ct. 2130] (hereafter sometimes *Lujan*). There, through a so-called "citizen-suit" provision in the Endangered Species Act of 1973, Congress had, in effect, unconstitutionally attempted to empower the federal courts to entertain actions by persons seeking to vindicate the public interest in the Secretary of the Interior's compliance with the statute, without regard to whether such actions were "Cases" or "Controversies" as required by clause 1 of section 2 of article III, and without regard to whether such persons had standing as demanded by that provision. The "citizen-suit" provision would have given to the federal courts the power under section 3 of article II to "take Care that the Laws be faithfully executed"—which belongs only to the President. "It would [have] enable[d] the courts, with the permission of Congress, 'to assume a position of authority over the governmental acts of another and co-equal department,' [citation], and to become ' "virtually continuing monitors of the wisdom and soundness of Executive action." ' " (*Lujan* v. *Defenders of Wildlife, supra,* 504 U.S. at p. 577 [119 L.Ed.2d at p. 375].)

In my view, the principle of separation of powers is violated here. Through RFRA, Congress has, in effect, unconstitutionally attempted to empower the courts, state as well as federal, to pass on religious questions.

In undertaking to apply RFRA and its "compelling government interest" test, a court would have to make a threshold inquiry into whether government action "substantially burdens" an individual's exercise of religion.

To do so, the court would have to take each of the following three steps. If it omitted any one, it would fail in its analysis.

First, the court would have to identify the particular government action that is asserted to cause the "substantial burden." It is surely fit to the task. It need do no more than look to the applicable official prescription or proscription.

Second, the court would have to ascertain the individual's specific religious conduct that is asserted to suffer the "substantial burden." Here, it would begin to experience difficulties. It would have to judge whether he is *sincere*: such protection as he may be due is based on *his* religion, not

another's (cf. *Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. at pp. 715-716 [67 L.Ed.2d at pp. 632-633] [impliedly holding as much under the First Amendment's free exercise clause]). It would also have to judge whether his conduct is *religious*: such protection as he may be due is based on his *religion,* nothing else (cf. *id.* at p. 713 [67 L.Ed.2d at pp. 630-631] [expressly holding as much under the First Amendment's free exercise clause]). To assess his sincerity would be hard. (E.g., Lupu, *Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion* (1989) 102 Harv. L.Rev. 933, 954-957 (hereafter Lupu).) To assess the religiousness of his conduct would be harder still. Such a "determination"—to understate the matter—"is more often than not a difficult and delicate task . . . ." (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. at p. 714 [67 L.Ed.2d at p. 631].) How could it be otherwise? The religious belief underlying such conduct "need not be . . . logical, consistent, or comprehensible . . . ." (*Ibid.*) Finally, the problems inherent in evaluating his sincerity are exacerbated because they must be resolved in the context of the religiousness of his conduct: the question is not whether he is sincere *in the abstract,* but whether he is sincere *in his religion.* (Lupu, *supra,* 102 Harv. L.Rev. at pp. 956-957.)

Third and last, the court would have to decide whether the particular government action "substantially burdens" the individual's specific religious conduct.

The court could not simply accept either the individual's assertion or the government's denial of the requisite "substantial burden." Otherwise, it would run the risk of either allowing the individual "to become a law unto himself" (*Reynolds* v. *United States* (1879) 98 U.S. (8 Otto) 145, 167 [25 L.Ed. 244, 250]) or letting government act with impunity—results that are antithetical to the RFRA Congress's stated purpose of "striking *sensible* balances" between the parties (RFRA § 2(a)(5), 42 U.S.C. § 2000bb(a)(5), italics added).

Rather, the court would have to determine whether the particular government action "substantially burdens" the individual's specific religious conduct. To do so, as *Smith* makes plain, the judge would have to look not only to the character of the government action but also to the nature of the specific religious conduct. As *Smith* also makes plain, although he could do the former, he could not do the latter. For how could he even speak of a "substantial burden" unless he were to compare what we may call the "weight" of the government action *in relation to* the "bearing capacity" of the religious conduct? And how could he do *that* unless he were to pass on religious questions?

It could not persuasively be argued that a court's inquiry into whether government action "substantially burdens" an individual's exercise of religion does not entail an inquiry into religion. Whatever the appearances

might have been before *Smith*—an inquiry into religion was deemed avoidable—the reality afterward is to the contrary—it is not. So held the very court that devised the inquiry: to determine "substantial burden"—whether under its own name or under such paraphrases as "constitutionally significant burden" or "severe impact"—implicates determining the "centrality" of religious conduct and/or the "centrality" of the underlying religious belief. (*Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra,* 494 U.S. at pp. 887-888, fn. 4 [108 L.Ed.2d at pp. 891-892].) But that is " 'not within the judicial ken . . . .' " (*Id.* at p. 887 [108 L.Ed.2d at p. 891].) On this point, of course, the *Smith* court is the final authority. The RFRA Congress simply adopted what it found in the pertinent pre-*Smith* federal court decisions. What it found, however, was an inquiry that extends—unavoidably—into religion. It did not even purport to limit that inquiry, as by renouncing "centrality," in an effort to salvage its constitutionality. That is the end of the matter.

Neither could it persuasively be argued that the judiciary's lack of competence in matters of religion has somehow been removed. The RFRA Congress took no steps in that direction. Had it done so, it would have faltered. For it is itself altogether "incompetent." (*Cantwell* v. *Connecticut, supra,* 310 U.S. at p. 303 [84 L.Ed. at p. 1218].) To be sure, it evidently believed that the courts possessed whatever power they needed. But the *Smith* court was of the opposite view. In such a dispute, as *Marbury* and *Lujan* demonstrate, the court must prevail.

It may be noted that one commentator has argued that the "strongest reading of . . . *Smith* is that it may verge on unconstitutional for a court to inquire into the substantiality of an alleged burden on religious exercise." (Idleman, *The Religious Freedom Restoration Act: Pushing the Limits of Legislative Power* (1994) 73 Tex. L.Rev. 247, 273.)

In light of the foregoing, I am compelled to conclude that the best reading of *Smith* is stronger still: for a court to so inquire is in fact unconstitutional.[7]

---

[7]In accord are *In re Tessier* (Bankr.D.Mont. 1995) 190 B.R. 396, 405-407, and Brant, *Taking the Supreme Court at its Word: The Implications of RFRA and Separation of Powers* (1995) 56 Mont. L.Rev. 5.

I recognize that, in *Flores* v. *City of Boerne, Tex.* (5th Cir. 1996) 73 F.3d 1352, 1363, the court rejected a claim that "RFRA violates the separation of powers because it restores" the "compelling government interest" test after it was "rejected in *Smith* as beyond the judiciary's competence to apply." It asserted that the "test" was not in fact rejected on that basis. As shown in the text, it was.

I also recognize that, in *State* v. *Miller* (1995) 196 Wis.2d 238, 247-248 [538 N.W.2d 573, 576-577], review granted (Wis. 1995) 540 N.W.2d 200, affirmed (1996) 202 Wis.2d 56 [549 N.W.2d 235]; *Sasnett* v. *Department of Corrections* (W.D.Wis. 1995) 891 F.Supp. 1305,

## IV

In sum, I am of the view that, except as to the vacation of the award of damages for emotional distress, the Court of Appeal's judgment must be reversed.

KENNARD, J., ██ ██ ██ At issue in this case is whether Congress's statutory guarantee of religious liberty excuses a California landlord from complying with state law prohibiting housing discrimination against unmarried cohabiting heterosexual couples when compliance would conflict with the landlord's sincerely held religious beliefs. Resolution of this issue requires a close examination of two statutes, one federal and one state.

California has adopted a strong policy against many forms of housing discrimination. This policy is a laudable one for, as I have said in an earlier case, "the act of discrimination itself demeans basic human dignity." (*Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 287 [284 Cal.Rptr. 718, 814 P.2d 704] (dis. opn. of Kennard, J.).) As relevant here, California by statute prohibits housing discrimination on the basis of marital status, including discrimination against unmarried couples. California law does not exempt discrimination that is motivated by religious belief.

California's laws against discrimination, however, are not the final word in this case. Also to be considered is a federal law that protects religious liberty, a goal that has figured prominently in our nation's history. "Many of the men and women who settled in this country fled tyranny abroad to practice peaceably their religion. The Nation they created was founded upon the conviction that the right to observe one's faith, free from Government interference, is among the most treasured birthrights of every American." (Sen.Rep. No. 103-111, 1st Sess., p. 4 (1993), reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1893-1894.)

To expansively protect religious liberty, Congress in 1993 enacted the Religious Freedom Restoration Act (42 U.S.C. §§ 2000bb to 2000bb-4; hereafter RFRA). RFRA was supported by a broad coalition that included many prominent religious organizations, as well as the American Bar Association and the American Civil Liberties Union. It received overwhelming

---

1315-1321; and *Belgard* v. *State of Hawai'i* (D.Hawai'i 1995) 883 F.Supp. 510, 512-517, the courts rejected claims that RFRA is unconstitutional. The *Miller* court did not even consider separation of powers. The *Sasnett* and *Belgard* courts did, but on a basis materially different from that on which I rest.

A final point: no section or subsection of RFRA that is pertinent here shows itself to be severable from the statute as a whole. Each falls with all.

bipartisan support in both houses of Congress; its lead sponsors in the Senate were Senators Edward Kennedy and Orrin Hatch.

RFRA provides that a person whose religious beliefs would be "substantially burden[ed]" by complying with a government law is excused from compliance unless the government can show that the law advances a "compelling governmental interest" and that it is the "least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000bb-1(b).) Under our federal Constitution, a federal law such as RFRA is supreme over any conflicting state law. (U.S. Const., art. VI, cl. 2.) Thus, if a state law barring housing discrimination substantially burdens a person's religious beliefs, Congress has, through RFRA, directed that the believer be exempted from the law unless the state can show that eliminating the discriminatory conduct in question is a "compelling" interest and that exempting the believer and others similarly situated from compliance is not a feasible alternative.

In this case, Evelyn Smith, a widow who owns two duplexes, refused to rent a vacant unit to an unmarried heterosexual couple, contrary to California law barring housing discrimination on the basis of marital status. No one questions that in doing so Smith was complying with her sincerely held religious beliefs. The plurality opinion holds that California's housing anti-discrimination law does not substantially burden Smith's religious beliefs and that therefore under RFRA the state need not justify its action by showing that it is the least restrictive means of advancing a compelling governmental interest.

I would hold to the contrary. In requiring Smith to comply with state law by renting to an unmarried couple, contrary to her sincerely held religious beliefs, the state has "substantially burden[ed]" Smith's exercise of her religious beliefs within the meaning of RFRA. Passing to RFRA's "compelling governmental interest" test, it is questionable whether California has carried its burden of showing that eliminating housing discrimination against unmarried heterosexual couples is a compelling governmental interest of the same high order as, for instance, eliminating racial housing discrimination. It is not necessary to resolve that issue here, however, for on the fully developed record in this case, the state has failed to prove that it would be infeasible to exempt Smith and others with sincerely held religious objections from the state's prohibition of housing discrimination against unmarried heterosexual couples. Therefore, RFRA precludes the state from requiring Smith to rent to unmarried heterosexual couples contrary to her religious beliefs.

I

Petitioner Evelyn Smith owns two duplexes in Chico, Butte County. For religious reasons, Smith objects to sex outside of marriage and believes she will be punished by God if she permits such sex to occur in her rental units. Kenneth Phillips and Gail Randall, an unmarried heterosexual couple, wished to rent one of Smith's units. Because of her religious beliefs, Smith told them that she did not rent to unmarried couples. Initially, they told Smith they were married; she agreed to rent them the unit. Later, they told her they were not married; she refused to rent to them.

Phillips and Randall each filed a complaint against Smith with the Fair Employment Housing Commission (hereafter the Commission). The Commission issued two accusations, alleging Smith had violated the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; hereafter FEHA), and the Unruh Civil Rights Act (Civ. Code, § 51). FEHA prohibits, among other things, "the owner of any housing accommodation to discriminate against any person because of the race, color, religion, sex, *marital status*, national origin, ancestry, familial status, or disability of that person." (Gov. Code, § 12955, subd. (a), italics added.) The Unruh Civil Rights Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51.) FEHA also makes it an unlawful practice under FEHA to violate the Unruh Civil Rights Act. (Gov. Code, § 12948.)

Smith defended on the ground that FEHA and the Unruh Civil Rights Act do not protect unmarried couples from discrimination and on the ground that the free exercise clauses of the state and federal Constitutions permit her to discriminate for religious reasons. After a hearing, an administrative law judge issued a proposed decision that Smith had violated FEHA and the Unruh Civil Rights Act. Addressing Smith's free exercise of religion defense, the administrative law judge found that those laws substantially burdened the free exercise of Smith's religious beliefs but that they were justified by the state's compelling interest in eliminating discrimination.

The Commission, however, did not adopt the administrative law judge's proposed decision but decided the case itself on the existing record. The Commission found that Smith had violated FEHA and the Unruh Civil Rights Act in refusing to rent to Phillips and Randall. The Commission concluded that under the California Constitution it lacked jurisdiction to

address Smith's constitutional arguments. (Cal. Const., art. III, § 3.5.) As relief, the Commission ordered Smith to cease and desist from discriminating, to post notices signed by her stating that she had violated housing discrimination laws and setting forth information about prohibited housing discrimination, and to pay a total of $954 in damages to Phillips and Randall.

Smith filed a petition for a writ of mandate in the Court of Appeal. The court granted the writ and directed that the Commission vacate its decision and dismiss the accusation and complaints against petitioner. The Court of Appeal held that, because the Commission had ordered Smith to post notices of nondiscrimination, her right to free speech was implicated as well as her right to the free exercise of religion. It further held that the state was prohibited by the state and federal Constitutions and the federal RFRA from requiring Smith to rent to unmarried couples contrary to her religious beliefs.

## II

A majority of the court holds, and I concur, that California law, through FEHA, protects unmarried couples from housing discrimination. The controlling issue then becomes whether the recent enactment of RFRA by Congress permits Smith, contrary to FEHA but in accord with her religious beliefs, to refuse to rent to unmarried heterosexual couples like Randall and Phillips. Although this is a case involving religious liberty, it does *not* turn on the free exercise of religion clauses found in the federal and state Constitutions, but on the statutory protection for religious liberty provided by Congress in RFRA.

Congress enacted RFRA in 1993 in response to the United States Supreme Court's decision in *Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595] (hereafter *Smith*), which substantially cut back on the protection that the high court's prior decisions had accorded to religiously motivated conduct under the free exercise clause of the federal Constitution. *Smith* held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" (*Smith, supra,* 494 U.S. at p. 879 [108 L.Ed.2d at p. 886].) Under *Smith,* therefore, no matter how great a burden a law may impose on religious conduct, the free exercise clause of the federal Constitution does not exempt the believer from compliance so long as the law is a "neutral law of general applicability."

Prior to *Smith, supra,* 494 U.S. 872, the United States Supreme Court had applied a "compelling governmental interest" test in determining whether

governmental actions that burdened the free exercise of religion were permissible. Under that test, the government must show that its action "is the least restrictive means of achieving some compelling state interest." (*Thomas v. Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 718 [67 L.Ed.2d 624, 634, 101 S.Ct. 1425].)

Congress specifically enacted RFRA to *broadly* expand protection for religiously motivated conduct, particularly for religious minorities, after the United States Supreme Court had sharply cut back such protection in *Smith, supra,* 494 U.S. 872.[1] In the words of the Senate Report: "By lowering the level of constitutional protection for religious practices, [*Smith*] has created a climate in which the free exercise of religion is jeopardized. . . . [¶] State and local legislative bodies cannot be relied upon to craft exceptions from laws of general application to protect the ability of the religious minorities to practice their faiths . . . . [¶] To assure that all Americans are free to follow their faiths free from governmental interference, the committee finds that legislation is needed to restore the compelling interest test. As Justice O'Connor stated in *Smith,* '[t]he compelling interest test reflects the First Amendment's mandate of *preserving religious liberty to the fullest extent possible in pluralistic society.'*" (Sen.Rep. No. 103-111, 1st Sess., p. 8, *supra,* italics added, fns. omitted, reprinted in 1993 U.S. Code Cong. & Admin. News at pp. 1897-1898.)

Congress expressly adopted the compelling interest test in RFRA. Under the heading "Purposes," RFRA states that it "restore[s] the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) . . . ." (42 U.S.C. § 2000bb(b)(1).) RFRA goes on to state that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." (42 U.S.C. § 2000bb-1(a).) Under subsection (b), "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person— [¶] (1) is in furtherance of a compelling governmental interest; and [¶] (2) is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000bb-1(b).)

---

[1]The breadth of support for RFRA was striking. Supporters included a broad coalition of religious groups as well as a range of other groups including the American Bar Association, American Civil Liberties Union, Americans United for Separation of Church and State, the Christian Legal Society, and the Home School Legal Defense Association. (Laycock & Thomas, *Interpreting the Religious Freedom Restoration Act* (1994) 73 Tex.L.Rev. 209, 210 & fn. 9.) RFRA passed the House of Representatives without opposition, and only three senators voted against it. (139 Cong. Rec. H2356-03, H2363 (daily ed. May 11, 1993); 139 Cong. Rec. H8713-04, H8715 (daily ed. Nov. 3, 1993); 139 Cong. Rec. S14461-01, S14471 (daily ed. Oct. 27, 1993).)

The threshold question in analyzing a claim under RFRA is whether the government has "substantially burden[ed] a person's exercise of religion"; if the government has done so, then it must demonstrate that the burden furthers "a compelling governmental interest" and is the "least restrictive means" of doing so. (42 U.S.C. § 2000bb-1(a), (b).) Thus, in applying RFRA to this case, the first step is to determine whether California's statutory requirement under FEHA that Smith not discriminate against unmarried heterosexual couples like Phillips and Randall substantially burdens Smith's exercise of her religious beliefs.

## III

The plurality opinion holds that FEHA does not "substantially burden" Smith's exercise of her religious beliefs by compelling her, against her religious beliefs, to rent to unmarried heterosexual couples. By holding that Smith has not met RFRA's threshold "substantial burden" test, the plurality opinion avoids having to address the question of whether requiring Smith to rent to unmarried heterosexual couples furthers a compelling governmental interest that cannot be achieved by less restrictive means. Unlike the plurality opinion, I am of the view that FEHA *does* substantially burden Smith's exercise of her religious beliefs.

Although it concludes that FEHA's requirement that Smith rent to unmarried heterosexual couples does not substantially burden Smith's exercise of her religious beliefs against renting to such couples, the plurality opinion is unable to discern any governing principle underlying the selected cases it surveys that address the substantial burden requirement. The meaning of substantial burden, however, is not as obscure and indeterminate as the plurality opinion believes it to be. In adopting the substantial burden test, Congress did not set loose a doctrinal chameleon for courts to chase through a jurisprudential swamp. Congress intended the substantial burden requirement to serve as a simple threshold test; it did not intend that every RFRA case would be the occasion for an open-ended metaphysical inquiry into the meaning of substantial burden.

In this case in particular, the high court's free exercise clause decisions predating *Smith, supra,* 494 U.S. 872, directly refute the plurality opinion's conclusion that FEHA does not substantially burden Smith's exercise of her religious beliefs. Those decisions show that a substantial burden exists where, as here, (1) a religious adherent engages in a particular activity; (2) a governmental command relating to the activity conflicts with the adherent's religious beliefs concerning the activity; (3) the conflict is irreconcilable (that is, to satisfy the governmental command the adherent must either

abandon the activity or violate his or her religious beliefs); and (4) the detriment to the adherent from abandoning the activity creates substantial secular pressure on the adherent to violate his or her religious beliefs rather than abandon the activity.

I begin with the first case that the text of RFRA directs us to, *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790] (hereafter *Sherbert*). (42 U.S.C. § 2000bb(b)(1).) *Sherbert* was the first in a series of United States Supreme Court cases in which the court held that it violated the free exercise clause of the federal Constitution to deny unemployment benefits to persons who had become unemployed because of a conflict between their religious beliefs and the demands of their employers.

As Congress and legal commentators have observed, it was in *Sherbert* that the high court first fully articulated its modern free exercise clause jurisprudence, which lasted until the high court's decision in *Smith, supra,* 494 U.S. 872. (Sen.Rep. No. 103-111, 1st Sess., p. 5, *supra,* reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1892, 1894 ["Meaningful constitutional protection against these abuses [burdening the free exercise of religion] began 30 years ago, with the Supreme Court's landmark decision in *Sherbert* v. *Verner.* (Fn. omitted.)"]; McConnell, *The Origins and Historical Understanding of Free Exercise of Religion* (1990) 103 Harv.L.Rev. 1409, 1412 [". . . *Sherbert* v. *Verner,* [is] the first and leading case in the Supreme Court's modern free exercise jurisprudence . . . . (Fn. omitted.)"]; Lupu, *Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion* (1989) 102 Harv.L.Rev. 933, 941; Choper, *The Rise and Decline of the Constitutional Protection of Religious Liberty* (1991) 70 Neb.L.Rev. 651, 655.) The *Sherbert* decision was widely discussed and relied on in the congressional committee reports on RFRA and in the floor debates in Congress. (Sen.Rep. No. 103-111, 1st Sess., pp. 5, 13, *supra,* reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1894, 1903; H.R. Rep. 103-88, 1st Sess., pp. 2-9 (1993); remarks of Sen. Feingold, 139 Cong. Rec. S14461-01, S14468 (daily ed. Oct. 27, 1993) ["[RFRA] is designed to . . . codify the Free Exercise Exemptions Doctrine established in Sherbert versus Verner"]; remarks of Sen. Bradley, *id.* at p. S14469 ["Our modern day jurisprudence on the free exercise clause can be traced back 30 years, when in 1963 the Supreme Court issued its landmark decision, Sherbert versus Verner."]; remarks of cosponsor Sen. Hatch, *id.* at p. S14470 ["RFRA reestablishes a very familiar and traditional standard of review that the courts have been applying since the 1963 decision *Sherbert* v. *Verner.*"].)

The religious believer in *Sherbert* was a Seventh Day Adventist whose Sabbath was Saturday. She was fired from her job when, in accordance with

her religious beliefs, she refused to work on Saturdays as her employer required. She applied for unemployment benefits, which the state denied because she had refused to work on Saturdays. The United States Supreme Court held that the believer was entitled to unemployment benefits because the state had burdened her religious belief against working on Saturdays.

The high court described the burden as "forc[ing] [the believer] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." (*Sherbert, supra,* 374 U.S. at p. 404 [10 L.Ed.2d at p. 970].) The court rejected the argument that the indirect economic pressure exerted by the state's denial of a "gratuitous benefit" (*id.* at p. 405 [10 L.Ed.2d at p. 971]) was insufficient to constitute a burden on the believer's exercise of her religion: "In a sense the consequences of [being denied unemployment benefits] . . . may be only an indirect result of welfare legislation within the State's general competence to enact . . . . but the pressure upon her to forego [the] practice [of her religion] is unmistakable." (*Id.* at pp. 403-404 [10 L.Ed.2d at p. 970].)

The court reached the same conclusion in three later cases in which individuals were denied unemployment benefits after they were fired from or quit their employment because it conflicted with their religious beliefs: *Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. 707; *Hobbie* v. *Unemployment Appeals Comm'n of Fla.* (1987) 480 U.S. 136 [94 L.Ed.2d 190, 107 S.Ct. 1046]; and *Frazee* v. *Illinois Employment Security Dept.* (1989) 489 U.S. 829 [103 L.Ed.2d 914, 109 S.Ct. 1514]. In *Thomas,* discussing the meaning of a substantial burden on religion, the high court stated: "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. at pp. 717-718 [67 L.Ed.2d at p. 634].)

In these unemployment benefits cases, the United States Supreme Court found a significant burden on the exercise of religion even though the believers' religious beliefs did not compel them to engage in the activity (whether defined as voluntary private employment or as the application for unemployment benefits that followed the termination of private employment) that conflicted with their beliefs. Instead, what the high court found determinative was that "the employee was forced to choose between fidelity to religious belief and continued employment; the forfeiture of unemployment benefits for choosing the former over the latter brings unlawful coercion to bear on the employee's choice." (*Hobbie* v. *Unemployment Appeals Comm'n of Fla., supra,* 480 U.S. 136, 144 [94 L.Ed.2d 190, 200].)

Here, Smith is faced with a similar, and similarly burdensome, choice. In requiring Smith to rent to an unmarried heterosexual couple against her sincerely held religious beliefs, the state substantially burdens Smith's exercise of religion because it "conditions receipt of an important benefit [that is, the right to engage in the rental housing business] upon conduct proscribed by a religious faith, . . . thereby putting substantial pressure on [her] to modify [her] behavior and to violate [her] beliefs." (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. at pp. 717-718 [67 L.Ed.2d at p. 634].) No less than the believer in *Sherbert, supra,* 374 U.S. 398, Smith is "force[d] . . . to choose between following the precepts of her religion and forfeiting [the right to rent her property], on the one hand, and abandoning one of the precepts of her religion in order to [rent her property], on the other hand." (*Sherbert, supra,* 374 U.S. at p. 404 [10 L.Ed.2d at p. 970].)

Denying unemployment benefits to anyone who quits a job for religious reasons creates economic pressure to remain at a job in violation of one's religious beliefs; likewise here, prohibiting housing discrimination against unmarried couples creates economic pressure on Smith to rent housing to unmarried heterosexual couples in violation of her religious beliefs. Just as the economic pressure on the unemployed was a substantial burden in *Sherbert, supra,* 374 U.S. 398, and its progeny, so too the economic pressure on Smith in this case is a substantial burden on her exercise of her religious beliefs. In each case, neutral state rules in combination with strong economic incentives create substantial pressure on the believer to engage in voluntary commercial activity in a manner that conflicts with the believer's religious beliefs; in each case, those beliefs do not compel participation in the activity but *participation on the government's terms necessarily violates those beliefs*.

Indeed, here Smith is subject to substantially more government coercion than the employees who were denied unemployment benefits in the cases discussed above; they lost only the opportunity for a state-conferred monetary benefit by conforming to their beliefs, while in this case the state has imposed on Smith civil penalties and a cease-and-desist order dictating her future conduct. In addition, the cease-and-desist order may be entered as a judgment (Gov. Code, § 12973, subd. (b)), which would thereby make Smith liable to additional fines and imprisonment should she follow her religious beliefs and refuse to obey the cease-and-desist order (Code Civ. Proc., § 1218).

Other free exercise decisions by the United States Supreme Court predating *Smith, supra,* 494 U.S. 872, also demonstrate that Smith's exercise of her religious beliefs has been substantially burdened in this case. For instance, in *United States* v. *Lee* (1982) 455 U.S. 252, 256-258 [71 L.Ed.2d 127, 131-133, 102 S.Ct. 1051], the Amish proprietor of a carpentry shop refused to withhold and pay Social Security taxes on his employees' income because of

his religious beliefs. The high court concluded that "[b]ecause the payment of the [Social Security] taxes or receipt of [Social Security] benefits violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights" and could only be justified by showing that "it is essential to accomplish an overriding governmental interest." (*Id.* at pp. 257-258 [71 L.Ed.2d at p. 132].)

And, in *Bowen* v. *Roy* (1986) 476 U.S. 693 [90 L.Ed.2d 735, 106 S.Ct. 2147], the government's requirement that persons requesting welfare benefits furnish a Social Security number to the welfare agency conflicted with the religious belief of the Native American in that case; a majority of the high court found that this requirement burdened the individual's religious beliefs and that the government had not justified the burden. (*Id.* at pp. 727-728 [90 L.Ed.2d at pp. 762-763] (conc. and dis. opn. of O'Connor, J., concurred in by Brennan and Marshall, JJ.); *id.* at pp. 715-716 [90 L.Ed.2d at pp. 754-755] (conc. opn. of Blackmun, J., concurring in opn. of O'Connor, J., on this issue); *id.* at p. 733 [90 L.Ed.2d at p. 766] (dis. opn. of White, J.).) In neither *Lee* nor *Roy* did the person's religious beliefs compel participation in the activity that created the conflict (employing carpenters in a carpentry shop in *Lee*; applying for welfare benefits in *Roy*), and thus the believer could have avoided the conflict without doing violence to those beliefs by abandoning the activity. Indeed, in both cases the motivation for the activity was economic gain, not religious observance; yet the high court nonetheless held that each of these conflicts resulted in a constitutionally significant burden on the believer that the government had to justify under the compelling interest test.[2]

It is thus not surprising that Massachusetts's highest court has concluded, as do I, that under the United States Supreme Court's case law prior to *Smith, supra,* 494 U.S. 872, forcing a landlord to rent to unmarried heterosexual couples contrary to his or her religious beliefs substantially burdens the landlord's exercise of religious beliefs. In *Attorney General* v. *Desilets* (1994) 418 Mass. 316 [636 N.E.2d 233], the Supreme Judicial Court of Massachusetts was faced with a similar statute outlawing marital status discrimination in housing. As here, a landlord with religious objections to sex outside of marriage refused to rent to an unmarried heterosexual couple. The court held that Massachusetts's prohibition against housing discrimination based on marital status substantially burdened the free exercise of the

---

[2]In analyzing the pre-*Smith, supra,* 494 U.S. 872, free exercise decisions clause of the United States Supreme Court, Professor Tribe likewise has concluded that a conflict between a religious belief and a governmental command amounts to a substantial burden. (Tribe, American Constitutional Law (2d ed. 1988), § 14-12, p. 1242 ["In order to gain the exemption, the claimant must show (1) a sincerely held religious belief, which (2) *conflicts with, and thus is burdened by,* the state requirement." (Italics added.)].)

landlord's religious beliefs.[3] (418 Mass. at pp. 323-325 & fn. 5 [636 N.E.2d at pp. 236-238].)

## IV

The plurality opinion attempts to distinguish the United States Supreme Court's unemployment benefits cases on two grounds, neither of which has merit. First, it is of the view that because Smith is not a wage earner, she is subject to less compulsion than were the religious adherents in the unemployment benefits cases. Second, it attempts to distinguish those decisions on the ground that granting Smith an exemption from FEHA's requirements would have an adverse impact on the rights that FEHA grants to Phillips and Randall. I shall examine each of these arguments in turn.

The plurality opinion takes the position that the rationale of the unemployment benefit cases does not apply here because "the degree of compulsion involved is markedly greater in the unemployment-compensation cases." (Plur. opn., *ante*, at p. 1170.) This is wrong. The plurality opinion ignores that, as noted above, Smith is subject to greater, not less, coercion than those who follow their religious beliefs rather than their employers' demands. If they are fired and denied unemployment benefits, they only lose a state subsidy of their transaction costs in finding new employment. For following her religious beliefs rather than FEHA, however, Smith is subject to civil penalties, a cease-and-desist order dictating her future conduct, and imprisonment.

Nor is the compulsion any less because, as the plurality opinion notes, Smith can sell her two duplexes and invest the proceeds in some other enterprise, a process the plurality opinion terms "redeploying . . . capital." (Plur. opn., *ante*, at p. 1170.) The employees in the unemployment benefits cases discussed above could have likewise sought other forms of employment that did not conflict with their religious beliefs or have chosen not to apply for benefits when they quit work, but that fact did not justify the denial of benefits to them when they quit work for religious reasons. Under the plurality opinion's reasoning, the Amish carpenter in *United States* v. *Lee*, *supra*, 455 U.S. 252, could have "redeployed" his assets into an investment that did not require him to hire employees subject to the Social Security tax, and the Native American in *Bowen* v. *Roy*, *supra*, 476 U.S. 693, could have

---

[3]Although the landlord's claim of an exemption in the Massachusetts case arose under the Massachusetts Constitution, the Massachusetts high court adopted and applied the substantial burden standard of pre-*Smith*, *supra*, 494 U.S. 872, federal case law discussed in this section of my opinion. (*Attorney General* v. *Desilets*, *supra*, 418 Mass. 316, 321-323 [636 N.E.2d 233, 236-237].) The court expressly noted that the standard it applied was the same as that of RFRA. (*Id.* at p. 322, fn. 5 [636 N.E.2d at p. 236].)

avoided having to submit a Social Security number to the government by choosing not to apply for welfare benefits. The hypothetical possibility of avoiding the conflict between religious belief and governmental rules by abandoning the activity in question, however, did not nullify the actual substantial burdens to which the government subjected each of these religious believers.

The plurality opinion also maintains that the compulsion was greater in the unemployment benefits cases than it is here because the religious adherents in those cases earned their income from personal labor while Smith lives on "the return on capital." (Plur. opn., *ante*, at p. 1170.) Smith, however, is not a passive investor who receives investment income without personal effort. She earns her income by actively managing her rental property. She testified she spent substantial time personally maintaining the duplexes. In addition, when a unit is vacant, she personally places the advertisements, takes the calls from prospective tenants, and interviews them. Thus, Smith does earn her livelihood from personal labor.

Nor does the scope of RFRA's protection of religious freedom turn on the valorization of labor over capital that the plurality opinion relies on. Changing jobs and changing investments both entail transaction costs. There is no basis for the plurality opinion's assumption that transaction costs of changing capital investments cannot amount to "substantial pressure on [an adherent] to modify [her] behavior and to violate [her] beliefs" (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div.*, *supra*, 450 U.S. at pp. 717-718 [67 L.Ed.2d at p. 634]), as do the transaction costs of changing jobs. In this case, Smith is a widow, and the two duplexes are her major source of income. The costs to Smith of switching to an alternative investment may be substantial, for in addition to the expenses of selling her property and locating an alternative investment, she may have to pay large capital gains taxes on the transaction, given that she has owned the duplexes for over 20 years. These expenses and taxes could significantly reduce the amount of capital she has to reinvest, and thereby permanently reduce her income and standard of living, even assuming she could find an investment with a comparable rate of return at an equivalent risk.

Finally, as a factual matter, the plurality opinion errs in asserting that greater compulsion exists in the unemployment benefits cases because it is "not . . . realistic" to imagine that a religious believer would, in the absence of unemployment benefits, quit work to avoid a conflict between religious belief and an employer's demands. (Plur. opn., *ante*, at p. 1170.) While the plurality opinion may find it unbelievable that any religious person would be so "unrealistic" as to choose fidelity to religious belief over livelihood,

history shows that people of faith throughout the centuries have been willing to sacrifice not only their livelihoods but their very lives for their beliefs. Indeed, the religious adherents in *Sherbert, supra,* 374 U.S. 398, *Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. 707, *Hobbie* v. *Unemployment Appeals Comm'n of Fla., supra,* 480 U.S. 136, and *Frazee* v. *Illinois Employment Security Dept., supra,* 489 U.S. 829, all chose to sacrifice their jobs rather than their religious beliefs even though they were denied unemployment benefits. So much for the plurality opinion's "realism."

The second ground on which the plurality opinion seeks to distinguish the unemployment cases is that granting an accommodation to Smith would have an impact on the FEHA rights of prospective tenants Phillips and Randall. (Plur. opn., *ante,* at pp. 1170-1171, 1174-1175.) In doing so, the plurality opinion conflates the substantial burden inquiry and the compelling interest test. The question at the substantial burden stage is *not* whether Smith is entitled to an accommodation nor whether, "were we to grant the requested accommodation, Smith would have more freedom and greater protection for her own rights and interests, while Phillips and Randall would have less freedom and less protection." (Plur. opn., *ante,* at p. 1175.) Rather, the question is simply what effect the requirements of FEHA have on Smith's exercise of her religious beliefs. In the words of RFRA, the question is whether Smith is "[a] *person* whose religious exercise has been burdened" (42 U.S.C. § 2000bb-1(c), italics added), not whether some other person would be adversely affected if Smith were granted an accommodation.

It is in the compelling interest test, as discussed in part VI below, that the FEHA rights of Phillips and Randall are properly taken into account. The benefit that the regulation provides to third parties is one factor that could conceivably strengthen the state's interest in enforcing its regulation. Nor does anything in *Wisconsin* v. *Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526], the sole case relied on by the plurality opinion in its third party impact discussion, suggest that third party impact is a factor to be considered at the substantial burden stage rather than as part of the compelling interest test.

The purpose of the substantial burden inquiry is to determine whether further judicial inquiry is warranted into the state's justifications for the burden it has imposed on an individual's exercise of religious beliefs. To consider at the substantial burden stage, as the plurality opinion does, the third party impact of a hypothetical accommodation for the religious adherent subverts this purpose. The FEHA rights of Phillips and Randall are creations of state statute, not fundamental constitutional rights. They are of recent vintage and limited scope. Using them to negate the substantial

burden on Smith and thereby avoid reaching the compelling interest test results in a blind deference to state policy judgments infringing religious freedom. Under the plurality opinion's reasoning, state-created statutory rights of third parties automatically trump the federally created right of religious freedom under RFRA without any judicial inquiry into the importance of those third party rights and the degree to which they would be impacted by an accommodation.

V

In addition to attempting to distinguish the unemployment benefits cases decided by the United States Supreme Court, the plurality rests its conclusion that in this case Smith's religious beliefs are not substantially burdened on two other "factors": its contention that Smith can avoid the burden on the exercise of her religious beliefs without violating her beliefs by abandoning the housing rental business (plur. opn., *ante*, at pp. 1171-1172), and its related contention that the only effect of FEHA is to make the exercise of Smith's religious beliefs more expensive (plur. opn., *ante*, at pp. 1172-1174). What the plurality opinion fails to recognize, however, is the fundamental feature distinguishing this case and others in which courts have found a substantial burden from the cases that the plurality opinion relies on to derive its two factors. In the cases relied on by the plurality opinion, the religious adherent could comply with both the religious belief and the government law *without abandoning the activity in question.* In this case and others in which courts have found a substantial burden on the exercise of religious beliefs, the religious adherent cannot avoid the conflict between religious belief and government law except by abandoning the activity in question. The following review of the case law makes this point clear.

The plurality opinion relies on *Braunfeld* v. *Brown* (1961) 366 U.S. 599 [6 L.Ed.2d 563, 81 S.Ct. 1144] (hereafter *Braunfeld*) to support its conclusion that the state has not substantially burdened Smith's exercise of her religious beliefs because she could avoid the conflict between FEHA and her religious beliefs by abandoning the housing rental business. This reliance is misplaced for two reasons. First, *Braunfeld, supra,* 366 U.S. 599, is consistent with the result I reach in this case. In *Braunfeld,* Orthodox Jewish shopkeepers who for religious reasons closed on Saturdays were also subject to a law compelling them to close on Sundays. They contended that the Sunday-closing law infringed the free exercise of their religious beliefs because, in combination with their religious beliefs, it resulted in closure of their businesses for two days a week (Saturday and Sunday) while other shopkeepers were only closed one day a week (Sunday). The high court rejected their claim.

The Sunday-closing law in *Braunfeld, supra,* 366 U.S. 599, did not conflict with the religious beliefs of the Orthodox Jewish shopkeepers,

because nothing in their religion compelled them to do that which the government prohibited (that is, nothing in their religion required them to be open on Sunday). Accordingly, the burden was not substantial because the Orthodox Jewish shopkeepers could comply with their religious beliefs without violating the law and without abandoning the activity in question. Here, by contrast, if landlord Smith complies with her religious beliefs without abandoning the activity in question she will violate the law, for her religious beliefs require her, contrary to state law embodied in FEHA, to refuse to rent to cohabiting unmarried heterosexual couples.

Second, *Braunfeld, supra,* 366 U.S. 599, represented only the first step by the United States Supreme Court in the development of its modern free exercise clause jurisprudence, not its full flowering. As I have noted previously, it was not until the subsequent unemployment benefits case of *Sherbert, supra,* 374 U.S. 398, that the high court first established its modern free exercise clause jurisprudence, and *Sherbert* went beyond *Braunfeld* in significant ways. (McConnell, *The Origins and Historical Understanding of Free Exercise of Religion, supra,* 103 Harv.L.Rev. 1409, 1412 [". . . *Sherbert v. Verner,* [is] the first and leading case in the Supreme Court's modern free exercise jurisprudence . . . . (Fn. omitted.)"]; Lupu, *Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion, supra,* 102 Harv.L.Rev. 933, 941 ["[C]ommentators see *Sherbert,* rather than *Braunfeld,* as marking the commencement of the contemporary law of free exercise. (Fn. omitted.)"]; Choper, *The Rise and Decline of the Constitutional Protection of Religious Liberty, supra,* 70 Neb.L.Rev. 651, 655 ["In [*Sherbert*], the Court abandoned *Braunfeld's* distinction between direct and indirect impacts upon religious conduct, and afforded religious action a level of constitutional protection that it had not before enjoyed."].)[4]

Nor do the other cases cited by the plurality opinion support its position that Smith's exercise of her religious beliefs is not substantially burdened by FEHA. (See *Swaggart Ministries v. Cal. Bd. of Equalization* (1990) 493 U.S. 378 [107 L.Ed.2d 796, 110 S.Ct. 688]; *Hernandez v. Commissioner* (1989) 490 U.S. 680 [104 L.Ed.2d 766, 109 S.Ct. 2136]; *Goodall by Goodall v.*

---

[4]Professor Tribe has described in these terms the ways in which *Sherbert, supra,* 374 U.S. 398, superseded *Braunfeld, supra,* 366 U.S. 599: "Two years after *Braunfeld,* [in *Sherbert*] the Supreme Court took a major step beyond these precedents, extending and solidifying the principles latent in its previous holdings. . . . [¶] *Sherbert* went well beyond the precedents in two important ways, the combination of which made the free exercise clause a vastly more powerful instrument for generating government accommodations of religion. [¶] First, *Sherbert* rejected *Braunfeld's* distinction between direct and indirect burdens . . . . [¶] . . . [¶] *Sherbert's* second important doctrinal advance was in formally adopting the least restrictive alternative-compelling state interest mode of analysis in a free exercise context." (Tribe, American Constitutional Law, *supra,* § 14-13, pp. 1255-1256, fns. omitted.)

*Stafford County School Bd.* (4th Cir. 1995) 60 F.3d 168; *McCarthy* v. *Hornbeck* (D.Md. 1984) 590 F.Supp. 936.) Like the high court's decision in *Braunfeld, supra,* 366 U.S. 599, and unlike this case, none of them involved a government rule requiring an individual to act contrary to his or her religious beliefs in order to conduct the activity in question, and none of them presented a conflict between religious belief and secular command that could only be resolved by abandoning the activity in question. The absence of these crucial facts makes those cases of little relevance to the issue we address today, for here the state does require Smith to act contrary to her religious beliefs in conducting her chosen activity of renting her duplex units, and she can avoid that conflict only by abandoning the housing rental business.

Moreover, as explained in part III above, the United States Supreme Court's pre-*Smith, supra,* 494 U.S. 872, free exercise decisions on which RFRA is based demonstrate that a conflict between government laws and an individual's religious beliefs substantially burdens the exercise of religion in cases where the believer cannot avoid the conflict except by abandoning participation in the activity that gives rise to the conflict. Nor does anything in the text of RFRA or its legislative history remotely suggest that Congress intended to limit RFRA's scope only to cases of religiously compelled activities, and to require religious believers in other cases to abandon the activity in question in order to resolve the conflict between their religious beliefs and the government law. (See Laycock, *RFRA, Congress, And The Ratchet* (1995) 56 Mont.L.Rev. 145, 151 ["The legislative history is clear that the conduct does not have to be compelled by religion."]; Laycock & Thomas, *Interpreting the Religious Freedom Restoration Act, supra,* 73 Tex.L.Rev. 209, 232-233.)

A number of cases decided since Congress enacted RFRA in 1993 further demonstrate that a conflict between a religious belief and a government rule that the adherent could avoid only by abandoning the activity in question amounts to a substantial burden on religion. In *Rourke* v. *New York State Department of Correctional Services* (N.D.N.Y. 1995) 915 F.Supp. 525, 543, a Native American correctional officer let his hair grow long as required by his religious beliefs but contrary to his government employer's rules. His religious beliefs did not compel him to work as a correctional officer; thus, as here, he could have avoided the conflict between his religious beliefs and the government mandate by abandoning the activity that gave rise to the conflict. The federal trial court nonetheless held that the employer's rule against long hair substantially burdened the exercise of the Native American correctional officer's religious beliefs. (*Ibid.*)

In another case decided since congressional enactment of RFRA in 1993, the State of Wisconsin required that slow-moving vehicles like horse-drawn

buggies display a fluorescent orange triangle to warn motorists of their presence. The Amish religion does not compel the Amish to use horse-drawn buggies to travel on the public highways. Their religion does require that, if they chose to do so, they not affix fluorescent orange triangles to their buggies, in keeping with their avoidance of colorful and worldly symbols. The Wisconsin Court of Appeals held that under RFRA the state's requirement substantially burdened the exercise of religion by the Amish, even though their beliefs did not compel the activity that brought their beliefs into conflict with the law and they could avoid the conflict by abandoning the activity. (*State* v. *Miller* (1995) 196 Wis.2d 238 [538 N.W.2d 573, 577], review granted (Wis. 1995) 540 N.W.2d 200; see also *State* v. *Hershberger* (Minn. 1989) 444 N.W.2d 282, 287, judg. vacated and cause remanded (1990) 495 U.S. 901 [109 L.Ed.2d 282, 110 S.Ct. 1918], judgment reinstated after remand (Minn. 1990) 462 N.W.2d 393 [applying the substantial burden test in a pre-RFRA case, the Minnesota Supreme Court reached the same conclusion].) Here, Smith's situation is no different, for the conduct compelled by her religious beliefs conflicts with the government's laws, and she could only avoid the conflict by abandoning the activity in question.

Two zoning cases decided under RFRA also demonstrate that a substantial burden exists if the only way of avoiding a conflict between religious belief and governmental mandate is to abandon the activity in question. These two cases held that particular zoning regulations prohibiting religious uses of property were substantial burdens on the exercise of religion, notwithstanding that the congregations owning the property could have avoided the conflict by selling the property and acquiring other property zoned for the uses they proposed: *The Jesus Center* v. *Farmington Hills Zoning Board of Appeals* (1996) 215 Mich.App. 54 [544 N.W.2d 698]; and *Western Presbyterian Church* v. *Bd. of Zoning Adj.* (D.D.C. 1994) 862 F.Supp. 538, 545-546.[5]

---

[5]These cases appear consistent with congressional intent. During the Senate floor debates, RFRA's cosponsor Senator Hatch pointed to a pre-RFRA zoning exclusion case, *Cornerstone Bible Church* v. *City of Hastings* (8th Cir. 1991) 948 F.2d 464, 472, which had held under the *Smith, supra,* 494 U.S. 872, standard of lessened scrutiny that the zoning regulations in question did not infringe the congregation's right to the free exercise of religion, as an example of the "serious[] ero[sion]" of religious freedom that RFRA would correct. Zoning regulations were also singled out in a similar vein in the remarks of cosponsor Senator Kennedy, in the House debates, and in the Senate Report. (Remarks of Sen. Hatch, 139 Cong. Rec. S14350-01, S14353 (daily ed. Oct. 26, 1993); remarks of Sen. Kennedy, 139 Cong. Rec. S14350-01, S14351 (daily ed. Oct. 26, 1993); remarks of Rep. Schumer, 139 Cong. Rec. H2356-03, 2360 (daily ed. May 11, 1993); remarks of Rep. Hoyas, *id.* at p. 2361; remarks of Rep. Maloney, *id.* at p. 2362; Sen. Rep. No. 103-111, 1st Sess., p. 8, *supra,* reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1892, 1897; see also written testimony of RFRA's original sponsor, Rep. Solarz, in hearings on H.R. No. 2797 before the House Com. on the Judiciary, Subcom. on Civil and Const. Rights, 102d Cong., 2d Sess., sec. 99, at p. 122 (1992); Laycock, *RFRA, Congress, And The Ratchet, supra,* 56 Mont.L.Rev. 145, 146, 151.)

(Contra, *Daytona Rescue Mission, Inc.* v. *City of Daytona Beach* (M.D.Fla. 1995) 885 F.Supp. 1554, 1560.)[6]

Finally, an example may serve to illustrate the untenability of the plurality opinion's position. The plurality concludes in this case that landlord Smith's exercise of her religious beliefs is not substantially burdened by FEHA because she can avoid the conflict "without violating her beliefs or threatening her livelihood" (plur. opn., *ante*, at p. 1175) by abandoning the housing rental business, because FEHA is a religion-neutral law that, at most, makes Smith's "religious exercise more expensive" (*ibid.*), and because granting Smith an accommodation "would necessarily impair the rights and interests of third parties" (*id.* at p. 1176). Under this reasoning, a law that all obstetricians must perform abortions when requested by their patients would not substantially burden the exercise of religion by a Catholic obstetrician who objects to abortion, and therefore would not be subject to any scrutiny under RFRA. Because Catholics need not be doctors and doctors need not be obstetricians, the obstetrician could avoid the conflict "without violating [the obstetrician's] beliefs or threatening [the obstetrician's] livelihood" (plur. opn., *ante*, at p. 1175) by abandoning obstetrics and switching to another medical specialty. The law is a religion-neutral one that, at most, might make the obstetrician's "religious exercise more expensive" (*ibid.*) because of the expenses of switching specialties. To grant the obstetrician an accommodation "would necessarily impair the rights and interests of third parties" (*id.* at p. 1176), the obstetrician's patients who have a constitutional right to abortion. Notwithstanding the plurality opinion's reasoning, however, I have no doubt that Congress did not intend that such a law would escape all scrutiny under RFRA.

## VI

My conclusion that in this case the state has substantially burdened landlord Smith's exercise of her religious beliefs does not mean that she is automatically entitled to an exemption from the requirement in state statutory law (FEHA) that she not discriminate on the basis of marital status. Under federal law (RFRA), a religious believer does not establish the right to an exemption simply by showing that the government has substantially

---

[6]Two decisions predating *Smith, supra*, 494 U.S. 872, further illustrate that conflicts between religious belief and government law are substantial burdens if they can only be avoided by abandoning the activity in question. In each case, laws requiring photographs on driver's licenses substantially burdened religious adherents whose beliefs forbade graven images, even though they could have avoided the conflict by not driving. (*Quaring* v. *Peterson* (8th Cir. 1984) 728 F.2d 1121, 1125, affd. by an equally divided court (1985) 472 U.S. 478 [86 L.Ed.2d 383, 105 S.Ct. 3492]; *Bureau of Motor Vehicles* v. *Pentecostal House of Prayer, Inc.* (1978) 269 Ind. 361, 367-368 [380 N.E.2d 1225, 1228-1229].)

burdened his or her religious beliefs. Satisfying RFRA's "substantial burden" threshold only shifts to the government the duty of justifying the substantial burden it has imposed on the believer's religious beliefs.

Hence, because requiring Smith to rent to cohabiting unmarried heterosexual couples substantially burdens her religious beliefs, it becomes necessary to address the question of whether the state has justified that requirement by proving it has a compelling governmental interest and that it has no less restrictive means for achieving that interest. As the text of RFRA states, the government (here, the Commission) must "demonstrate[] that application of the burden *to the person* [here, Smith]— [¶] (1) is in furtherance of a compelling governmental interest; and [¶] (2) is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000bb-1(b), italics added.) I shall examine each of these requirements in succession.

On this record, it is questionable whether the Commission has carried its burden of proving there is a compelling governmental interest in eliminating discrimination against unmarried cohabiting heterosexual couples.[7] The Commission has failed to present any significant evidence on this point. Instead, the Commission argues that *all* forms of discrimination listed in FEHA and the Unruh Civil Rights Act, simply by being included in those statutes, are necessarily equally invidious, and that the state has an equally compelling interest in eliminating all of them.

This facile equation of all forms of discrimination simply because they are recited side by side in a statute is supported neither by history nor present social reality. There is no recent history or present practice of invidious discrimination against unmarried cohabiting heterosexual couples that is remotely comparable to the disgraceful and unhappy history of racial, ethnic, and gender discrimination. (See *Walnut Creek Manor* v. *Fair Employment & Housing Com.*, *supra*, 54 Cal.3d 245, 276 (dis. opn. of Kennard, J.) [discussing persistence of racially and ethnically "[s]egregated housing patterns, which frequently confine minority groups to substandard housing"].) For that reason, deciding there is no compelling interest in ameliorating housing

---

[7]The issue raised by this case is the legitimacy of religiously motivated housing discrimination against unmarried *heterosexual* couples. My discussion of whether the state has carried its heavy burden of demonstrating a compelling state interest addresses only that issue. Analysis of whether there is a compelling interest in eliminating discrimination against homosexual couples may well involve different considerations; homosexual couples have been subject to a quite different, and continuing, history of discrimination; also, their unmarried status is not a matter of voluntary choice. (See *Gay Rights Coalition* v. *Georgetown Univ.* (D.C.App. 1987) 536 A.2d 1, 31-38 [determining under the District of Columbia Human Rights Act that there is a compelling governmental interest in eradicating discrimination against homosexuals].)

discrimination against unmarried heterosexual couples would not mean that there is no compelling interest in eliminating other forms of housing discrimination, such as racially motivated discrimination, even if based on religious beliefs. (Cf. *Bob Jones University* v. *United States* (1983) 461 U.S. 574, 604 [76 L.Ed.2d 157, 181, 103 S.Ct. 2017] [eliminating racial discrimination in education held to be a compelling governmental interest that justified the substantial burden that denying tax benefits to racially discriminatory university imposed on the religious organization that ran the university].)

Unmarried cohabiting heterosexual couples were relatively rare until the 1960's; once they appeared in significant numbers, whatever housing and employment barriers existed for them crumbled rapidly and almost completely. Twenty years ago, this court noted "the prevalence of nonmarital relationships in modern society and the social acceptance of them" and observed that moral considerations against cohabitation by unmarried heterosexuals "have apparently been so widely abandoned by so many." (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 683-684 [134 Cal.Rptr. 815, 557 P.2d 106].) Furthermore, in the housing arena, the Legislature has authorized both public and private universities to discriminate in housing on the basis of marital status, permitting them to offer housing reserved for married students. (Gov. Code, § 12995, subd. (a)(2).) It is hard to see how the state can claim to have a compelling interest in eliminating from the *private* sector a form of discrimination that it expressly authorizes and practices in its own operations.

Other courts have also questioned whether eliminating housing discrimination against unmarried heterosexual couples has been shown to be a compelling governmental interest. (*Attorney General* v. *Desilets, supra*, 418 Mass. 316, 327 [636 N.E.2d 233, 239] ["marital status discrimination is not as intense a State concern as is discrimination based on certain other classifications"]; *State by Cooper* v. *French* (Minn. 1990) 460 N.W.2d 2, 10 [finding that state lacked a compelling interest in eliminating housing discrimination against unmarried heterosexual couples]; see also *Swanner* v. *Anchorage Equal Rights Comm'n* (1994) __ U.S. __, __ [130 L.Ed.2d 368, 369, 115 S.Ct. 460, 461] [Justice Thomas, dissenting from the denial of certiorari: "I am quite skeptical that Alaska's asserted interest in preventing discrimination on the basis of marital status is 'compelling' enough to satisfy [the] stringent standards [of *Sherbert, supra*, 374 U.S. 398, and *Wisconsin* v. *Yoder, supra*, 406 U.S. 205]."].)

One scholarly commentary has criticized the assertion made in this very case that eliminating housing discrimination against unmarried heterosexual

couples is a compelling governmental interest: "California authorities are arguing . . . that states have a compelling interest in forcing conscientiously objecting landlords to rent apartments to unmarried couples. [They do not] mention[] any evidence that unmarried couples were actually having difficulty finding housing; without such evidence, this claim of compelling interest is utterly frivolous. The stakes are entirely symbolic: sex outside of marriage has gone from misdemeanor to compelling interest in one generation, and religious believers who resist the change must be crushed. . . . [¶] If any such deferential view of compelling interest is read into RFRA, the congressional goal of protecting religious practice will be wholly defeated." (Laycock & Thomas, *Interpreting the Religious Freedom Restoration Act, supra,* 73 Tex.L.Rev. 209, 223-224.)

Ultimately, however, it is unnecessary to resolve the question of whether in this case the Commission has carried its burden of demonstrating that there is a compelling governmental interest in prohibiting housing discrimination against unmarried heterosexual couples or to address the privacy interests of Phillips and Randall that have also been advanced to justify the burden on Smith's religious beliefs. Even if the interest in preventing housing discrimination against unmarried cohabiting heterosexual couples were compelling, to prevail the Commission would have to demonstrate that the state could not advance this interest by a less restrictive means that would exempt Smith and other religious objectors from renting to such couples. This the Commission has not done. It has not shown that excepting landlords like Smith from housing laws would so reduce the stock of housing available to unmarried heterosexual couples, or otherwise be so infeasible, as to defeat or even substantially impair its goal of providing equal housing opportunities to unmarried heterosexual couples.

The Commission has not presented any evidence that unmarried heterosexual couples would face significant obstacles in finding housing if religiously based exemptions were granted. Both RFRA, which Congress enacted in 1993, and the case law to which it refers make clear that it is the government's burden to produce evidence that there are no less restrictive alternatives to denying exemptions to religious objectors. Mere speculation is not enough. Congress has specifically stated in RFRA that the government must "demonstrate[] that application of the burden to the person— [¶] . . . [¶] . . . is the least restrictive means of furthering th[e] compelling governmental interest" (42 U.S.C. § 2000bb-1(b)); the statute defines "demonstrate[]" as meaning "meet[] the burdens of going forward with the evidence and of persuasion" (42 U.S.C. § 2000bb-2(3)).

The high court's decisions in this area illustrate the government's burden in proving that there are no less restrictive alternatives. In *Thomas* v. *Review*

*Bd., Ind. Empl. Sec. Div., supra*, 450 U.S. 707, 718 [67 L.Ed.2d 624, 634], the state unemployment compensation fund had argued that providing unemployment benefits to religious objectors who quit their jobs would result in "widespread unemployment and [a] consequent burden on the fund." The high court rejected this "what if everybody did it?" argument on the ground that "[t]here is no evidence in the record to indicate that the number of people who find themselves in the predicament of choosing between benefits and religious beliefs is large enough to create 'widespread unemployment,' or even to seriously affect unemployment." (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra*, 450 U.S. at p. 719 [67 L.Ed.2d at p. 634].) Earlier, in *Sherbert, supra*, 374 U.S. at page 407 [10 L.Ed.2d at p. 972], the court had likewise rejected for lack of evidence the "possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might not only dilute the unemployment compensation fund but also hinder the scheduling by employers of necessary Saturday work."

*Frazee* v. *Illinois Employment Security Dept., supra*, 489 U.S. 829, was another unemployment benefits case, and the lower court had upheld the denial of the religious objector's claim to benefits on the ground that "'chaos would result'" if, like the religious objector in that case, all Americans stopped working on Sundays for religious reasons. (*Id.* at p. 835 [103 L.Ed.2d at p. 920].) The United States Supreme Court rejected this dire prophecy as lacking in evidentiary support. Quoting the passage from *Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra*, 450 U.S. at page 719 [67 L.Ed.2d at page 634], set forth above, the court concluded instead that "[a]s was the case in *Thomas* . . . there is nothing before us in this case to suggest that Sunday shopping, or Sunday sporting, for that matter, will grind to a halt as a result of our decision today." (*Frazee* v. *Illinois Employment Security Dept., supra*, 489 U.S. at p. 835 [103 L.Ed.2d at p. 921].) So too, here, there is no evidence that granting religiously based exemptions to Smith and others like her would seriously deplete the stock of housing available to unmarried heterosexual cohabitants.

Moreover, in this case the religious beliefs of landlord Smith and others similarly situated are at odds with their economic self-interest, further reducing the probability that religious exemptions would seriously affect the housing market for unmarried heterosexual couples. In the case of religious objections to a tax or a claim for a religious exemption that expands a religious believer's entitlement to government benefits, religious belief aligns with economic self-interest. This confluence of religious and economic motives may in some cases encourage phony claims of religious conflict. Here, by contrast, Smith's sincerely held religious beliefs are contrary to her economic self-interest, for by excluding unmarried heterosexual couples she is artificially reducing demand, and thus the price she can

command, for her rental housing. This further reduces the likelihood that there will be a mass movement of landlords seeking to refuse rentals on religious grounds to unmarried heterosexual couples.

Nor would it be administratively infeasible to grant exemptions to Smith and others similarly situated. Like an unemployment benefits system, California's housing discrimination laws create an administrative mechanism for individualized enforcement that is capable of assessing on a case-by-case basis claims of a federal statutory entitlement under RFRA to a religious exemption. Unemployment benefits systems typically provide for an administrative procedure by which the benefits claimant can be heard and present evidence, and by which the agency then renders an individualized determination of the claimant's eligibility for benefits. (E.g., *Frazee* v. *Illinois Employment Security Dept., supra*, 489 U.S. at pp. 830-831 [103 L.Ed.2d at pp. 917-918]; *Hobbie* v. *Unemployment Appeals Comm'n of Fla., supra*, 480 U.S. at pp. 138-139 [94 L.Ed.2d at pp. 195-196]; *Sherbert, supra*, 374 U.S. at pp. 399-401 [10 L.Ed.2d at pp. 967-969].) California's housing antidiscrimination laws are enforced by an analogous administrative procedure that provides for administrative hearings and an individualized determination of whether the landlord has discriminated in violation of the law. (Gov. Code, §§ 12980-12981.) A landlord who contends that religious beliefs prohibit him or her from renting to unmarried heterosexual couples can raise a RFRA defense in the hearing process. As occurred in this case, the hearing officer can take evidence and determine the sincerity of the landlord's professed beliefs, whether there is a conflict between those beliefs and the fair housing laws, whether the state has proven a compelling interest in eliminating the discriminatory conduct in question, and whether the state has shown there is no less restrictive alternative that would exempt the landlord from compliance.

Because the Commission has failed to show that there is no less restrictive alternative to enforcing California's housing antidiscrimination law, FEHA, against Smith (or otherwise stated, the Commission has not shown that it is infeasible to exempt Smith from FEHA's requirement that she rent to unmarried heterosexual couples), the congressional mandate in RFRA precludes the Commission from applying the state statute, FEHA, to Smith. (42 U.S.C. § 2000bb-1(a)-(c).) Like the plurality opinion, I find it unnecessary to decide whether the Unruh Civil Rights Act provides unmarried couples with a similar protection against discrimination, for even if it does, RFRA similarly bars its application to Smith. Also, given my conclusion that RFRA

prohibits the Commission from applying FEHA to Smith, I need not address Smith's defenses under the federal and state Constitutions.[8]

## VII

Finally, it is appropriate to discuss briefly the issue of the constitutionality of RFRA. In enacting RFRA, Congress relied on its power under section 5 of the Fourteenth Amendment to "enforce, by appropriate legislation" the constitutional rights secured by that amendment, which include freedom of religion. (Sen.Rep. No. 103-111, 1st Sess., pp. 13-14, *supra*, reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1892, 1903.) Some scholars are of the view that RFRA is unconstitutional, asserting that Congress has exceeded its powers under section 5 of the Fourteenth Amendment by requiring in RFRA that states defer to the free exercise of religion to a greater degree than is constitutionally required under *Smith*, *supra*, 494 U.S. 872. (See, e.g., Conkle, *The Religious Freedom Restoration Act: The Constitutional Significance of an Unconstitutional Statute* (1995) 56 Mont.L.Rev. 39; Hamilton, *The Religious Freedom Restoration Act: Letting the Fox Into the Henhouse Under Cover of Section 5 of the Fourteenth Amendment* (1994) 16 Cardozo L.Rev. 357; contra, Laycock, *RFRA, Congress, And The Ratchet*, *supra*, 56 Mont.L.Rev. 145 [explaining why RFRA is constitutional].)

Quite recently, however, the federal Court of Appeals for the Fifth Circuit has upheld the constitutionality of RFRA. (*Flores* v. *City of Boerne, Tex.* (5th Cir. 1996) 73 F.3d 1352.) Three other courts have also reached this conclusion. (*State* v. *Miller*, *supra*, 538 N.W.2d 573, 577; *Sasnett* v. *Department of Corrections* (W.D.Wis. 1995) 891 F.Supp. 1305, 1315-1320; *Belgard* v. *State of Hawaii* (D.Hawaii 1995) 883 F.Supp. 510, 512-517.) Because no party has raised the issue, it is unnecessary to address in this case whether RFRA is a permissible exercise of Congress's authority under section 5 of the Fourteenth Amendment.

Randall acknowledges that RFRA is constitutional as a general matter but argues RFRA is unconstitutional as applied to this case if its application

---

[8]Although Justice Baxter similarly concludes that in this case the Commission has substantially burdened the exercise of Smith's religious beliefs, he would remand the case for the Commission to apply the compelling governmental interest test instead of deciding whether the compelling governmental interest test requires that the state grant Smith an exemption. In my view, there is no necessity to remand this case. As discussed above, RFRA adopted the free exercise clause legal standard that had existed prior to *Smith*, *supra*, 494 U.S. 872. Because the hearing in this case occurred before *Smith* was decided, the standard adopted by RFRA was in effect at that time. Both the parties and the administrative law judge were fully aware of this standard, and the parties addressed it in presenting their evidence and argument. Application of the law to the record in this case is a task that this court can perform without remanding to the Commission.

would exempt Smith from complying with the housing antidiscrimination mandate of FEHA and the Unruh Civil Rights Act. Randall claims that any such exemption cannot diminish Randall's rights under state and, he asserts, federal statutory law to be free of discrimination. This argument is meritless. Congress can enact a statute (here, RFRA) to diminish or qualify rights it has created in prior federal statutes just as it could repeal those statutes directly. Nor is there any merit to Randall's argument that a law passed by Congress under section 5 of the Fourteenth Amendment cannot impinge on state laws to the contrary. If, as Randall concedes, Congress has the constitutional power to enact RFRA, then under the supremacy clause of the federal Constitution (U.S. Const., art. VI, cl. 2), RFRA prevails over state law to the contrary.

Justice Mosk relies on an altogether different ground to assert that RFRA is unconstitutional. He takes the view that under RFRA a court deciding whether the government has substantially burdened the exercise of a person's religious beliefs must determine to what degree the religious conduct in question is central to the person's religious beliefs, and that such an inquiry is constitutionally forbidden. (Conc. opn. of Mosk, J., *ante*, at pp. 1181-1182, 1190.) RFRA, however, requires no such inquiry. Nothing in the text of RFRA or in its legislative history shows any indication that Congress intended that the substantial burden test apply only to religious conduct that is central to an adherent's beliefs. To the contrary, Congress rejected any centrality inquiry by adopting the pre-*Smith, supra,* 494 U.S. 872, free exercise clause case law. That case law had unequivocally rejected any inquiry into the centrality of religious practices in free exercise clause cases. (*Hernandez* v. *Commissioner, supra,* 490 U.S. 680, 699 [104 L.Ed.2d 766, 786] [applying the substantial burden test while observing that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith"]; *United States* v. *Lee, supra,* 455 U.S. 252, 257 [71 L.Ed.2d 127, 132]; *Thomas* v. *Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. 707, 715-716 [67 L.Ed.2d 624, 632].)

Justice Mosk's argument rests on a footnote in the majority opinion in *Smith, supra,* 494 U.S. 872, 887, footnote 4 [108 L.Ed.2d 876, 891]. That footnote, however, does not purport to discuss the meaning of "substantial burden" established in cases prior to *Smith,* and nowhere asserts that those cases had adopted an inquiry into the centrality of the adherent's religious beliefs. Rather, the footnote contends that it would be "unworkable" to apply the compelling interest test without also adopting a centrality test to limit the instances to which the compelling interest test applied. Elsewhere, the *Smith* court expressly acknowledged that its prior case law, the case law adopted by Congress in RFRA, had rejected any centrality test: "Repeatedly and in

many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." (*Smith, supra*, 494 U.S. 872, 887 [108 L.Ed.2d 876, 891].) More fundamentally, regardless of the *Smith* court's views on the feasibility of a compelling interest test without a threshold centrality inquiry, in enacting RFRA Congress was not required to adopt those views. Nor did it, for, as discussed above, its incorporation of pre-*Smith* case law shows that Congress rejected any centrality inquiry.

## CONCLUSION

"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate." (Madison, Memorial and Remonstrance Against Religious Assessments (1785), reprinted in *Everson* v. *Board of Education* (1947) 330 U.S. 1, 64 [91 L.Ed. 711, 748, 67 S.Ct. 504, 168 A.L.R. 1392] (appen. to dis. opn. of Rutledge, J.).)

The freedom that James Madison championed—the freedom not only to hold but also to freely exercise religious beliefs—is a freedom older than our nation. For centuries, many have come to our shores seeking it. Our nation was founded by a people who valued it, and who enshrined it in the Constitution. In protecting this fundamental liberty by its 1993 enactment of the Religious Freedom Restoration Act, Congress expressly acted in the tradition of "the framers of the Constitution, [who] recogniz[ed] free exercise of religion as an unalienable right, [and] secured its protection in the First Amendment to the Constitution." (42 U.S.C. § 2000bb(a)(1).)

Our society recognizes and fosters other values as well, however. Especially in recent years, our society has taken a strong stand against many forms of invidious discrimination. To balance the sometimes conflicting values of religious liberty and freedom from discrimination is not an easy task. In enacting RFRA, Congress struck the balance by requiring that a religious adherent be exempted from an antidiscrimination law that conflicts with the adherent's religious beliefs unless the government shows that application of the antidiscrimination law to the adherent and others similarly situated furthers a compelling governmental interest that cannot be advanced by any less restrictive alternative.

Applying to this case the congressional mandate expressed in RFRA, I would hold that in requiring that Smith comply with state statutory law by

renting to unmarried heterosexual couples, the state substantially burdens Smith's religious beliefs by compelling her to do that which her beliefs forbid. On the record it created in this case, the state has failed to demonstrate that there are no alternatives that would allow it to pursue its goal of abolishing discrimination against unmarried heterosexual couples while granting case-by-case exemptions to landlords like Smith with religious objections. Accordingly, I would affirm the judgment of the Court of Appeal granting the writ of mandate.

**BAXTER, J., Concurring and Dissenting.—** ██ ██ ██ ██ The California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) on its face prohibits a landlord from discriminating against any individual on the basis of "marital status." (Gov. Code, § 12955, subds. (a), (d).) As will be explained, notwithstanding evidence of contrary original legislative intent, the statute has consistently been interpreted as prohibiting discrimination in housing accommodations against unmarried cohabiting heterosexual couples. Under settled principles of statutory construction, that interpretation must likewise obtain in this case.

The more difficult question presented is whether Congress's enactment in 1993 of the Religious Freedom Restoration Act (42 U.S.C. § 2000bb et seq., hereafter RFRA)—a federal statutory guarantee of religious liberty expressly and retroactively made applicable to cases such as this one—affords the landlord in this case a basis upon which to seek an individualized *exemption* from compliance with FEHA's prohibition against housing discrimination based on marital status, on the ground that to require her to rent an apartment to an unmarried cohabiting heterosexual couple would conflict with her sincerely held, fundamental religious beliefs.

Evelyn Smith, a widow who owns two duplexes (comprising four rental apartments) in Chico, and who derives her primary source of income from the rental units in question, refused to rent a vacant unit to an unmarried heterosexual couple, contrary to the aforementioned housing discrimination prohibition of FEHA. It is not contested that Smith so acted out of her firm and sincerely held Christian beliefs. The lead opinion effectively concludes that under no circumstance can the state statutory requirement that Smith offer to rent the vacant unit to the unmarried couple be found to "substantially burden" her federal statutorily guaranteed fundamental right to free exercise of her religion. It is further concluded in the lead opinion that even under the mandate of RFRA, California need not demonstrate a "compelling state interest" in furtherance of the housing discrimination provision here in issue before refusing to grant Smith an exemption from it, notwithstanding

the patent conflict between that state statutory provision and Smith's fundamental, federal statutorily guaranteed free exercise rights. Nor, under the lead opinion's rationale, need the state meet its burden under RFRA of demonstrating that FEHA's blanket prohibition against housing discrimination on the basis of marital status, as applied to Smith, is "the least restrictive means" by which to implement this particular antidiscrimination policy.

In short, the lead opinion concludes, purportedly under the balancing test mandated by RFRA and retroactively applicable to this case, that the state policy of prohibiting housing discrimination on the basis of marital status must always prevail, as a matter of law, over a landlord's right of free exercise of his or her religion—even where that policy is shown to conflict with the landlord's sincerely held religious beliefs. And in this case, if Smith does not like it, the plurality invites her to get out of the apartment rental business by selling her duplexes and "redeploying . . . [her] capital in other investments." (Lead opn., *ante*, at p. 1170.)

I dissent. I would hold that the state must meet its burden under the mandate of RFRA of applying the compelling interest test to the particular facts of this case to determine whether the FEHA provision in question "substantially burdens" Smith's federal statutory right to free exercise of her religion, thereby entitling her to seek an individualized exemption from FEHA's requirement that she rent to the unmarried couple in question. Fundamentally, under the supremacy clause of the federal Constitution (U.S. Const., art. VI, cl. 2), the provisions of RFRA must prevail over state law to the contrary.

On the record before us, the state has never directly been put to its burden of demonstrating, upon proper application of RFRA's balancing test, that FEHA's blanket prohibition against housing discrimination based on marital status is the "least restrictive means" of implementing a "compelling governmental interest" in furtherance of the statute's purpose, or whether petitioner is instead entitled to an individualized exemption from that provision based on the particular facts of this case. The Fair Employment and Housing Commission (Commission) exercised its power not to adopt the proposed decision of the administrative law judge who heard the matter, opted instead to hear the case itself on the existing record (Gov. Code, § 11517, subd. (c)), and ultimately concluded it had no power to address Smith's constitutional

arguments in view of article III, section 3.5, of the California Constitution.[1] All of these proceedings were conducted during the years 1988 and 1989, well before RFRA's enactment and, indeed, prior to the high court's decision in *Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595], which prompted Congress to enact the remedial legislation. Because the specific procedures outlined in RFRA were not in effect at the time the Commission heard this case and found petitioner in violation of FEHA, I would reverse the judgment of the Court of Appeal with directions to remand this matter to the Commission for further proceedings consistent with the mandate of RFRA.

I

Petitioner Evelyn Smith (plaintiff below), a widow, is a member of the Bidwell Presbyterian Church in Chico. She owns two duplexes in Chico, comprising four rental units, the rents from which provide her primary source of income. Because of her religious conviction that sex outside of marriage is a sin, she refuses to rent to unmarried couples. Smith informs couples interested in renting her units that she prefers to rent to married couples. In all other respects her rental practices conform to the letter of the law. As the Commission found, "[Petitioner] has rented her units to single, divorced and widowed persons. [She] has no religious objection to renting to people who are single, divorced, widowed or married. [She] would not rent to anyone who engages in sex outside of marriage, whether they are single, divorced, widowed or married. [Petitioner] rents her units to people without regard to their race, color, national origin, ancestry, or physical handicap. [She] rents her units without regard to the religious beliefs of tenants. She does not know the religious background of most of her tenants because she never asks them and only knows if they volunteer the information. [Petitioner] has rented her units to males and females and does not discriminate on the basis of sex."

Complainants Kenneth Phillips and Gail Randall (real parties in interest below) are an unmarried couple. When they expressed an interest in renting one of petitioner's duplex units, petitioner informed them, as was her custom, that she preferred renting to married couples. Complainants then lied to Smith, representing to her that they were married. Petitioner agreed to

---

[1]California Constitution, article III, section 3.5, provides in relevant part: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power: [¶] (a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional . . . ."

rent one of the duplex units to them, and complainants tendered a $150 deposit to secure it. Complainant Randall also falsely signed the lease agreement, "Gail Phillips."

Before moving into the duplex, complainant Phillips informed petitioner that in actuality he and Randall were not married. Petitioner told Phillips she could not rent to an unmarried cohabiting couple because that would violate her religious beliefs. She refused to rent to complainants and returned their security deposit. Petitioner would have rented the unit to complainants had they been married.

Petitioner refused to rent to complainants because of her religious conviction that sex outside of marriage is sinful; she believes she would be committing a sin if she rented to people who engage in nonmarital sex. Petitioner explained: "I believe it's a sin to have sex out of marriage, and if I rent to [complainants] I'm also contributing to their sin and it's a sin for me. I believe that I have to answer [for] that as long as I know it's a sin and if I am assisting them in committing the sin, then I'm guilty, also."

Randall and Phillips each filed separate complaints against petitioner with the Commission. The matter was heard by an administrative law judge. Petitioner argued that the relevant provisions of FEHA (Gov. Code, § 12955, subd. (a)) and the Unruh Civil Rights Act (Civ. Code, § 51) do not prohibit discrimination against unmarried couples in the first instance. She further argued that to require her to rent to an unmarried couple over her religious objections would violate her free exercise rights under the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4.) The administrative law judge rejected both arguments and issued a proposed decision in favor of Randall and Phillips.

The Commission thereafter exercised its discretion not to adopt the proposed decision, and to instead hear the case itself on the existing record. (Gov. Code, § 11517, subd. (c).) The Commission concluded it had no power to address Smith's constitutional arguments in view of the provisions of article III, section 3.5, of the California Constitution. (See *ante*, at p. 1219, fn. 1.) It found that FEHA's prohibition of discrimination based on "marital status" does encompass discrimination against unmarried couples, and that the Unruh Civil Rights Act further prohibits all forms of arbitrary discrimination by business establishments, including discrimination against

unmarried couples. The Commission ultimately ruled in favor of complainants, finding Smith had violated Government Code sections 12955, subdivisions (a) and (d),[2] Civil Code section 51, and Government Code section 12948.[3]

The Commission awarded complainants out-of-pocket and emotional distress damages totalling $954.[4] Petitioner was ordered to "cease and desist" marital status discrimination. She was further ordered to post in her rental units for a period of 90 days a notice announcing that she had been adjudicated in violation of FEHA for refusing to rent to prospective tenants because they were an unmarried couple. She was also ordered to permanently post in her rental units a notice to rental applicants of their rights and remedies under FEHA generally, and specifically with regard to discrimination against unmarried couples. Petitioner was ordered to personally sign both notices, and to provide copies to each person thereafter who expressed interest in renting from her.

---

[2]Government Code section 12955, subdivision (a) provides in relevant part:
"It shall be unlawful:
"(a) For the owner of any housing accommodation to discriminate against any person because of the race, color, religion, sex, *marital status*, national origin, ancestry, familial status, or disability of that person." (Italics added.)
Government Code section 12955, subdivision (d) provides in relevant part:
"It shall be unlawful: [¶] . . . [¶] (d) For any person subject to the provisions of Section 51 of the Civil Code, as that section applies to housing accommodations, to discriminate against any person on the basis of sex, color, race, religion, ancestry, national origin, familial status, marital status, disability, or on any other basis prohibited by that section."

[3]The Commission also concluded plaintiff's conduct constituted a form of arbitrary discrimination by a business establishment in violation of Civil Code section 51 and Government Code section 12948.
At the time of these events Civil Code section 51 provided: "This section shall be known, and may be cited, as the Unruh Civil Rights Act.
"All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.
"This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry, or national origin." (Stats. 1974, ch. 1193, § 1, p. 2568.)
Government Code section 12948 provides: "It shall be an unlawful practice under this part for a person to deny or to aid, incite, or conspire in the denial of the rights created by Section 51 or 51.7 of the Civil Code."

[4]A component of the emotional distress damages found by the Commission was that plaintiff's refusal to rent to complainants "revived for complainant Randall the pain of her parents' disapproval of her living with complainant Phillips." Randall was awarded $300 for this emotional trauma. Phillips was awarded $200. On appeal, the Commission concedes it was without the power to award such damages. (See *Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 251, 267 [284 Cal.Rptr. 718, 814 P.2d 704].)

Smith sought a petition for writ of mandate in the Court of Appeal. That court granted relief and reversed the ruling of the Commission. The Court of Appeal implicitly held that unmarried couples such as complainants came within the protection of the housing discrimination provision here in issue in the first instance. (Gov. Code, § 12955, subd. (a).) The court went on to hold that Smith's free exercise rights under the federal and state Constitutions (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4) took precedence over the state statute's commands. It is noteworthy that the Court of Appeal filed its opinion in this case in May of 1994, only six months after the date on which RFRA became effective (November 16, 1993). (42 U.S.C. § 2000bb-3(a).) Although the Court of Appeal purported to invoke the provisions of RFRA in partial support of its holding, the appellate court did not place principal reliance on that federal statute, and instead reached its conclusions under the case law interpreting the free exercise clauses of the federal and state Constitutions.

II

At the threshold, I concur in the plurality's conclusion that the provisions of FEHA with which we are here primarily concerned—Government Code section 12955, subdivision (a)—must be construed as prohibiting discrimination in housing accommodations against unmarried cohabiting heterosexual couples. I would observe, however, that the Legislature's enactment of the pertinent statutory amendments may not have been originally intended to so broadly extend the proscription against housing discrimination to all such persons.

The language prohibiting discrimination "because of . . . marital status" (Gov. Code, § 12955, subd. (a)) derived from the California Fair Housing Act of 1963, commonly known as the Rumford Fair Housing Act of 1963 (Rumford Act) (former Health & Saf. Code, § 35720).[5] As originally enacted, the Rumford Act did not refer to "marital status." (Stats. 1963, ch. 1853, § 2, p. 3824.) After several failed attempts in the Legislature to amend the act to add prohibitions against housing discrimination on the basis of "sex" and "marital status," among other statuses, the Legislature, during its 1974-1975 Regular Session, enacted Senate Bill No. 844, which amended the Rumford Act to add both "sex" and "marital status" to the list of prohibited grounds of housing discrimination without any further definition of those terms. Thus, as of 1975, the Rumford Act barred housing discrimination on the basis of "race, color, religion, sex, marital status, national

---

[5]For the antidiscrimination laws preceding the Rumford Act and their construction by this court, see Comment, *The Rumford Fair Housing Act Reviewed* (1964) 37 So.Cal.L.Rev. 427, 430-434.

origin, or ancestry." (Former Health & Saf. Code, § 35720, subd. 1, as amended by Stats. 1975, ch. 1189, § 3, p. 2943.)

The statutory provisions prohibiting housing discrimination were transmuted into their present form when the Legislature enacted FEHA in 1980, combining in one scheme both the Rumford Act and the Fair Employment Practices Act (former Lab. Code, § 1411 et seq.). In that process, the Legislature repealed former Health and Safety Code section 35720 and reenacted its provisions in new Government Code section 12955. (Stats. 1980, ch. 992, § 4, p. 3154.) Although the new section applied more broadly to all classes of accommodations, it continued without change the prior statutory list of prohibited grounds of housing discrimination.

The available legislative history of Senate Bill No. 844 includes staff reports by various state agencies (e.g., the Department of Housing and Community Relations, the Fair Employment Practices Commission) and legislative committees (e.g., the Assembly Committee on Housing and Community Development, and the Assembly Ways and Means Committee). In addition to analyzing the background, terms, and effects of the bill, these reports generally recite the purposes that the bill sought to serve. In construing a statute, of course, we may consider "the ostensible objectives to be achieved." (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

It appears from these materials that Senate Bill No. 844 was largely intended to combat housing discrimination against unmarried women, and to a lesser extent unmarried men, based on unwarranted stereotypical beliefs that a single person is both a greater credit risk and a greater security risk than a married person. The legislative record identifies several such beliefs. First, there is the stereotype that unmarried men or women are less financially responsible than married persons, and hence are more likely to default in their obligations to make rent or mortgage payments; this stereotype is stronger in the case of unmarried women than men, and strongest for divorced women or women who are single heads of households. Second, there is the stereotype that the traditional nuclear family is a more stable social unit, and hence that unmarried men or women are more likely than married persons to disturb the peace of the premises. Third, there are two stereotypes aimed particularly at unmarried women: the belief that unmarried female tenants attract "drop-in" or "live-in" men, thus creating an undesirable climate on the premises; and the belief that unmarried female tenants lack the physical ability or skills to properly maintain the premises.

Noticeably absent from this legislative history of the relevant predecessor statutory enactments to Government Code section 12955 is any persuasive

evidence that the addition of the term "marital status" was intended to prohibit housing discrimination against unmarried cohabiting heterosexual couples as such. The foregoing notwithstanding, the plurality offers sufficiently persuasive countervailing reasons why the pertinent FEHA provisions should today be construed as prohibiting housing discrimination against unmarried cohabiting heterosexual couples.

When interpreting a statute, we normally look first to its plain language, attributing to those words their usual and ordinary meaning. (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Smith ultimately refused to rent to Randall and Phillips when she learned they were not married. Government Code section 12955, subdivision (a) makes it "unlawful . . . [¶] . . . [f]or the owner of any housing accommodation to discriminate against any person because of the . . . marital status . . . of that person." The ordinary meaning and use of that term logically encompasses both married and unmarried persons, and it would therefore appear that Smith's actions violated the letter of FEHA.

Moreover, since the enactment of FEHA in 1980, the Commission has apparently consistently interpreted Government Code section 12955, subdivision (a) as applying to unmarried cohabiting couples. So too have at least two California appellate decisions (*Hess* v. *Fair Employment & Housing Com.* (1982) 138 Cal.App.3d 232 [187 Cal.Rptr. 712]; *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89, 99-100 [130 Cal.Rptr. 375]), one of which was cited twice by this court with approval (see *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 213 [211 Cal.Rptr. 398, 695 P.2d 695] [citing *Atkisson* for the proposition]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 264, fn. 10 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118] [same].) Nor has the Legislature ever acted to amend Government Code section 12955, subdivision (a) in the face of this long-standing and well-publicized construction of its terms, which strongly suggests legislative aquiescence in the judicial interpretation of the statute. (*Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 235 [5 Cal.Rptr.2d 782, 825 P.2d 767].)

I therefore agree with the plurality's conclusion that the provisions of FEHA here in issue must be interpreted as prohibiting discrimination in housing accommodations against unmarried cohabiting heterosexual couples. The foregoing legislative history, however, will serve to further characterize the nature of the rights which this particular provision of FEHA was intended to protect. (*Post*, at pp. 1240-1243.) As will be seen, where the statutory provision conflicts with and substantially burdens petitioner's fundamental right of free exercise of religion, such a characterization gains

importance in seeking to determine, under RFRA's mandated balancing test, whether the state can meet its burden of demonstrating the statute is the "least restrictive means" of implementing a "compelling governmental interest" in furtherance of the statute's purpose, such as will outweigh petitioner's federal statutorily guaranteed right to an exemption from its proscriptions.

## III

In *Employment Div., Ore. Dept. of Human Res. v. Smith, supra*, 494 U.S. 872 (*Smith*), a sharply divided United States Supreme Court held that members of the Native American Church were not constitutionally entitled to ingest peyote as part of their religion's sacrament in the face of an Oregon law outlawing the use of peyote. (*Id.* at p. 890 [108 L.Ed.2d at p. 893].) In so holding, the opinion for the court distinguished freedom of religious belief from freedom to act in strict conformance with one's religious scruples. The opinion further distinguished what may be characterized as laws "directed at religion" from neutral laws that merely prescribe or proscribe conduct, but nonetheless conflict in some fashion with behavior driven by religious beliefs. *Smith* held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" (*Id.* at p. 879 [108 L.Ed.2d at p. 886], quoting *United States v. Lee* (1982) 455 U.S. 252, 263, fn. 3 [71 L.Ed.2d 127, 136, 102 S.Ct. 1051] (conc. opn. of Stevens, J.).)

It is beyond dispute that *Smith, supra*, 494 U.S. 872, marked a radical departure from free exercise jurisprudence to the extent its holding redefined the constitutional parameters of religious exemptions. Prior to *Smith*, the high court's cases interpreting the First Amendment's guarantee of free exercise of religion had granted extensive protection to religious liberty through application of the "compelling interest" test. Under that test, the government could not pass or enforce any law that burdened the exercise of religion unless the law's operative effect was the least restrictive means of attaining the compelling state interest which the law was enacted to further. The compelling interest test (or "compelling state interest" or "compelling governmental interest" test) was first announced by the court in *Sherbert v. Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790] (see also *Wisconsin v. Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526]).

In *Smith, supra*, 494 U.S. 872, the high court effectively abandoned the compelling interest test. Under the holding of *Smith*, the free exercise clause of the federal Constitution does not exempt the believer from compliance

with the challenged law, no matter how great a burden the law imposes on the believer's religious beliefs or conduct, so long as the law is one of " 'valid and neutral . . . general applicability.' " (494 U.S. at p. 879 [108 L.Ed.2d at p. 886].)

The decision in *Smith, supra,* 494 U.S. 872, was met with near universal condemnation by members of Congress, religious leaders, religious interest groups, and academics alike. The reaction of Congressman Stephen J. Solarz, who was RFRA's initial sponsor, is illustrative: "[W]ith the stroke of a pen, the Supreme Court has virtually removed religious freedom from the Bill of Rights."[6] Law review articles and notes were nearly unanimous in condemning the rationale and holding of *Smith.*[7] One commentator who agreed with the outcome of *Smith* nevertheless opined that the high court's decision "exhibits only a shallow understanding of free exercise jurisprudence and its use of precedent borders on fiction." (Marshall, *In Defense of Smith and Free Exercise Revisionism* (1991) 58 U. Chi. L.Rev. 308, 309 [describing the purpose of his article as an attempt to defend *Smith*'s rejection of the compelling interest test "without defending *Smith* itself."].)

Plainly, the opinion in *Smith, supra,* 494 U.S. 872, was viewed by many as reflecting the high court's abandonment of all traditional protection of religious liberty. A large number of individuals, scholars, and religious groups joined together in a futile effort to petition the high court for a rehearing.[8] Congress then set out to overturn the effect of the decision in *Smith.*

---

[6]Religious Freedom Restoration Act of 1990: Hearings on House Bill No. 5377 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 101st Congress, Second Session (1990), page 18 (statement of Rep. Stephen J. Solarz).

[7]See, e.g., Note, *The Criminalization of Belief: When Free Exercise Isn't* (1991) 42 Hastings L.J. 1491; Gordon, *Free Exercise on the Mountaintop* (1991) 79 Cal.L.Rev. 91; Delaney, *Police Power Absolutism and Nullifying the Free Exercise Clause: A Critique of Oregon v. Smith* (1991) 25 Ind. L.Rev. 71; McConnell, *Free Exercise Revisionism and the Smith Decision* (1990) 57 U. Chi. L.Rev. 1109; Note, *The Illusory Enforcement of First Amendment Freedom: Employment Division, Department of Human Resources v. Smith and the Abandonment of the Compelling Governmental Interest Test* (1991) 69 N.C. L.Rev. 1332; Comment, *Employment Division, Department of Human Resources v. Smith: The Supreme Court Deserts the Free Exercise Clause* (1991) 25 Ga. L.Rev. 567; Comment, *Just Say No to Judicial Review: The Impact of Oregon v. Smith on the Free Exercise Clause* (1991) 76 Iowa L.Rev. 805; Note, *Employment Division v. Smith: The Supreme Court Alters the State of Free Exercise Doctrine* (1991) 40 Am. U. L.Rev. 1431.

[8]The petition for rehearing in *Smith* was subscribed to by public interest groups such as the American Civil Liberties Union, numerous religious interest groups (including Baptist, Catholic, Jewish, Lutheran, Evangelical, Unitarian and Seventh Day Adventist groups), as well as an unprecedented coalition of over 50 law professors, among them Gerald Gunther of Standford, Laurence Tribe of Harvard, Kent Greenawalt of Columbia, and Michael McConnell of Chicago. (*Smith, supra,* 494 U.S. 872, rehg., den. (1990) 496 U.S. 913 [110 L.Ed.2d 285, 110 S.Ct. 2605].)

RFRA was first introduced by Congressman Stephen J. Solarz on July 26, 1990. (H.R. No. 5377, 101st Cong., 2d Sess. (1990).) The same bill was introduced in the Senate on October 26, 1990, by cosponsoring Senators Biden, Hatch, Inouye, Kennedy, Lieberman, Metzenbaum, Moynihan and Specter. (Sen. No. 3254, 101st Cong., 2d Sess. (1990).) A second version of the bill was introduced, again by its chief sponsor, Congressman Solarz, on June 26, 1991 (H.R. No. 2797, 102d Cong., 1st Sess. (1991)), and reintroduced in the Senate by Senator Edward Kennedy (Sen. No. 2969, 102d Cong., 2d Sess. (1992)). The final version of the bill, which ultimately became law (H.R. No. 1308, 103d Cong., 1st Sess. (1993); Sen. No. 578, 103d Cong., 1st Sess. (1993)), differed from the original bill in several important respects. Among them, a section entitled "Congressional Findings and Declaration of Purposes," which had been added in the second version, was retained and further amended in the final version of the bill. A section from the original bill that had defined the term "person" as used in the act, and ostensibly would have allowed individuals *and* religious organizations, corporations or associations to bring suit under the act, was deleted from the second version, and likewise omitted from the final version of the bill which became law.

Bipartisan support for the enactment of RFRA in both houses of Congress was overwhelming. The final version of RFRA was introduced in the Senate by Senators Edward Kennedy and Orrin Hatch, and was cosponsored by 55 Senators. (139 Cong. Rec. S14461-01, S14471 (daily ed. Oct. 27, 1993).) There were over 190 cosponsors of the predecessor bill in the House of Representatives; the final version passed in that house of Congress without opposition. (139 Cong. Rec. H2356-03, H2363 (daily ed. May 11, 1993); 139 Cong. Rec. H8713-04, H8715 (daily ed. Nov. 3, 1993).) The Coalition for the Free Exercise of Religion, formed for the specific purpose of supporting passage of RFRA, was comprised of more than 35 organizations representing widely diverse religious and political groups and viewpoints, among them the American Civil Liberties Union, the American Jewish Congress, Concerned Women for America, the Baptist Joint Committee on Public Affairs, the National Association of Evangelicals, and the Native American Rights Fund, to name a few. (See Religious Freedom Restoration Act of 1990: Hearings on H.R. No. 5377 before House Com. on Judiciary, Subcom. on Civil & Constitutional Rights, 101st Cong., 2d Sess. (1990) at pp. 61-62.)

It is clear beyond cavil that RFRA was enacted for the express purpose of restoring the level of protection for religious freedom that existed prior to the high court's decision in *Smith*. As the court noted in *Hunafa* v. *Murphy* (7th Cir. 1990) 907 F.2d 46, 48, "*Smith* cut back, possibly to minute

dimensions, the doctrine that requires government to accommodate . . . minority religious preferences[.]" (See also *Yang* v. *Sturner* (D.R.I. 1990) 750 F.Supp. 558, 560 ["One must wonder . . . what is left of Free Exercise jurisprudence when one can attack only laws explicitly aimed at a religious group."]; see also *Smith*, *supra*, 494 U.S. at p. 908 [108 L.Ed.2d at p. 905] (dis. opn. of Blackmun, J.) [*Smith* "effectuates a wholesale overturning of settled law concerning the Religion Clauses of our Constitution."]; and see *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah* (1993) 508 U.S. 520, 566 [124 L.Ed.2d 472, 512, 113 S.Ct. 2217] (conc. opn. of Souter, J.) [describing the hybrid distinction posited in *Smith* as unworkable and "ultimately untenable"].)

It is equally clear that RFRA,[9] which applies retroactively to all cases pending at the time of its enactment (42 U.S.C. § 2000bb-3(a)), including this case, was purposefully intended to reverse the impact of the high court's decision in *Smith*, *supra*, 495 U.S. 872, by creating a statutory right requiring the compelling interest test to be applied in all cases in which the free exercise of religion has been burdened by a law of general applicability.

That Congress intended RFRA to restore First Amendment free exercise jurisprudence to that which existed prior to *Smith* is clear from the following report of the House Judiciary Committee: "For many years and with very few exceptions, the Supreme Court employed the compelling governmental interest test [in deciding free exercise claims]. The *Smith* majority[']s abandonment of strict scrutiny represented an abrupt, unexpected rejection of long-standing Supreme Court precedent. . . . [¶] The effect of the *Smith* decision has been to subject religious practices forbidden by laws of general applicability to the lowest level of scrutiny employed by the courts. Because the 'rational relationship test' only requires that a law must be rationally related to a legitimate state interest, the *Smith* decision has created a climate in which the free exercise of religion is continually in jeopardy . . . . [¶] It is the Committee[']s expectation that the courts will look to free exercise of religion cases decided prior to *Smith* for guidance in determining whether or

---

[9]Title 42 United States Code section 2000bb-1 states:

"(a) IN GENERAL.—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

"(b) EXCEPTION.—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

"(1) is in furtherance of a compelling governmental interest; and

"(2) is the least restrictive means of furthering that compelling governmental interest.

"(c) JUDICIAL RELIEF.—A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution."

not religious exercise has been burdened and the least restrictive means have been employed in furthering a compelling governmental interest. . . . Therefore, the compelling governmental interest test should be applied to all cases where the exercise of religion is substantially burdened; however, the test generally should not be construed more stringently or more leniently than it was prior to *Smith*." (H.R.Rep. No. 103-88, 103d Cong., 1st Sess. (1993) at pp. 3, 6, 7; and see *id.* at p. 15 ["[T]he purpose of the statute is to 'turn the clock back' to the day before *Smith* was decided."].)

It is against this backdrop of the high court's decision in *Smith, supra,* 495 U.S. 872, and the groundswell of opposition to that decision, culminating in Congress's enactment of remedial legislation to reverse its impact on the traditional protections of religious liberty, that I turn next to the rationale of the lead opinion.

The lead opinion first analyzes petitioner's free exercise claim under the First Amendment, and it is concluded that "[t]he First Amendment does not support Smith's claim." (Lead opn., *ante,* at p. 1161.) Principal reliance is placed on the holding in *Smith, supra,* 494 U.S. 872, and in particular, the passage in that case holding that " 'the right of free exercise does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." ' " (Lead opn., *ante,* at p. 1161, quoting *Smith, supra,* 494 U.S. at p. 879 [108 L.Ed.2d at p. 886].)

The lead opinion reflects a clear understanding of the import of the high court's decision in *Smith, supra,* 494 U.S. 872. The plurality acknowledges that "in [*Smith*], the high court *abandoned balancing* as a way of adjudicating religiously motivated challenges to generally applicable laws." (Lead. opn., *ante,* at p. 1163, italics added; see conc. opn. of Mosk, J., *ante,* at p. 1181 ["The *Smith* court all but declared the 'compelling government interest' test to be 'utterly unworkable' . . . ."].) The lead opinion further acknowledges that in *Smith* the high court "[r]epudiat[ed] the balancing test set out in such cases as *Sherbert* v. *Verner, supra,* 374 U.S. 398, and *Wisconsin* v. *Yoder, supra,* 406 U.S. 205 . . . ." (Lead opn., *ante,* at p. 1164.)

In proceeding to analyze petitioner's free exercise claim under RFRA, the lead opinion acknowledges that RFRA was enacted for the express purpose of reversing the impact of *Smith, supra,* 494 U.S. 872, and restoring the compelling interest test. (Lead opn., *ante,* at p. 1166.) It is further explained that prior to *Smith,* the high court's cases applying the compelling interest test required a critical threshold showing, to wit, that the statute challenged be shown to "substantially burden" the religious beliefs of the person

asserting its provisions violated his free exercise rights under the First Amendment, and that "Congress pointedly retained the threshold requirement in RFRA." (*Id.* at p. 1169.) Nor are there any factual conclusions drawn in the lead opinion at odds with the obvious "burden" that will result if petitioner is required to comply with the provision of FEHA here in question. In essence, she will be required to either (1) violate her religious beliefs, by having to rent to unmarried couples, (2) refuse to comply with the law, and thereby incur statutory penalties, which, I would note, include increasingly severe *criminal penalties* for continuing violations, or (3) get out of the apartment rental business.

Notwithstanding the clear commands of the compelling interest test mandated under RFRA, and the "substantial burden" that looms plain and clear when that threshold requirement is applied to the facts of this case, the lead opinion concludes as follows: "In summary, these are the facts on which we must decide whether [petitioner] should be exempt from the antidiscrimination provisions of FEHA: [Petitioner's] religion does not require her to rent apartments, nor is investment in rental units the only available income-producing use of her capital. Thus, she can avoid the burden on her religious exercise without violating her beliefs or threatening her livelihood. [Citations.] The asserted burden is the result not of a law directed against religious exercise, but of a religion-neutral law that happens to operate in a way that makes [petitioner's] religious exercise more expensive. [Citations.] Finally, to grant the requested accommodation would not affect [petitioner] alone, but would necessarily impair the rights and interests of third parties. [Citation.] [¶] This set of facts does not, under the relevant case law, support [petitioner's] argument that requiring her to comply with FEHA's antidiscrimination provisions substantially burdens her religious exercise. Accordingly, we have no occasion to determine whether application of the statute to her furthers a compelling state interest or is the least restrictive means to further such an interest." (Lead opn., *ante,* at pp. 1175-1176.)

The lead opinion's characterization of the compelling interest test mandated under RFRA, and its determination to truncate application of that test to this case because the "substantial burden" requirement assertedly could never be met on facts such as are before us, is simply flawed. True, "in enacting RFRA, Congress did not attempt to define a 'substantial burden.'" (Lead opn., *ante,* at p. 1169.) True, the legislative history reflects Congress expected courts would look to the free exercise cases decided prior to *Smith, supra,* 494 U.S. 872, to determine whether the exercise of religion has been substantially burdened. (Lead opn., *ante,* at p. 1169.) But these observations are only accurate insofar as Congress plainly, and expressly, directed through RFRA that the compelling interest test, *a balancing test* first announced in the pre-*Smith* seminal case of *Sherbert* v. *Verner, supra,* 374 U.S.

398, and thereafter applied without exception to free exercise claims for nearly three decades (see also *Wisconsin* v. *Yoder, supra,* 406 U.S. 205), should henceforth be applied to such claims as a matter of federal statutory right. It is the rule of those pre-*Smith* cases and their progeny—that the compelling interest test be applied whenever government seeks to substantially burden a person's exercise of religion, even if the burden results from a rule or law of general applicability—that RFRA commands must henceforth be applied to free exercise claims. Surely Congress did not intend to resurrect through RFRA the interpretation of the pre-*Smith* decisions which the high court in *Smith* placed on them to reach its holding *abandoning* the compelling interest test.

I view the lead opinion's conclusions, summarized above, as virtually indistinguishable from the rationale and holding of *Smith, supra,* 494 U.S. at page 879 [108 L.Ed.2d at page 886], in which case the high court concluded that the free exercise clause of the federal Constitution does not exempt the believer from compliance with a challenged law, no matter how great a burden the law imposes on the believer's religious beliefs or conduct, so long as the law is one of " 'valid and neutral . . . general applicability.' " It is this central theme and holding of *Smith* that was so plainly, expressly, and thoroughly repudiated through the enactment of RFRA.

The seminal case relied on in the lead opinion is *Braunfeld* v. *Brown* (1961) 366 U.S. 599 [6 L.Ed.2d 563, 81 S.Ct. 1144]. But the holding in that case is inapposite to the facts at hand. In *Braunfeld,* Orthodox Jewish shopkeepers were required by their religious scruples to close their shops on Saturdays, their Sabbath. They were also subject to the challenged Sunday closing law which required them to keep their shops closed on Sundays. They urged that the Sunday closing law violated their free exercise rights because the effect of that law, taken together with the command of their Orthodox Jewish faith that their shops remain closed on Saturdays, resulted in the closure of their businesses for two days a week, whereas other merchants were only required to close their shops one day a week (Sunday). The high court rejected the shopkeepers' claim because nothing in Orthodox Judaism prohibited them from complying with the challenged law requiring them to close their shops on Sundays. The burden on the Orthodox Jewish shopkeepers was not "substantial" because nothing about their religious beliefs prevented them from complying with the Sunday-closing law.

Petitioner has never claimed her religion compels her to participate in the business of renting apartments. Nor is that factor alone conclusive of the issue at hand. Although the question whether the believer's religion *compels* the conduct that stands in conflict with the challenged statute is a relevant

and important one, it is *not* determinative of the "substantial burden" inquiry we make under the compelling interest test. The Orthodox Jewish shopkeepers in *Braunfeld* did not claim their religious beliefs prevented them from complying with the Sunday-closing law, much less prevented them from pursuing their livelihood as shopkeepers. Nor, for that matter, did the United States Supreme Court in *Braunfeld* directly extend an invitation to the shopkeepers, who were petitioning the court to secure their fundamental right to free exercise of their religion, to get out of the business of being merchants.

Here, petitioner's firm and sincerely held religious beliefs *do* prevent her from renting to unmarried cohabiting heterosexual couples. Unlike the shopkeepers in *Braunfeld*, here petitioner's religious beliefs *do* conflict with, and require her to violate, the provision of FEHA in issue as long as she continues to offer her units for rent to the public. I would commend to the plurality the high court's cautionary remarks in *Wisconsin* v. *Yoder, supra*, 406 U.S. 205, 220 [32 L.Ed.2d 15, 28], to the effect that "belief and action cannot be neatly confined in logic-tight compartments," and those of Justice Sandra Day O'Connor in her concurring opinion[10] in *Smith, supra*, 494 U.S. 874, 893 [108 L.Ed.2d 876, 895], to wit, "Because the First Amendment does not distinguish between religious belief and religious conduct, conduct motivated by sincere religious belief, like the belief itself, must be at least presumptively protected by the Free Exercise Clause."

I am particularly persuaded by that portion of the analysis set forth in Justice Kennard's concurring and dissenting opinion, wherein she explains that *"Braunfeld* . . . represented only the first step by the United States Supreme Court in the development of its modern free exercise clause jurisprudence, not its full flowering." (Conc. and dis. opn. of Kennard, J., *ante,* at p. 1206.) Justice Kennard quotes various academics and commentators in support of this viewpoint, one of whom pointedly observed that the high court, in *Sherbert* v. *Verner, supra*, 374 U.S. 398, " 'abandoned *Braunfeld's* distinction between direct and indirect impacts on religious conduct, and afforded religious action a level of constitutional protection that it had not before enjoyed.' " (Conc. & dis. opn. of Kennard, J., *ante,* at p. 1206, quoting Choper, *The Rise and Decline of the Constitutional Protection of Religious Liberty* (1991) 70 Neb. L.Rev. 651, 655.)

To this line of reasoning I would add a further observation. In paraphrasing RFRA's "compelling governmental interest" test to be applied in cases in

---

[10]It should be noted that Justice O'Connor did not join the rationale of the majority in *Smith*, but instead concurred on separate grounds. She would have applied the compelling interest test, but concurred in the judgment because she believed the petitioners would still lose under that test. (*Smith, supra*, 494 U.S. at pp. 905-907 [108 L.Ed.2d at pp. 903-904] (conc. opn. of O'Connor, J.).)

which a law of general applicability is asserted to burden the claimant's free exercise of religion, the lead opinion points to authorities setting forth the threshold requirement that "[t]he burden must fall on a religious belief rather than on a philosophy or a way of life." (Lead opn., *ante,* at p. 1166, citing *Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 215-219 [32 L.Ed.2d 15, 24-27]; *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 713-718 [67 L.Ed.2d 624, 630-634, 101 S.Ct. 1425]; *Werner* v. *McCotter* (10th Cir. 1995) 49 F.3d 1476, 1479, fn. 1; and *Thiry* v. *Carlson* (D.Kan. 1995) 887 F.Supp. 1407, 1412.) It seems to me the "burden" may, and often does, fall on both the believer's religious beliefs, and one or more aspects of his "way of life." In reviewing the rationale of the lead opinion, it strikes me that the justices subscribing to it are seemingly choosing to focus, not on petitioner's sincere affirmation that compliance with the provision of FEHA in question will burden her firmly held religious beliefs, but instead *solely* on the manner in which her compliance with the statutory provision will impact her *economic* "way of life." Although the extent of the "economic" burden a challenged statute imposes on the believer is clearly a factor that can be weighed in evaluating the sincerity of the claimed need for a religious exemption, it is not determinative of the question of "substantial burden" where, as here, it can be shown that compliance with the law *conflicts* with the believer's fundamental religious beliefs. Indeed, this case well illustrates the point, for as will be explained, petitioner's economic interest in securing tenants for her vacant units is in actuality at odds with her religious beliefs, which serve to limit her pool of prospective lessees. In this sense too then, I believe the subscribers to the lead opinion lose sight of the full mandate of RFRA to apply a true *balancing test* to free exercise claims.

Finally, the subscribers to the lead opinion err when they meld the "compelling governmental interest" and "least restrictive means" inquiries into the threshold "substantial burden" inquiry. The lead opinion cautions that "were we to grant the requested accommodation, [petitioner] would have more freedom and greater protection for her own rights and interests, while Phillips and Randall would have less freedom and less protection." (Lead opn., *ante*, at p. 1175.) But such is not a conclusion of law to be determined on speculation by this court. The balancing of rights and interests, and the determination whether the blanket prohibition of housing discrimination based on marital status is the "least restrictive means" of implementing the "compelling governmental interest," if any, behind Government Code section 12955, is a matter of proof for the Commission in this case. RFRA expressly provides that the government must "demonstrate[] that application of the burden to the person— [¶] . . . [¶] . . . is the least restrictive means of furthering th[e] compelling governmental interest." (42 U.S.C. § 2000bb-1(b).) "Demonstrate" is in turn defined in the legislation as "meet[ing] the burdens of going forward with the evidence and of persuasion." (*Id.* at § 2000bb-2(3).) In contrast, the threshold "substantial burden"

inquiry to be made below, in the words of the statute, is simply this—is petitioner "[a] *person* whose religious exercise has been burdened." (42 U.S.C. § 2000bb-1(c), italics added.) In short, the focus at the "substantial burden" stage of our inquiry must be on whether the FEHA provision in question substantially burdens petitioner's free exercise rights—not on whether Phillips and Randall would be afforded less protection under FEHA's marital antidiscrimination provision, were petitioner granted an exemption from its proscriptions.

For reasons not entirely clear to many, myself included, the sharply divided high court in *Smith, supra,* 494 U.S. 872, in a single judicial opinion, undid nearly three decades of traditional constitutional protection of religious liberty which the court in *Sherbert* v. *Verner, supra,* 374 U.S. 398, set in motion in formulating the compelling interest test. In 1993, a nearly unanimous Congress, with overwhelming public support, passed federal legislation in an attempt to reestablish the traditional protections which religious liberty has long enjoyed in this country. In my view, the justices subscribing to the lead opinion have misconstrued both the letter and spirit of that important remedial legislation as it applies to this case.

It must, of course, be noted that there is no "majority" support in this case for the interpretation of RFRA suggested in Justice Werdegar's lead opinion. This becomes clear when one considers the basis on which Justice Mosk has provided the essential concurring fourth vote for *the result* reached by the plurality in this case. The rationale of Justice Mosk's separate concurring opinion warrants close scrutiny. Justice Mosk would find RFRA unconstitutional; in his words, "the statute itself is without effect as violative of the United States Constitution." (Conc. opn. of Mosk, J., *ante,* at p. 1180.) Justice Mosk then rejects petitioner's claims under the free exercise clause of the First Amendment, as that clause is interpreted by the high court's decision in *Smith, supra,* 494 U.S. 872. Indeed, Justice Mosk would go *farther* than did the high court in *Smith, supra,* 494 U.S. 872. He states, "one commentator has argued that the 'strongest reading of . . . *Smith* is that it may verge on unconstitutional for a court to inquire into the substantiality of an alleged burden on religious exercise.' (Idleman, *The Religious Freedom Restoration Act: Pushing the Limits of Legislative Power* (1994) 73 Tex. L.Rev. 247, 273.) [¶] In light of the foregoing, I am compelled to conclude that the best reading of *Smith* is stronger still: for a court to so inquire is in fact unconstitutional." (Conc. opn. of Mosk, *ante,* at p. 1191, fn. omitted.)

In short, there is no majority support for the construction of the provisions of RFRA, or the suggested limited scope of its protection of religious liberties in California, set forth in the lead opinion. "And it is important. The lead opinion's reasoning does not express the views of a majority of this court. As a result, its analysis 'lacks authority as precedent' (*Board of*

*Supervisors* v. *Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198]) and hence cannot bind. Therefore, its mischief is limited to this case and to this case alone." (*Alfredo A.* v. *Superior Court* (1994) 6 Cal.4th 1212, 1257 [26 Cal.Rptr.2d 623, 865 P.2d 56] (dis. opn. of Mosk, J.).)

IV

Given my disagreement with the interpretation of RFRA found in the lead opinion, and my conclusion that a full and proper application of RFRA's balancing test to the facts at hand might result in a conclusion that petitioner is entitled to an exemption under its provisions, I will proceed to discuss what I believe would be the appropriate application of RFRA's balancing test to this case.

RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." (42 U.S.C. § 2000bb-1(a).) Under subdivision (b), "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person— [¶] (1) is in furtherance of a compelling governmental interest; and [¶] (2) is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000bb-1(b).)

At the outset, I note that no party to these proceedings has directly challenged the constitutionality of RFRA as a general matter. In enacting RFRA, Congress relied on its power under section 5 of the Fourteenth Amendment, which provides that, "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." (See Sen.Rep. No. 103-111, 1st Sess., pp. 13-14 (1993), reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1892, 1903.) In *Cantwell* v. *Connecticut* (1940) 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352], the Supreme Court incorporated the free exercise clause into the Fourteenth Amendment, thereby making it subject to the legislative protection afforded under section Five of the Fourteenth Amendment. To date, at least one federal circuit court, the United States Court of Appeals, Fifth Circuit, has expressly upheld the constitutionality of RFRA. (*Flores* v. *City of Boerne, Tex.* (5th Cir. 1996) 73 F.3d 1352.) Two federal district courts have likewise reached the same conclusion. (*Sasnett* v. *Department of Corrections* (W.D.Wis. 1995) 891 F.Supp. 1305, 1315-1320; *Belgard* v. *State of Hawaii* (D.Hawaii 1995) 883 F.Supp. 510, 512-517.)[11]

I also find it significant that the express language of RFRA embodies *individuals* with standing to seek its protections. The statute provides that

---

[11]Congress's power in this regard has been successfully exerted in other contexts. (See, e.g., the Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa-2000aa-12 [restricting the ability of government investigators to obtain documents from the media, thereby limiting the

"[a] *person* whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." (42 U.S.C. § 2000bb-1(c), italics added.) As noted, a prior version had defined "person" more broadly, but was deleted from the final version of the law. (*Ante,* at p. 1228.) I would not read beyond the express language of the statute. Unless construed otherwise by the high court, I view the provisions of RFRA as authorizing *persons* to seek individualized exemptions from generally applicable governmental laws or rules that burden their free exercise of religion, by authorizing them to invoke the statutorily mandated application of the compelling interest balancing test. When read together with the minimum standing requirements of article III of the Constitution which also apply to RFRA (see *Lujan* v. *Defenders of Wildlife* (1992) 504 U.S. 555, 560 [119 L.Ed.2d 351, 363-364, 112 S.Ct. 2130]), there need be no concern that broad segments of California's citizenry will be able to seek religious-belief-based exemptions from otherwise valid state laws of general applicability.

Returning to the facts of the case before us, there is no dispute that Government Code section 12955, subdivision (a), embodying FEHA's housing discrimination prohibition based on marital status, is a "neutral, generally applicable law." The antidiscrimination provision applies to landlords of all faiths, and does not single out Christians like petitioner.

Nor does anyone appear to dispute that petitioner's religious beliefs regarding the renting of her units to unmarried cohabiting heterosexual couples are sincerely held. In this regard, I find the following observations in the opinion of the Court of Appeal below, authored by Presiding Justice Robert K. Puglia and concurred in by Justice Arthur G. Scotland, with a separate concurring and dissenting opinion by Justice Vance W. Raye, pertinent here:[12]

The Commission entertained no "doubt" as to 'the depth and sincerity of [plaintiff's] religious convictions . . . .' [] We accept as established by the

---

effect of the high court's holding in *Zurcher* v. *Stanford Daily* (1978) 436 U.S. 547 [56 L.Ed.2d 525, 98 S.Ct. 1970]; the Church Audit Procedure Act of 1984, 26 U.S.C. § 7611 [strictly regulating the ability of the Internal Revenue Service to conduct "church tax examination" and "church tax inquiry"].)

Most pertinent here is Congress's enactment of the Exemption Act of 1988, 26 United States Code section 3127, which created a special Social Security tax exemption for employers and employees who are members of "a recognized religious sect" and whose "established tenets" include opposition to participation in the Social Security program. This legislation freed the Old Order Amish from the high court's holding in *United States* v. *Lee, supra,* 455 U.S. 252, which decision rejected the Amish petitioners' free exercise claim on the ground that uniform, compulsory collection of Social Security taxes was essential to accomplishing an overriding governmental interest.

[12]Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the reporter's parallel citations) are, unless otherwise indicated, used to denote insertions or additions. Footnotes in the Court of Appeal opinion that have been retained are sequentially numbered. (See *Arriaga* v. *County of*

Commission's finding to that effect that [petitioner] is sincere in her expressed religious conviction and belief that [sex outside of marriage] is a sin in the commission of which she will be complicit if forced to rent to an unmarried couple. "It is not within 'the judicial function and judicial competence' . . . to determine whether [plaintiff] or the Government has the proper interpretation of [her] faith; '[c]ourts are not the arbiters of scriptural interpretation.' " (*United States* v. *Lee, supra,* 455 U.S. at p. 257 [71 L.Ed.2d at p. 132].) "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task . . . . However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [free exercise] protection." (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 714 [67 L.Ed.2d 624, 631, 101 S.Ct. 1425] (*Thomas*).)

More importantly, the constitutional protection accorded free exercise of religion is not limited to beliefs which are shared by all members of a religious sect. (*Thomas, supra,* 450 U.S. at pp. 715-716 [67 L.Ed.2d at p. 632].) "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." (*Board of Education* v. *Barnette* (1942) 319 U.S. 624, 642 [87 L.Ed. 1628, 1639, 63 S.Ct. 1178, 147 A.L.R. 674].) We thus accept on faith, as it were, the sincerity of [petitioner's] assertion her religious convictions and beliefs preclude her from renting to an unmarried couple on penalty of herself committing a sin."[13] [End of quoted portion of Court of Appeal opinion.]

As I have explained, I disagree with the rationale that leads the subscribers to the lead opinion to conclude FEHA's prohibition against housing discrimination based on marital status does not "substantially burden" petitioner's religious beliefs or free exercise rights. Here again, I commend the observations of the Court of Appeal below on that aspect of the inquiry:

"Compelling [petitioner] to rent her properties to unmarried couples, to pay damages to the unmarried complainants for refusing out of conscience to rent to them, to post notices informing prospective tenants of their rights and remedies under FEHA and specifically as it pertains to unmarried couples,

---

*Alameda* (1995) 9 Cal.4th 1055, 1059 [40 Cal.Rptr.2d 116, 892 P.2d 150]; *People* v. *May* (1988) 44 Cal.3d 309, 315 [243 Cal.Rptr. 369, 748 P.2d 307]; *Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

[13]We do not mean to suggest that every claim of religious belief warrants free exercise protection. One can easily imagine "an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to [free exercise] protection . . . ." (*Thomas, supra,* 450 U.S. at p. 715 [67 L.Ed.2d at p. 632].) That is manifestly not the case here.

and to post announcements, signed by her, that she has been adjudicated in violation of FEHA for refusing to rent to an unmarried couple interferes with and substantially burdens [her] free exercise rights. [Petitioner] cannot remain faithful to her religious convictions and beliefs and yet rent to unmarried couples. If faced with that choice, [petitioner] testified her rental units will 'stay vacant.' The Commission's order penalizes [petitioner] for her religious belief that [sex outside of marriage] and its knowing facilitation are sinful."

The Court of Appeal concluded: "[Petitioner] has been forced to choose between fidelity to her religious beliefs and renting to complainants. Choosing to follow her conscience, [she] has further suffered abridgement of her free speech rights. The coercive impact is real and the conflict is irreconcilable. While the compulsion may be indirect, the infringement upon fundamental rights is nonetheless substantial."

I agree with these conclusions. Petitioner presumably did not choose her religious beliefs for their convenience, yet she must, and has stated she will, abide by them despite the economic hardship of forgoing the business of unmarried couples who would otherwise make acceptable tenants. It would appear on these facts that the plurality's result in this case will place on petitioner, a widow who derives her primary source of income from the rental units in question, the very substantial burden of finding a new livelihood and means of support.

I would add that I recognize that "[t]o maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good." (*United States* v. *Lee, supra*, 455 U.S. at p. 259 [71 L.Ed.2d at p. 133]; see, e.g., *Braunfeld* v. *Brown, supra*, 366 U.S. at p. 603 [6 L.Ed.2d at p. 566] [state's interest in "improving the health, safety, morals and general well-being of . . . citizens" permitted enforcement of Sunday-closing laws against shopkeepers who observed a Saturday Sabbath]; *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 165 [88 L.Ed. 645, 652, 64 S.Ct. 438] [the "interests of society to protect the welfare of children" permitted the state to apply its child labor law to bar a Jehovah's Witness from distributing religious literature on the streets].)

Nevertheless, to my mind, telling petitioner in this case she must choose between her sincerely held religious beliefs and her present means of income, support, and livelihood, that is to say, telling her to forgo her religious beliefs and "redeploy her capital" or get out of the apartment rental business, without making further inquiry into the "compelling interest," if any, the FEHA provision in question is intended to protect, and the manner in which the statutory scheme seeks to attain that compelling interest, and without further *balancing* the results of those inquiries against petitioner's

fundamental free exercise rights, violates both the letter and spirit of her federal statutory rights under RFRA. The lead opinion's rationale is precisely the type of abbreviated analysis embraced in *Smith, supra,* 495 U.S. 874, which the federal legislation was enacted to redress.

I will therefore proceed, under the balancing test mandated by RFRA, to inquire generally into the matter of whether the state can demonstrate "that application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling interest." (42 U.S.C. § 2000bb-1(b).) Here again, I commend that portion of the opinion of the Court of Appeal below which concluded California has no compelling interest in promoting the housing rights of unmarried couples such as would automatically outweigh petitioner's fundamental free exercise rights. The Court of Appeal reasoned as follows:[14]

California has a significant interest in eradicating discrimination in employment and housing. In 1975, provisions prohibiting sex and marital status discrimination in housing were added to the statute which previously forbade discrimination on the basis of race, creed or color. (Stats. 1975, ch. 1189, pp. 2942-2948; see also 2 Stats. 1975 (Reg. Sess.) Summary Dig., [ ] p. 322.) [As noted, *ante,* at page 1225,] [a]ppellate decisions hold that "marital status" includes unmarried couples. (*Hess* v. *Fair Employment & Housing Com.*[, *supra,* ] 138 Cal.App.3d 232, 235; *Atkisson* v. *Kern County Housing Authority*[, *supra,* ] 59 Cal.App.3d 89, 99.)

The inquiry narrows to whether California's interest in eradicating discrimination in housing against unmarried couples reaches the level of an overriding governmental interest. (See *United States* v. *Lee, supra,* 455 U.S. at p. 259 [71 L.Ed.2d at p. 133].) It is self-evident the Legislature cannot by statute establish that a governmental interest is so compelling as to override conflicting constitutional rights. When legislative abridgment of constitutional rights is asserted, the courts must be astute to examine the effect of the challenged legislation. (*Schneider* v. *Irvington* (1939) 308 U.S. 147, 161 [84 L.Ed. 155, 165, 60 S.Ct. 146].) "Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." [(*Ibid.*)] "In the end, the judiciary must complete the task of determining whether a particular governmental policy is sufficiently compelling to override a claimed constitutional right." (*Gay Rights Coalition* v. *Georgetown Univ.* (D.C.App. 1987) 536 A.2d 1, 73 (conc. and dis. opn. of Belson, J.); see *Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 440-441 [87 L.Ed.2d 313, 320-321, 105 S.Ct. 3249].)

---

[14]For comments as to format, see *ante,* page 1237, footnote 12.

While the Legislature has proscribed discrimination on a number of grounds—race, color, religion, sex, marital status, national origin, ancestry, familial and disability status—neither the statutory language nor legislative history indicates the Legislature intended the several proscribed grounds of discrimination be arrayed in any particular hierarchy of priorities, or that within each classification legitimate distinctions might be made. It is reasonable, however, to postulate that the Legislature did not intend all such classifications to be equal. (See *Gay Rights Coalition* v. *Georgetown Univ.*, *supra*, 536 A.2d at p. 72 (conc. and dis. opn. of Belson, J.).) Several factors point to this conclusion.

First, it cannot be said the goal of eliminating discrimination on the basis of unmarried status enjoys equal priority with the state public policy of eliminating racial discrimination. Racial classifications leading to different treatment always demand strict scrutiny. (*Cleburne* v. *Cleburne Living Center, Inc.*, *supra*, 473 U.S. at p. 440 [87 L.Ed.2d at p. 320].) No similar level of scrutiny is demanded where discrimination is on the basis of marital status and certainly not for discrimination against unmarried couples (see *Hinman* v. *Department of Personnel Admin.* (1985) 167 Cal.App.3d 516, 526 [213 Cal.Rptr. 410]; *Garcia* v. *Douglas Aircraft Co.* (1982) 133 Cal.App.3d 890, 894 [184 Cal.Rptr. 390]).

Second, the Legislature has not extended to unmarried couples numerous rights which married couples enjoy. Citing typically the lack of legislative approval, the courts have consistently refused to treat unmarried couples as the legal equivalent of married couples. (E.g., *Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 274-279 [250 Cal.Rptr. 254, 758 P.2d 582] [unmarried person does not have cause of action either for negligent infliction of emotional distress or for loss of consortium]; (*In re Cummings* (1982) 30 Cal.3d 870 [180 Cal.Rptr. 826, 640 P.2d 1101] [prison regulations may properly allow conjugal visitation rights to married couples but deny them to unmarried couples]; *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106] [unmarried couples do not have a right to spousal support absent a written agreement]; *Beaty* v. *Truck Insurance Exchange* (1992) 6 Cal.App.4th 1455, 1461 [8 Cal.Rptr.2d 593] [insurer's refusal to issue joint umbrella policy, reserved for married couples, to unmarried couple is not unlawfully discriminatory]; *Hinman* v. *Department of Personnel Admin.*, *supra*, 167 Cal.App.3d at p. 530 [unmarried cohabitant is not entitled to dental benefits available to family members of state employees]; *Garcia* v. *Douglas Aircraft Co.*, *supra*, 133 Cal.App.3d at p. 894 [unmarried person does not have a right to bring wrongful death action on behalf of cohabiting partner]; *Harrod* v. *Pacific Southwest Airlines* (1981) 118 Cal.App.3d 155 [173 Cal.Rptr. 68] [same]; *People* v. *Delph* (1979) 94 Cal.App.3d 411 [156 Cal.Rptr. 422, 4 A.L.R.4th 416] [unmarried couples do not have marital

communication privilege under the rules of evidence].) If the need to eradicate discrimination against unmarried couples is so compelling as complainants and the Commission contend, the Legislature would have responded to these judicial decisions to extend equal rights to all cohabiting Californians. (See *Garcia* v. *Douglas Aircraft Co.*, *supra*, 133 Cal.App.3d at p. 894.)

We deem the Legislature's lack of response to reflect the state's strong interest in the marriage relationship. "[T]he state's interest in promoting the marriage relationship is not based on anachronistic notions of morality. The policy favoring marriage is 'rooted in the necessity of providing an institutional basis for defining the fundamental relational rights and responsibilities of persons in organized society.' [Citation.]" (*Elden* v. *Sheldon*, *supra*, 46 Cal.3d at p. 275.)

Moreover, the legislative history suggests the Legislature's purpose in adding "marital status" to the list of proscribed bases for discrimination primarily was to protect single men and women, students, widows and widowers, divorced persons, and unmarried persons with children. Even assuming as we do (see *Hess* v. *Fair Employment & Housing Com.*, *supra*, 138 Cal.App.3d at p. 235; *Atkisson* v. *Kern County Housing Authority*, *supra*, 59 Cal.App.3d at p. 99) that "marital status" in its broadest, generic sense includes unmarried couples, a hierarchy still emerges from within the classification because the state's interest in prohibiting discrimination in housing against, for example, a widower or an unmarried woman with children is more compelling than is its interest in prohibiting discrimination against unmarried couples. To conclude otherwise would defeat the state's strong interest in promoting marriage. (*Elden* v. *Sheldon*, *supra*, 46 Cal.3d at p. 274; see *Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 9 [192 Cal.Rptr. 134, 663 P.2d 904] ["We reaffirm our recognition of a strong public policy favoring marriage. [Citation.] No similar public policy favors the maintenance of nonmarital relationships."].) In short, we find no evidence the Legislature considers the extension to unmarried couples of all rights enjoyed by married couples a compelling state interest. [End of quoted portion of Court of Appeal opinion.]

It is also noteworthy that simultaneously with the additions of "sex" and "marital status" as proscribed grounds of housing discrimination, the Legislature added provisions which *authorize* public and private postsecondary educational institutions to provide accommodations limited on the basis of sex or marital status but not on the basis of race, religion, or national origin. (Stats. 1975, ch. 1189, pp. 2942-2948; see also Stats. 1975 (Reg. Sess.) Summary Dig., ch. 1189, p. 322.) Government Code section 12995 provides in relevant part: "Nothing contained in this part relating to discrimination in housing shall be construed to: [¶] . . . [¶] (2) Prohibit any postsecondary

educational institution, whether private or public, from providing housing accommodations reserved for either male or female students so long as no individual person is denied equal access to housing accommodations, or from providing separate housing accommodations reserved primarily for married students or for students with minor dependents who reside with them. [¶] (3) Prohibit selection based upon factors other than race, color, religion, sex, marital status, national origin, [or] ancestry . . . ."

In short, the Legislature has reiterated that discrimination on the basis of race or creed is intolerable, but has recognized that in certain instances discrimination on the basis, for example, of marital status, is permissible given what it perceives to be the greater public benefit. Surely, petitioner's fundamental federally guaranteed free exercise rights are entitled to no less deference and respect.

Indeed, as the Court of Appeal below aptly observed, "The exemption of Government Code section 12995 for postsecondary educational institutions, if applied to these complainants, would render an anom[a]lous result. Complainant Randall was at the time of this action a student at California State University at Chico. University officials could legally have denied complainants accommodations to live together in married student housing because of their unmarried status. Yet, [petitioner's] refusal to rent to complainants because of her religious beliefs has brought down on her the wrath of the state for doing the very thing the state, as landlord, could do with impunity. Thus, the state is, hypocritically, coercing [petitioner] to 'do as it says, not as it does.' "

As one commentator has observed: "[A] State's failure to eliminate other serious forms of discrimination suggests that the State itself currently views the interest in eliminating marital-status discrimination as somewhat less than compelling." (Comment (1995) 108 Harv. L.Rev. 763, 767.)

Assuming arguendo the state can demonstrate a sufficient "compelling governmental interest" under RFRA, a complete balancing analysis under the mandate of that federal statutory scheme requires further inquiry into whether the state can demonstrate that the challenged rule or statute "is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000bb-1(b).)

I believe it would be administratively feasible to grant petitioner an individualized exemption from FEHA's prohibition against housing discrimination based on marital status, on a proper showing that all the elements of RFRA's balancing test were satisfied. FEHA's statutory scheme plainly includes an administrative mechanism for enforcement that would be capable of assessing, on an individualized, case-by-case basis, the validity of a claimed entitlement to an RFRA-based exemption. The statutory scheme

affords a landlord the right to an administrative hearing, and an individualized determination of whether he or she has discriminated in violation of the law. (Gov. Code, §§ 12980-12981.) A landlord who contends that religious beliefs prohibit him or her from renting to unmarried cohabiting couples should be permitted to raise an RFRA-based defense at such a hearing. The hearing officer can take evidence on the questions of the sincerity of the landlord's religious beliefs, whether those beliefs are substantially burdened by the challenged provision of the state's fair housing laws, whether the state can meet its burden of demonstrating a compelling interest in eliminating the discrimination to which the challenged provision is directed, and lastly, whether application of the challenged provision to the landlord is the least restrictive means of furthering that compelling governmental interest. Moreover, the Commission can intervene to hear the case itself, as was done here (see Gov. Code, § 11517, subd.(c)), and judicial review of any determination by way of a petition for mandamus relief is available to the parties. (Code Civ. Proc., § 1094.5.)

On the question of whether the state, at such a hearing, could likely meet its burden under RFRA of demonstrating that the provision of FEHA here under scrutiny is the "least restrictive means" of furthering the antidiscrimination policy to which it is addressed, I share the viewpoint expressed by Justice Kennard, who, in her concurring and dissenting opinion, explains: "[I]n this case the religious beliefs of landlord Smith and others similarly situated are at odds with their economic self-interest, further reducing the probability that a religious exemption would seriously affect the housing market for unmarried heterosexual couples. In the case of religious objections to a tax or a claim for a religious exemption that expands a religious believer's entitlement to government benefits, religious belief aligns with economic self-interest. This confluence of religious and economic motives may in some cases encourage phony claims of religious conflict. Here, by contrast, Smith's sincerely held religious beliefs are contrary to her economic self-interest, for by excluding unmarried heterosexual couples she is artificially reducing demand, and thus the price she can command, for her rental housing. This further reduces the likelihood that there will be a mass movement of landlords seeking to refuse rentals on religious grounds to unmarried heterosexual couples." (Conc. & dis. opn. of Kennard, J., *ante,* at pp. 1213-1214.)

In that same vein are the following observations of the Court of Appeal below; with which I also agree: "The instant case does not raise the spectre of floodgates opened to a myriad of exemptions from the state antidiscrimination law. To the contrary, we are confronted with a single landlord with two duplexes whose religious convictions will be violated if she is forced to rent her premises to unmarried couples. There is nothing in the record to

indicate the number of landlords similarly circumstanced is so great as to cause a serious shortage of housing for unmarried couples. There likewise is no evidence in the record to indicate landlords all over the state will suddenly experience religious conversions in order to obtain exemption from the statutory proscription of discrimination on the basis of marital status. In fact, the economic interests of landlords as a class would counsel otherwise."

Given these realities, and the record before us, it is far from clear to me that the state could meet its burden of demonstrating that the blanket application of Government Code section 12955, subdivisions (a) and (d) to petitioner constitutes the least restrictive means of enforcing the state's policy of prohibiting housing discrimination against unmarried cohabiting heterosexual couples. In any event, the specific requirements of RFRA were never directly addressed below (see *post*, at p. 1251), and as I shall conclude, this case should therefore be remanded for further proceedings consistent with the mandate of that federal legislation.

## V

Given my conclusion that RFRA applies to this case, that the federal legislation affords petitioner in the first instance statutory protection of her right to free exercise of her religion, that the balancing test mandated under RFRA was never directly invoked below, and that therefore this matter should be remanded for a full and proper application of that test to the facts of this case, I would not address petitioner's further claims under the federal or state Constitution. Because Justice Kennard would go even farther and find, on the record before us, that RFRA prohibits the Commission from applying FEHA to petitioner, she likewise stands on firm ground in concluding that she need not address petitioner's claims under the state Constitution. (Conc. & dis. opn. of Kennard, J., *ante*, at pp. 1214-1215.) The lead opinion and concurring opinion of Justice Mosk are not on such firm footing.

It is suggested in the lead opinion that the question of whether the California Constitution's free exercise clause (art. I, § 4) is *more protective* than the federal Constitution's free exercise clause (U.S. Const., 1st Amend.) is, to date, not definitively settled. (Lead opn., *ante*, at p. 1179.) That may be so. We are all seemingly in agreement, however, that the protection afforded petitioner's right of religious liberty under our state Constitution is *at least* as extensive as that afforded her under the federal Constitution. The lead opinion so concludes, wherein it is observed that "California courts have typically construed the provision [art. I, § 4] to afford the same protection for religious exercise as the federal Constitution before *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra*, 494 U.S. 872. Indeed, our more recent cases treat the state and federal free exercise clauses as interchangeable and apply, to both, the compelling state interest test articulated in

*Sherbert* v. *Verner, supra,* 374 U.S. 398, and *Wisconsin* v. *Yoder, supra,* 406 U.S. 205. (See *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 138-141 [253 Cal.Rptr. 1, 763 P.2d 852] [evaluating, under *Yoder,* the claim of a criminal defendant that his failure to obtain medical treatment for a child was religiously motivated]; *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1112-1120 [252 Cal.Rptr. 122, 762 P.2d 46] [rejecting, under *Yoder,* the defense of religious motivation to a cause of action for fraud]; *In re Arias* (1986) 42 Cal.3d 667, 692 [230 Cal.Rptr. 505, 725 P.2d 664] [applying *Sherbert* to prohibit electronic monitoring devices in the chapel of a Youth Authority facility]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718, fn. 1 [40 Cal.Rptr. 69, 394 P.2d 813] [reversing, under *Sherbert,* a conviction for using peyote as a sacrament of the Native American Church].)" (Lead opn., *ante,* at pp. 1177-1178.)

The lead opinion concludes that "[u]nder the approach of these cases, the analysis that disposes of Smith's claim under RFRA also disposes of her claim under article I, section 4, of the state Constitution." (Lead opn., *ante,* at p. 1178.) I respectfully disagree. The four decisions of this court noted in the quoted portion of the lead opinion, and relied on by the plurality herein, were decided *prior to* the high court's decision in *Smith, supra,* 494 U.S. 872. All were decided *before* the enactment of RFRA, which legislation was passed in response to the holding in *Smith.* I am aware of no case decided by this court since *Smith* was handed down in which we have *limited* the scope of protection of religious liberty afforded under article I, section 4 of our state Constitution in the manner in which the high court in *Smith* limited the constitutional interpretation of the protection of religious liberty under the First Amendment to the United States Constitution.

Nor, until today, has this court ever suggested that the scope of protection of religious liberty under the free exercise clause of the First Amendment as construed in *Smith, supra,* 494 U.S. 872, or under RFRA, or under any case that has sought to interpret the scope of that federal legislation, has any bearing on the protection of religious liberty as independently guaranteed under article I, section 4 of our state Constitution. It is simply incorrect for the subscribers to the lead opinion's interpretation of RFRA to suggest that the disposition of petitioner's claim, purportedly thereunder, somehow "disposes of her claim under article I, section 4, of the state Constitution." (Lead opn., *ante,* at p. 1178.) And it would likewise be incorrect to conclude that the plurality's "majority" holding today, reached under the rationale of *Smith, supra,* 494 U.S. 872, stands as a definitive interpretation of the scope of religious protection afforded under the free exercise clause of article I, section 4 of our state Constitution.

Justice Kennard and we, having concluded that the federal statute (RFRA) affords *protection* of petitioner's fundamental right to the free exercise of her

religion, have no compelling need or occasion to address petitioner's further state constitutional challenge to the provision of FEHA here in question. Fundamentally, under the supremacy clause of the federal Constitution (U.S. Const., art. VI, cl. 2), the provisions of RFRA must prevail over state law to the contrary.

The plurality, in contrast, having found no protection of petitioner's fundamental free exercise rights under federal statutory or constitutional law, is obligated to further address petitioner's claims under the state Constitution in a meaningful manner. The plurality has not done so.

The lead opinion states: "[Petitioner's] claim to an exemption implicates three areas of law: the First Amendment to the United States Constitution, the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb et seq.), and article I, section 4, of the California Constitution. We consider each in turn." (Lead opn., *ante*, at p. 1161.) The lead opinion goes on to hold: "The First Amendment does not support [petitioner's] claim. Her religion may not permit her to rent to unmarried cohabitants, but 'the right of free exercise does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."' (*Employment Div., Ore. Dept. of Human Res.* v. *Smith* (1990) 494 U.S. 872, 879 [108 L.Ed.2d 876, 886, 110 S.Ct. 1595], quoting *United States* v. *Lee* (1982) 455 U.S. 252, 263, fn. 3 [71 L.Ed.2d 127, 136, 102 S.Ct. 1051].) The statutory prohibition against discrimination because of marital status (Gov. Code, § 12955) is a law both generally applicable and neutral towards religion. The law is generally applicable in that it prohibits all discrimination without reference to motivation. The law is neutral in that its object is to prohibit discrimination irrespective of reason—not because it is undertaken for religious reasons. (See *Church of Lukumi.* v. *Hialeah* (1993) 508 U.S. 520, __ [124 L.Ed.2d 472, 512, 113 S.Ct. 2217].) Consequently, section 12955 does not violate the free exercise clause as interpreted in *Employment Div., Ore. Dept. of Human Res.* v. *Smith, supra.* [¶] The foregoing principles reflect the latest evolution in the United States Supreme Court's understanding of the free exercise clause. . . . [T]hey bar [petitioner's] claim *under the federal Constitution* to an exemption from FEHA . . . ." (Lead opn., *ante*, at pp. 1161-1162.)

The lead opinion, together with Justice Mosk's separate concurring opinion, therefore form a majority *only* for the proposition that petitioner's free exercise claims must fail under the First Amendment to the federal Constitution as interpreted by *Smith, supra*, 494 U.S. 872. That being the only true majority holding in this case, the failure of the plurality to reckon with petitioner's state constitutional claims takes on added significance. One might ask—in light of the majority holding of this case—can the plurality

reasonably avoid further scrutiny of petitioner's claims under the state Constitution's free exercise clause of article I, section 4? Are the lead and concurring opinions suggesting, without independent analysis, that the protection of religious liberty afforded under the free exercise clause of the California Constitution is henceforth to be limited in the same manner that the First Amendment's protection of religious liberty was limited by the high court in *Smith*? For some further guidance, we might turn to the plurality of opinions filed in one of this court's most recent religious liberties cases— *Sands* v. *Morongo Unified School Dist.* (1991) 53 Cal.3d 863 [281 Cal.Rptr. 34, 809 P.2d 809] (*Sands*).

In *Sands, supra,* 53 Cal.3d 863, a plurality of this court held that a school district's practice of conducting prayers at public school graduation ceremonies violated the establishment clauses of both the federal (U.S. Const., 1st Amend.) and state (art. I, § 4) Constitutions. (53 Cal.3d at p. 867.) I dissented. Because I concluded that the First Amendment does not bar all religious content in public high school graduation ceremonies, I recognized that the restrictions of the California Constitution to the issue there at hand would also have to be addressed by this court. (*Sands, supra,* 53 Cal.3d 863, 945 (dis. opn. of Baxter, J.).)

The plurality in *Sands, supra,* 53 Cal.3d 863, could have reached its conclusion under the federal Constitution alone, for once it determined the school district's practice of conducting prayers at public school graduation ceremonies violated the establishment clause of the federal Constitution (contrary to my own views in that case), nothing in the California Constitution, or any other source of California law, could have validated the school prayer practices. (U.S. Const., art. VI, cl. 2.) Still, the plurality in *Sands* proceeded to invoke article I, section 4 of the California Constitution as an independent ground for striking down such school prayers. (*Sands, supra,* 53 Cal.3d at p. 867.)

In a separate concurring opinion in *Sands, supra,* 53 Cal.3d 863, Chief Justice Lucas—who joined in the plurality's holding that the school prayer practices there in question violated the establishment clause of the First Amendment under the "*Lemon* test" (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105])—further concluded, in light of that finding of a violation under the federal Constitution, that the *Sands* plurality need not have, and should not have, reached petitioners' further claims that the prayer practices also violated article I, section 4 of the California Constitution. (*Sands, supra,* 53 Cal.3d 863, 902-905 (conc. opn. of Lucas, C. J.).)

In his separate concurring opinion in *Sands, supra,* 53 Cal.3d 863, Justice Mosk, in full agreement with the majority's determination to ground its

holding, in part, on the provisions of the state Constitution, offered some observations about when this court should look to the California Constitution's independent guarantee of religious rights in the face of a party's claim that his rights thereunder are being abridged by some governmentally sanctioned law, rule, or practice. In my view, Justice Mosk's observations in *Sands* take on particular importance and relevance in the context of the legal issue presented in this case.

In *Sands, supra,* 53 Cal.3d 863, Justice Mosk first registered his belief that "religious invocations and benedictions at public high school graduation ceremonies violate both the federal and California Constitutions." (*Id.* at p. 905 (conc. opn. of Mosk, J.).) He then turned his attention to that aspect of Chief Justice Lucas's concurring opinion in *Sands,* paraphrased above, which suggested that where a governmental law, rule or practice is found unconstitutional under the United States Constitution, this court is not compelled to reach a petitioner's related claims under the state Constitution. Justice Mosk offered the following observations in response to Chief Justice Lucas's separate concurrence:

"[A]s the highest court of this state, we are independently responsible for safeguarding the rights of our citizens. State courts are, and should be, the first line of defense for individual liberties in the federal system. It is unnecessary to rest our decision on federal authority when the California Constitution alone provides an independent and adequate state constitutional basis on which to decide. (See, e.g., *People* v. *Brisendine* (1975) 13 Cal.3d 528, 551 [119 Cal.Rptr. 315, 531 P.2d 1099].)

"In his separate concurrence the Chief Justice virtually begs the Supreme Court to relieve us of our duty under the Constitution of California. Such a supplication is unprecedented. We are not a branch of the federal judiciary; we are a court created by the Constitution of California and we owe our primary obligation to that fundamental document. Only if an issue cannot be determined with finality under state constitutional doctrine do we turn to federal authority for assistance.

"The Chief Justice suggests that *after* federal review we may possibly consider state constitutional issues. This is not only the horse trailing the cart, it results in unnecessary delay, additional costs to the parties—one here being a tiny school district—and a duplicative burden on judicial resources. *State law and state constitutional principles should be our first, not our last, referent.*

"The Minnesota Supreme Court experience should be a lesson to us. In *State* v. *Hershberger* (Minn. 1989) 444 N.W.2d 282, the court held the Amish are entitled to religious exemption from certain traffic requirements. The United States Supreme Court granted certiorari, took the case over, and

then remanded for consideration in the light of its opinion in *Employment Div. Dept. of Human Resources of Oregon* v. *Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595] [holding no religious exemption for peyote users].

"On remand, the Minnesota court declined to follow *Smith*, and instead, relying on the state Constitution, reiterated its original conclusion (*State* v. *Hershberger* (Minn. 1990) 462 N.W.2d 393). While the ultimate result in Minnesota was a vindication of state constitutionalism, the delay in achieving finality, the time and expense of unnecessary proceedings, and the duplicative burden on judicial resources, should caution us against traveling the same route in the instant case." (*Sands, supra*, 53 Cal.3d at pp. 906-907 (conc. opn. of Mosk, J.), italics in original.)

Returning to the case before us, unlike the issue and holding in *Sands, supra*, 53 Cal.3d 863, here the lead and concurring opinions have not found a governmental law, rule or practice violative of the federal Constitution. FEHA's prohibition against housing discrimination based on marital status was not being challenged as unconstitutional in the proceedings below. Instead, we have an individual, petitioner Evelyn Smith, who, based on the particular facts and circumstances of this case, is seeking an individualized exemption from FEHA's requirement that she go against her sincerely held fundamental religious beliefs and offer her rental units for lease to unmarried cohabiting heterosexual couples. These are religious beliefs which, we might add, undeniably enjoy *some* level of protection under our state Constitution, particularly so where a plurality of this court is finding that they enjoy virtually no such protection under the "latest evolution in the United States Supreme Court's understanding of the [First Amendment's] free exercise clause." (Lead opn., *ante*, at p. 1162.)

The views of Justice Mosk, as set forth in his separate concurring opinion in *Sands, supra*, 53 Cal.3d 863, would therefore appear to me to have more pertinent application to this case. Without further critical analysis, I would not read the lead opinion and concurring opinion of Justice Mosk as together definitively setting forth the scope of protection of religious liberty under the free exercise clause of our state Constitution.

CONCLUSION

The hearing before the administrative law judge in this case, and the subsequent proceedings had before the Commission, were conducted in 1988 and 1989, well before RFRA's enactment and, indeed, prior to the high court's decision in *Smith, supra*, 495 U.S. 874, which prompted Congress to enact the remedial legislation. RFRA, by its own terms, is broadly and expressly retroactive, "appl[ying] to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether

adopted before or after [November 16, 1993 (the date on which RFRA became effective)]." (42 U.S.C. § 2000bb-3(a).) RFRA mandates retroactive application of the compelling interest test to petitioner's free exercise claim. Application of that test in turn requires that findings of fact be made, and various factors balanced, toward determining whether the state can meet its burden of demonstrating that the housing discrimination provision in question is the "least restrictive means" of implementing a "compelling governmental interest" in furtherance of the statute's purpose, or whether petitioner is instead entitled to an individualized exemption from the provision based on the particular facts of this case. The specific procedures outlined in RFRA were not in effect at the time the Commission heard this case and found petitioner in violation of FEHA, nor did the Commission elect to adopt the findings and conclusions made by the administrative law judge respecting petitioner's constitutional claims. I therefore conclude the most appropriate disposition would be to remand the matter for further proceedings consistent with the requirements of that federal legislation.

I would reverse the judgment of the Court of Appeal with directions to remand this matter for further proceedings consistent with the mandate of RFRA.

Lucas, C. J., concurred.